**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| IN RE FUBOTV INC. SECURITIES LITIGATION | Case No. 1:21-CV-01412 (ALC) (JLC) <br><br> <u>CLASS ACTION</u> |

**PLAINTIFF'S MEMORANDUM OF LAW**
**IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**
<u>**THE AMENDED CLASS ACTION COMPLAINT**</u>

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................................... ii

INTRODUCTION ....................................................................................................................... 1

STATEMENT OF FACTS ........................................................................................................... 3

    A.  Defendants' Deceptive Campaign to Hype the Market Prior to its IPO ...................... 3

    B.  Fubo's House of Cards Is Dismantled .......................................................................... 4

ARGUMENT ............................................................................................................................... 6

    A.  Defendants Had a Duty to Speak Truthfully and Completely About Fubo's
        Business Operations and Financial Prospects ............................................................. 6

    B.  The AC Identifies Defendants' False and Misleading Statements .............................. 8

        1.  Defendants' Misstatements and Omissions About Fubo's Financial Model .......... 8

        2.  Defendants' Misstatements and Omissions Concerning Fubo's User
            Data and its Advertising Revenue ...................................................................... 10

        3.  Defendants' Misstatements Concerning the Sport Wagering Market .................. 11

        4.  Defendants' Misstatements and Omissions Concerning Fubo's Competitive
            Advantage Over Its Peers .................................................................................. 13

    C.  The PSLRA Safe Harbor and Bespeaks Caution Doctrine Are Not Implicated ......... 14

        1.  Defendants' Misrepresentations Were Not Forward Looking ............................. 14

        2.  Defendants' Statements Are Not Puffery ............................................................ 17

        3.  Defendants' Misstatements Are Not Opinions .................................................... 18

    D.  Plaintiff Sufficiently Pleads Scienter .......................................................................... 19

    E.  Plaintiff Has Sufficiently Pled Loss Causation ........................................................... 23

    F.  Plaintiff Stated Claim Under Section 20(a) ................................................................. 25

CONCLUSION ........................................................................................................................... 25

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re Alcatel Sec. Litig.*,
   382 F. Supp. 2d 513 (S.D.N.Y. 2005) ................................................................................. 8

*In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*,
   381 F. Supp. 2d 192 (S.D.N.Y. 2004) ............................................................................... 21

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
   324 F. Supp. 2d 474 (S.D.N.Y. 2004) ............................................................................... 20

*In re Bear Stearns Cos., Inc. Sec., Deriv., & ERISA Litig.*,
   763 F. Supp. 2d 423 (S.D.N.Y. 2011) ............................................................................... 24

*Behrendsen v. Yangtze River Port & Logistics Ltd.*,
   No.19-00024, 2021 WL 2646353 (E.D.N.Y. June 28, 2021) ............................................ 24

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ............................................................................................................ 7

*In re BioScrip, Inc. Sec. Litig.*,
   95 F. Supp. 3d 711 (S.D.N.Y. 2015) ................................................................................... 7

*In re BOFI Holdings, Inc. Sec. Litig.*,
   977 F.3d 781 (9th Cir. 2020), cert. denied sub nom. BOFI Holding, Inc.
   v. Houston Mun. Emps. Sys.*, No. 20-1364, 2021 WL 4507646 (U.S. Oct. 4, 2021) .......... 12, 13

*Born v. Quad/Graphics, Inc.*,
   521 F. Supp. 3d 469 (S.D.N.Y. 2021) ................................................................................. 8

*C.D.T.S. v. UBS AG*,
   No. 12 CIV. 4924 KBF, 2013 WL 6576031 (S.D.N.Y. Dec. 13, 2013),
   *aff'd, 604 F.* App'x 5 (2d Cir. 2015) ................................................................................. 25

*Campo v. Sears Holdings Corp.*,
   371 F. App'x. 212 (2nd Cir. 2010) ..................................................................................... 21

*Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*,
   543 F. App'x 72 (2d Cir. 2013) .......................................................................................... 24

*In re Chicago Bridge & Iron Co. N.V. Sec. Lit.*,
   No. 17 CIV. 01580 (LGS), 2019 WL 5287980 (S.D.N.Y. Oct. 18, 2019) .............................. 24

*Citiline Holdings, Inc. v. iStar Fin., Inc.*,
   701 F. Supp. 2d 506 (S.D.N.Y. 2010)......................................................................... 23

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
   450 F. Supp. 3d 379 (S.D.N.Y. 2020)........................................................................... 7

*City of Pontiac Gen. Empls. Ret. Sys. v. Lockheed Martin Corp.*,
   875 F. Supp. 2d 359 (S.D.N.Y. 2012)................................................................... 20, 22

*In re Comput. Assoc. Class Action Sec. Litig.*,
   75 F. Supp. 2d 68 (E.D.N.Y. 1999).............................................................................. 17

*Constr. Laborers Pension Tr. for S. California v. CBS Corp.*,
   433 F. Supp. 3d 515 (S.D.N.Y. 2020)............................................................................ 8

*Cornwell v. Credit Suisse Grp.*,
   689 F. Supp. 2d 629 (S.D.N.Y. 2010)......................................................................... 21

*In re CRM Holdings, Ltd. Sec. Litig.*,
   No. 10 CIV. 975 RPP, 2012 WL 1646888 (S.D.N.Y. May 10, 2012)...................................... 24

*In re Doral Fin. Corp. Sec. Lit.*,
   563 F. Supp. 2d 461 (S.D.N.Y. 2008), *aff'd,* 344 F. App'x 717 (2d Cir. 2009) ........................ 21

*Ellenburg v. J.A. Solar Holdings Co.*,
   No. 08 Civ. 10475(JGK), 2010 WL 1983375 (S.D.N.Y. May 17, 2010) ................................. 19

*Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*,
   343 F.3d 189 (2d Cir. 2003)....................................................................................... 24

*Empls. Ret. Sys. of Gov't of the Virgin Islands v. Blanford,*
   794 F.3d 297 (2d Cir. 2015)....................................................................................... 10

*In re Ford Fusion & C-MAX Fuel Econ. Lit.*,
   No. 13-MD-2450 (KMK), 2017 WL 3142078 (S.D.N.Y. July 24, 2017) ................................. 17

*Francisco v. Abengoa, S.A.*,
   481 F. Supp. 3d 179 (S.D.N.Y. 2020)......................................................................... 21

*Freudenberg v. E\*Trade Fin. Corp.,*
   712 F. Supp. 2d 171 (S.D.N.Y. 2010)................................................................. 9, 15, 21

*Galestan v. OneMain Holdings, Inc.*,
   348 F. Supp. 3d 282 (S.D.N.Y. 2018)......................................................................... 17

*Ganino v. Citizens Utils. Co.*,
   228 F.3d 154 (2d Cir. 2000)....................................................................................... 13

*Gauquie v. Albany Molecular Research, Inc.*,
No. 14-CV-6637 (FB) (SMG), 2016 WL 4007591 (E.D.N.Y. July 26, 2016) ........................ 20

*Glaser v. The9, Ltd.*,
772 F. Supp. 2d 573 (S.D.N.Y. 20111) .................................................................................. 21

*Hall v. The Children's Place Retail Stores, Inc.*,
580 F. Supp. 2d 212 (S.D.N.Y. 2008) .................................................................................... 15

*In re Inv. Tech. Grp., Inc. Sec. Litig.*,
251 F. Supp. 3d 596 (S.D.N.Y. 2017) ................................................................................ 7, 19

*Iowa Pub. Emps. Ret. Sys. v. MF Global, Ltd.*,
620 F.3d 137 (2d Cir. 2010) ................................................................................................... 10

*In re IPO Sec. Litig.*,
358 F. Supp. 2d 189 (S.D.N.Y. 2004) .................................................................................... 15

*In re IPO Sec. Litig.*,
544 F. Supp. 2d 277 (S.D.N.Y. 2008) ...................................................................................... 2

*Kuriakose v. Fed. Home Loan Mortg. Corp.*,
897 F. Supp. 2d 168 (S.D.N.Y. 2012) .................................................................................... 22

*Lau v. Opera Ltd.*,
527 F. Supp. 3d 537 (S.D.N.Y. 2021) .................................................................................... 21

*Long Miao v. Fanhua, Inc.*,
442 F. Supp. 3d 774 (S.D.N.Y. 2020) .................................................................................... 22

*In re Lululemon Sec. Litig.*,
14 F. Supp. 3d 553 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015) ...................... 21, 22

*Manavazian v. Atec Grp.*,
160 F. Supp. 2d 468 (E.D.N.Y. 2001) .................................................................................... 17

*In re Marsh & McClennan Cos., Inc. Sec. Litig.*,
501 F. Supp. 2d 452 (S.D.N.Y. 2006) ................................................................................ 21, 22

*Meyer v. Greene*,
710 F.3d 1189 (11th Cir. 2013) .............................................................................................. 25

*Meyer v. JinkoSolar Holdings Co.*,
761 F.3d 245 (2d Cir. 2014) ................................................................................................... 16

*In re MF Global, Holdings Ltd. Sec. Litig.*,
982 F. Supp. 2d 277 (S.D.N.Y. 2013) .................................................................................... 14

iv

*In re Mindbody, Inc. Sec. Litig.*,
  489 F. Supp. 3d 188 (S.D.N.Y. 2020) ............................................................................... 7

*In re Morgan Stanley Info. Fund Sec. Litig.*,
  592 F.3d 347 (2d Cir. 2010) ............................................................................................. 7

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
  455 F. App'x 10 (2d Cir. 2011) ....................................................................................... 22

*In re Nokia Corp. Sec. Litig.*,
  No. 19-CV-3509, 2021 WL 1199030 (S.D.N.Y. Mar. 29, 2021) ................................... 8

*In re Nortel Networks Corp. Sec. Litig.*,
  238 F. Supp. 2d 613 (S.D.N.Y. 2003) ........................................................................... 16

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000) ............................................................................................. 7

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
  575 U.S. 175 (2015) ...................................................................................... 7, 17, 18, 19

*In re Omnicom Grp., Inc. Sec. Litig.*,
  597 F.3d 501 (2d Cir. 2010) ........................................................................................... 25

*In re Optionable Sec. Litig.*,
  577 F. Supp. 2d 681 (S.D.N.Y. 2008) ........................................................................... 21

*In re OSG Sec. Litig.*,
  971 F. Supp. 2d 387 (S.D.N.Y. 2013) ...................................................................... 23, 24

*P. Stolz Fam. P'ship L.P. v. Daum*,
  355 F.3d 92 (2d Cir. 2004) ............................................................................................. 14

*In re Pareteum Sec. Litig.*,
  No. 19 CIV. 9767 (AKH), 2021 WL 3540779 (S.D.N.Y. Aug. 11, 2021) .................... 23

*Plumbers & Pipefitters Nat. Pension Fund v. Orthofix Int'l N.V.*,
  89 F. Supp. 3d 602 (S.D.N.Y. 2015) ............................................................................... 9

*Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*,
  694 F. Supp. 2d 287 (S.D.N.Y. 2010) ........................................................................... 22

*In re Scholastic Corp. Sec. Litig.*,
  252 F.3d 63 (2d Cir. 2001) ........................................................................................ 7, 10

*S.E.C. v. Fiore*,
  416 F. Supp. 3d 306 (S.D.N.Y. 2019) ........................................................................... 23

*Tellabs, Inc. v. Makor Issues & Rights., Ltd.*,
   551 U.S. 308 (2007) ....................................................................................................... 19

*In re Time Warner Inc. Sec. Litig.*,
   9 F.3d 259 (2d Cir. 1993) ............................................................................................... 8

*Union No. 630 Pension-Annuity Tr. Fund v. Arbitron Inc.*,
   741 F. Supp. 2d 474 (S.D.N.Y. 2010) .......................................................................... 18

*In re Vivendi, S.A. Sec. Litig.*,
   838 F.3d 223 (2d Cir. 2016) ............................................................................... 6, 15, 17

*In re Vivendi, S.A. Sec. Litig.*,
   381 F. Supp. 2d 158 (S.D.N.Y. 2003) .......................................................................... 15

*In re Wells Fargo & Co. Sec. Litig.*,
   No. 20-04494, 2021 WL 4482102 (S.D.N.Y. Sept. 30, 2021) ....................................... 13

*In re Winstar Commc'ns*,
   No. 01-11522, 2006 WL 473885 (S.D.N.Y. Feb. 27, 2006) .......................................... 24

*In re Yukos Oil Co. Sec. Litig.*,
   No. 04-5243, 2006 WL 3026024 (S.D.N.Y. Oct. 25, 2006) .......................................... 22

**Statutes**

15 U.S.C. § 78u-5(c)(1) ..................................................................................................... 15

Lead Plaintiff, Nordine Aamchoune ("Plaintiff"), respectfully submits this Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Amended Class Action Complaint pursuant to Rule 12(b)(6) ("Defs. Br.") filed by Defendant fuboTV, Inc. ("Fubo" or the "Company") and Defendants David Gandler (CEO), Edgar Bronfman Jr. (Executive Chairman), and Simone Nardi (CFO) (the "Individual Defendants," and together with Fubo, the "Defendants"). This is a federal securities class action on behalf of all persons other than Defendants who purchased or otherwise acquired common shares of Fubo between March 23, 2020 and January 4, 2021, both dates inclusive (the "Class Period").

## INTRODUCTION

The Amended Complaint ("AC" or "¶") (ECF No. 32) states actionable claims against all Defendants. Plaintiff alleges with specificity that during the Class Period, Defendants knowingly made materially false and misleading statements to public investors regarding Fubo's subscription-based financial model, its technological capabilities and their impact on advertising revenue, its prospects of meaningfully entering the online sports betting market, and its purported competitive advantages over its peers. Plaintiff has conducted a rigorous investigation and the AC meets all of the requirements of the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4, *et seq*. ("PSLRA") and Rule 9(b). Plaintiffs' allegations are supported by confidential witnesses who are former Fubo employees with direct knowledge of the subject matter at issue in this case.

The AC details CEO Gandler's active and knowing participation in the scheme by repeatedly making  bullish pronouncements, claiming Fubo was "at the forefront of the streaming revolution," with "significant advantage over [its] peers," and the ability to "leverage [its] proprietary data" to drive "advertising sales" and "margin expansion." ¶¶ 53, 67, 70. Bronfman echoed Gandler's claims, adding that Fubo "was firmly position[ed] for "long term growth" due to its due to its "differentiation in the marketplace" based on "sports-focused programming and

1

tech-first user experience." ¶69. Defendants' self-aggrandizement reached a new high — along with Fubo's stock price — in touting Fubo's entry into the "$155 billion" global sports wagering market through its "instrumental" acquisition of Balto Sports (Balto") (¶75), which purportedly provided "significant synergies" to expand the Company's "total available market." ¶75. However, a series of short seller reports revealed flaws in the Company's business model and technological deficiencies belied Fubo's claimed competitive advantages based on its differentiation in product selection and proprietary technology, and ability to attract advertising revenues. These facts were independently confirmed by confidential witnesses. The scienter allegations against Gandler are bolstered by the small size of the Company; Gandler's control over day to day operations of Fubo and his active involvement – making false and misleading statements concerning the Company's core matters he was responsible for.  *See infra*, Sec. D.

The AC adequately pleads loss causation by alleging Fubo's stock hare price declined as the truth behind Defendants' misstatements was revealed through several short seller reports.  The § 20(a) control person claim, 15 U.S.C. § 78t(a), should be sustained because Plaintiff has adequately alleged a primary violation of § 10(b) under Exchange Act. *See infra*, Secs. E and F.

Defendants' Motion misconstrues Plaintiff's pleading and ignores crucial facts.  For example, it mischaracterizes the analysts' revelations as negative opinions and claims that short seller reports cannot serve as corrective disclosures.  This argument is contrary to Second Circuit law that a corrective disclosure can be of any form or quality, so long as it reveals the falsity of prior misstatements, and the market reacts negatively to the disclosure.  *In re IPO Sec. Litig.,* 544 F. Supp. 2d 277, 289 (S.D.N.Y. 2008). Defendants also assert a laundry list of defenses, including the PSLRA safe harbor for forward looking statements, corporate optimism, and inactionable opinions, and accurate statements of historical facts.  As demonstrated herein, these arguments are

meritless and at best raise questions of fact inappropriate for resolution on a motion to dismiss.

## STATEMENT OF FACTS

### A. Defendants' Deceptive Campaign to Hype the Market Prior to its IPO

Fubo is a sports-geared vMVPD (Virtual Multichannel Video Programming Distributor) that offers subscribers access to live sporting events, news and entertainment content. ¶29. Unlike its competitors, Hulu and YouTube TV, Fubo does *not* produce its own content; it merely aggregates, and streams content generated by large networks, such as CBS, Viacom, and Disney. ¶¶30, 38. Fubo derives nearly 90% of revenue from subscription fees to access its streaming platform, while12% comes from fees generated by the placement of ads during live programming. ¶¶36-37.[1] Since its inception in 2015, Fubo burned through hundreds of millions of dollars of investors' money, which Fubo had secured through private financings. ¶32. However, by year-end 2019, its capital was depleted, leaving Fubo in dire financial straits. *Id.*

To access the desperately needed pool of capital, Fubo decided to offer its shares to the investing public in its first public offering ("IPO"). Leading up to the IPO, Fubo executives embarked on a deceptive campaign to drive up the price of Fubo securities and boost Fubo's valuation. For example, Fubo proclaimed that it was "at the forefront of the streaming revolution and has a significant advantage . . . over peers in the vMVPD space," that it was "well-positioned to achieve its goal of becoming a world-leading live TV streaming platform for premium sports, news and entertainment content," and that it would "redefine the virtual MVPD space." ¶¶39-40, 48, 57. Defendants regularly reported on its growing subscriber base (¶¶49, 53-4, 57, 67-8, 70) to create an impression it was on the "path to profitability," which is still nowhere in sight. ¶49. Fubo also continued to tout "a proprietary technology platform" and its purportedly differentiated

---

[1] Unless otherwise stated, all internal citations are omitted and all emphasis is added.

"unparalleled" sports package. ¶57.

Defendant's strategically timed IPO occurred on October 13, 2020, after months of pandemic lockdowns and coincided with major political and sport events, including the U.S. presidential election, the Masters Golf tournament, Stanley Cup, NBA playoffs, and the Super Bowl. ¶59. Simultaneous airing of these blockbuster events created a once-in-a-lifetime opportunity for Fubo to camouflage its unsustainable financial model. Fubo's Registration Statement reiterated Defendants' overblown claims about Fubo's financial model, ability to generate advertising revenue, and competitive advantages over its peers. ¶¶60-64. For example, Defendants told investors that their "business model" leverages sporting events to "acquire subscribers at lower acquisition costs" and that its "technology and data" (¶60) purportedly gave Fubo insight to "capture and analyze how our subscribers engage our offering." ¶61. This so-called proprietary technology, data and measurability purportedly attracted major advertisers. ¶62.

Following the IPO, in November 2020, Defendants claimed to have expanded into the online sports betting industry, which would become "an important contributor to [its] business." ¶66. To create a false sense of the enormous opportunity, Defendants repeatedly pointed to a $155 billion global sports wagering market, which Fubo could not even remotely attain. *Id.* On December 1, 2020, Defendants announced the acquisition of Balto, a technology company that develops fantasy sports game software. ¶75. Defendants claimed the acquisition was Fubo's "first step" into the online sports wagering and was "instrumental" for the Company. ¶75. These bold proclamations sent Fubo shares soaring to a high of $62 on December 22, 2020. ¶86.

**B. Fubo's House of Cards Is Dismantled**

On December 23, 2020, the first of a series of short-seller reports gradually exposed the truth. ¶84. Specifically, Lightshed Partners ("Lightshed")initiated coverage of Fubo with a price target of $8, calling Fubo the "most compelling short we have ever identified in our career." Based

4

on its in-depth analysis of the vMVPD and cable industries, Lightshed dismantled the Company's flawed business model which was built on misleading assumptions. Lightshed explained that Fubo's profitability depended on expanding subscriber margins through increased advertising and sports betting. However, Lightshed revealed that Fubo's technology was deficient and required a substantial investment to improve on its monthly advertising revenue per subscriber. *See* ECF No. 35-10 at 3.  Lightshed also disclosed that Fubo's entry into sports betting was nothing of the sort. The report revealed that Balto "was a failed free-to-play start-up … (which had no product or revenue or even a website.)." *Id.* at 5. Moreover, Lightshed disclosed critical facts that Fubo had omitted from Defendants' bullish pronouncements, including (i) even with 2+ million subscribers in 2025 Fubo's scale in individual states will be tiny; (ii) Fubo's had no obvious casino partners that could facilitate access to states with legalized gambling; (iii) sports betting on home TV screens  presented regulatory and consumer complexities that had no ready solutions; and (iv) Fubo's product offering was "largely undifferentiated from its peers." *Id.* As the Lightshed report observed, Fubo's bullish statements misled investors into believing that the Company was actually executing on its foray into sport betting by beginning to "view Fubo as the next FanDuel and DraftKings" based on management's "talking up the long-term potential of sports betting without specifics." *Id.* Following the report, Fubo shares plunged over 28%, or $17.82.  ¶86. On December 27, 2020, Lightshed issued its second report, elaborating on its prior conclusions, revealing that Fubo operated a "fundamentally flawed MVDP/vMVPD business" that "lack[ed] scale and other product bundles." ¶87. On this news, Fubo declined nearly 12%, or $5.24. ¶88.

On December 30, 2020, Kerrisdale Capital published its bombshell report which further dissected Fubo's financial model and provided more revelations based upon its independent investigation (the "Kerrisdale Report"). ¶¶90, 96, 100. *First,* Fubo's "core subscription business

5

was structurally unprofitable" and unsustainable "due to high variable content costs" to purchase programming and escalation provisions built into the contracts." ¶90. Fubo was losing money at the actual subscription level before the cost to acquire the subscriber, infrastructure, and G&A. *Id.* In fact*,* the content costs were — and continue to be — so significant that even if Fubo acquired 2 million subscribers, it would still not have meaningful leverage in negotiations with content providers. *See* ECF 35-8 at 15. *Second,* Kerrisdale revealed that Fubo "does not have any data or inventory that is differentiated and cannot provide the reach many advertisers crave." (¶96), which undermined Fubo's ability to attract advertisers and generate advertising revenue. Thus, contrary to Fubo's assertions, the Company had "nothing to differentiate itself" in order to sell more advertising or subscribing "levers [to] pull to meaningfully improve its pricing." *Id. Third,* the Report further exposed Defendants' misstatements about Balto and its marginal impact on Fubo's ability to capture the sports betting market. ¶100. *Fourth,* Kerrisdale revealed Fubo lacked an advantage over its peers but rather was "no different from every other distributor in the world" and had no meaningful differentiation as it relates to sports content offering. ¶38. Fubo's shares declined by 26%, or $9.70, closing at $28 on December 31, 2020 on unusually high trading volume. ¶102.

## **ARGUMENT**

A.    **Defendants Had a Duty to Speak Truthfully and Completely About Fubo's Business Operations and Financial Prospects**

"It is well-established precedent in this Circuit that once a company speaks on an issue or topic, there is a duty to tell the whole truth, even when there is no existing independent duty to disclose information" on the issue or topic. *In re Vivendi, S.A. Sec. Litig.,* 838 F.3d 223, 258 (2d Cir. 2016). Thus, a company that speaks publicly about specific aspects of its financial model, revenue streams, technological capabilities and/or competitive advantages, must speak truthfully

6

and completely. *See In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 612 (S.D.N.Y. 2017) (having chosen to speak about specific features of its business model and the advantages it offered, the company "had an obligation to ensure its statements were both accurate and complete"); *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 410 (S.D.N.Y. 2020) (finding misleading defendants' statements about "add[ing] new technologies, attractive geographic regions and end-markets" where the company was terminating experienced sales personnel that devasted its business acquisition).

Whether a statement of fact or opinion is actionable requires the Court to assess whether the statements "viewed as a whole would have misled a reasonable investor." *In re BioScrip, Inc. Sec. Litig.,* 95 F. Supp. 3d 711, 742 (S.D.N.Y. 2015). *See also In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010) (relevant inquiry is whether defendants' statements would have misled a reasonable investor); *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund,* 575 U.S. 175, 186 (2015) ("whether a statement is misleading depends on the perspective of a reasonable investor"). Accordingly, the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers. *In re Mindbody, Inc. Sec. Litig.*, 489 F. Supp. 3d 188, 208 (S.D.N.Y. 2020).

To state a claim under the PSLRA and Fed. R. Civ. P. 9(b), a plaintiff is not required to plead "detailed evidentiary matter," (*In re Scholastic Corp. Sec. Litig.,* 252 F.3d 63, 72 (2d Cir. 2001)), but simply "*sufficient* facts to support [a reasonable] belief[]" that defendants' statements were materially false or misleading. *Novak v. Kasaks,* 216 F.3d 300, 313-14 (2d Cir. 2000). The Court must accept as true all factual allegations and draw all reasonable inferences in plaintiff's favor. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

## B. The AC Identifies Defendants' False and Misleading Statements

The AC alleges that Defendants repeatedly gave one-sided bullish pronouncements about Fubo's subscription-based financial model (¶¶90-95), its technological capabilities and their impact on advertising revenue (¶¶96-99), its prospects of meaningfully entering the online sports betting market (¶¶80-82, 100), and its purported competitive advantages over its peers (¶¶107-09), while withholding adverse facts that "would place [those statements] in a materially different light" with public investors. *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 268 (2d Cir. 1993).[2] As revealed in the Lighshed and Kerrisdale reports in December 2020, Fubo's public disclosures omitted material facts, including: (i) exorbitantly high costs for programming content combined with escalation provisions that rendered Fubo's subscription-based profitability unattainable, and had caused several critical deals to crater (¶¶90-95); (ii) Fubo's inability to collect and differentiate user data necessary to attract advertisers (¶¶96-99); (iii) the inconsequential impact of the Balto acquisition (¶¶80-82, 100); and (iv) Fubo's lack of competitive advantages over its peers (¶¶107-09).  Each of these misstatements and omissions is discussed below.

### 1. Defendants' Misstatements and Omissions About Fubo's Financial Model

Throughout the Class Period, Defendants engaged in unrestrained self-aggrandizement to convince the public of Fubo's ability to grow subscribers and expand into new markets. *See e.g.,* ¶¶39, 48, 53, 55-56. For example,  Fubo's July 8, 2020 press release, which was attached as Exhibit

---

[2] The AC identified four categories of misstatements in 15 pages that span less than 10-month Class Period. ¶¶29-82. Plaintiff included, for context and clarity, a few block quotes while emphasizing key language - a pleading style entirely proper, particularly in light of the AC's overall detailed, well-pled factual allegations -- followed by explanation as to why the statements are false and misleading. *See Constr. Laborers Pension Tr. for S. California v. CBS Corp.,* 433 F. Supp. 3d 515, 530 (S.D.N.Y. 2020). Defendants nevertheless seek to summarily dismiss the AC on the grounds of Plaintiff's "lengthy" allegations. Def. Br. at 8-9. Defendants misleadingly compare Plaintiff's AC to several inapposite cases. *See Born v. Quad/Graphics, Inc*., 521 F. Supp. 3d 469, 478 (S.D.N.Y. 2021) (involving 100-page, 268-paragraph complaint containing 30 pages worth of misstatements spanning an 18-month Class Period and continuous half-page long single-spaced text); *In re Alcatel Sec. Litig*., 382 F. Supp. 2d 513, 534 (S.D.N.Y. 2005) (involving 102-page and 250-paragraph complaint); *In re Nokia Corp. Sec. Litig*., No. 19-CV-3509, 2021 WL 1199030, at *14 (S.D.N.Y. Mar. 29, 2021) (involving 35-pages of misstatements mostly comprising of lengthy half- and full-page block quotes).

99.1 to Fubo's SEC Form 8-K signed by Gandler, highlighted Fubo's subscription-based financial model, claiming that Fubo was positioned to attain scale and thereby advance on its "path to profitability" — a factor that was immensely important to investors. But far from being revolutionary, Fubo's subscription-based financial model was flawed and unsustainable because it was subject to exorbitantly high programming content costs with undisclosed escalation provisions. ¶¶90-92. These contractual limitations were so significant that even a massive increase in Fubo's subscription base would not provide the scale necessary for Fubo to generate any profit or lead to "improved margins." *Id.* These contract limitations contradicted Fubo's claims that it was on the "path to profitability" and prevented Fubo from acquiring subscribers at "lower acquisition costs" and/or to lower its content expenses. *Id.* CW #1 independently confirmed that the prohibitively high costs contributed to losing or failing to renew at least two lucrative contracts. ¶¶90, 95. The deal to acquire Sony's PlayStation Vue failed to materialize because Fubo was not in the position to absorb the high content costs, notwithstanding Gandler's boast that the deal would provide the means to capture PlayStation Vue's subscriber base and enhance Fubo's brand. *Id.* The second failed deal involved Fubo's rights to stream "Game of Thrones," which fell through at the last minute and after Fubo had already acquired some of the episodes for the show. *Id.*

Defendants do not (and cannot) dispute CW #1's testimony at the pleading stage. Instead, they seek to dismiss it altogether on the grounds that the CW #1 left the Company one-month prior to the Class Period. Def. Br. at 12.[3] However, the Second Circuit has previously rejected identical

---

[3] "Information from confidential witnesses can be relied upon provided the confidential witnesses are described with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Freudenberg v. E\*Trade Fin. Corp.,* 712 F. Supp. 2d 171, 196 (S.D.N.Y. 2010). Here, the allegations made by CW #3 in AC ¶109 undercut Defendants' argument that "[n]one of these allegations show that Mr. Gandler had any information 'highlighting the falsity of public statements.'" Defs. Br. at 22. There is no requirement of direct contact to sufficiently allege the probability that a person in the source's position would possess the information alleged. *See Plumbers & Pipefitters Nat. Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 615–16 (S.D.N.Y. 2015).

arguments, holding that "allegations concerning activity in one period can support an inference of similar circumstances in a subsequent period." *Empls. Ret. Sys. v. Blanford*, 794 F.3d 297, 307 (2d Cir. 2015); *Iowa Pub. Emps. Ret. Sys. v. MF Global, Ltd.*, 620 F.3d 137, 143 (2d Cir. 2010) (finding error in dismissing plaintiffs' claim because the allegations focused on risk-management problems six months after the disclosures were made); *Scholastic Corp.*, 252 F.3d at 72 (considering pre-class period information to establish defendants' knowledge at the start of the class period, defendants had a basis for knowing" certain information and holding that "[a]ny information that sheds light on whether class period statements were false or materially misleading is relevant."). Disregarding statements of the CWs is particularly unwarranted where, as here, their statements are linked to defendants' misstatements during the class period. *See Blanford*, 794 F. 3d at 307.

### 2.   Defendants' Misstatements and Omissions Concerning Fubo's User Data and its Advertising Revenue

As detailed in the AC (¶¶46, 56-57, 60-61, 66, 72), Defendants falsely touted Fubo's proprietary technology and its ability to convert user data to advertising dollars. *See, e.g.*, ¶¶43, 61-62, 64, 70, 71. For example, Fubo's Prospectus, signed by Individual Defendants, claimed a "significant opportunity [ ] to allow advertisers to access our audience by leveraging our technology, data, and measurability to drive returns on advertising spend," so that Fubo's platform was "highly attractive to advertisers." ¶62. In the context of discussing its purported competitive strengths, Defendants claimed that the "proprietary technology and first party data" allowed Fubo to "capture and analyze how our subscribers engage [its] offering." ¶61. Similarly, during the 3Q 2020 earnings call, Gandler stated that Fubo could "leverage [its] proprietary data" to drive "advertising sales" and "margin expansion." ¶70. The 2019 Annual Report also reported that Fubo is "increasingly leveraging our data and analytics capabilities to optimize advertisements." ¶98.

However, Kerrisdale revealed that Fubo did not have data or inventory that was

10

differentiated and could not "provide the reach that many advertisers craved." ¶96. Thus, contrary to Fubo's bullish statements, the Company had "nothing to differentiate itself" or "ability to leverage [] proprietary data." *Id.* CW #1 confirmed Fubo did not possess enough lucrative data that could be shared with content providers for targeted advertising and that "[Fubo was] very limited on targeted ads." ¶97. CW #1 further specified that at meetings with content providers, Fubo's negotiating team admitted that it does "[not] have the ability to provide user data." ¶97. This, according to CW #1, was due to limitations in the technical backend of the Company ¶¶ 6, 99 – a fact entirely unknown to the investing public.

### 3.    Defendants' Misstatements Concerning the Sport Wagering Market

Even before the Company publicly announced its decision to acquire Balto, Defendants began to prime the market for the news. ¶66. In a shareholder letter dated November 10, 2020, Bronfman represented that Fubo's goal as it comes to sports wagering "was to develop a new revenue stream for [Fubo], and one which we believe will be an important contributor to Fubo's busines." ¶66. During an analysts' conference call that same day, Gandler reinforced his message. In response to a direct question from Evercore ISI regarding Fubo's plan on expanding sports gambling, Gandler represented that Fubo had already started "executing on its [wagering] strategy" and that it will be "able to also sell a lot of wagering opportunities." *Id.* Having conditioned market expectations, Defendants had no difficulty convincing investors that the acquisition of Balto was "instrumental" to Fubo's entry into the online sports wagering market (¶66); would deliver a "truly groundbreaking live TV streaming platform to consumers,"(¶75); and that "significant synergies" existed between subscribers to Balto and Fubo, which Fubo could monetize by expanding its "total available market" and "developing another important revenue stream for fuboTV." *Id.* Furthermore, on December 9, 2020, Defendants affirmatively represented that the acquisition will "allow [Fubo] to really build something compelling," based on the "very specific skill set" as well

11

as Balto's "resources and the metadata mapping." ¶78. Defendants thereby created a false impression of the scale of the acquisition which misled investors to believe that Fubo was targeting a multibillion dollar constituency as potential subscribers. Accordingly, these and other bullish pronouncements sent Fubo stock soaring to a high of $62 on December 22, 2021. ¶86.

For all the public fanfare touting the Balto deal, the truth was that it was a trivial, inconsequential step toward Fubo's entry into sport wagering. ¶¶81, 100. As revealed by the Lightshed and Kerrisdale reports, Balto -- whose website was shut down before Fubo's acquisition -- "had 3 employees, a failed test product, and had mothballed operations during the pandemic." ¶100. Given Balto's size and limited operations, the acquisition did not present an "instrumental" or "compelling" opportunity to expand at all, let alone access the $155 billion market touted by Fubo executives. ¶66. Relatedly, as revealed by the Kerrisdale Report, becoming a serious player in the sports betting arena would require "hundreds of millions of dollars in technology, marketing, and licensing" -- resources that Fubo did not have. Thus, the short seller reports contradicted Defendants' bullish assertions regarding the scale, import, and opportunities for Fubo.

Defendants' contention that the facts about Balto were "publicly known," and therefore "cannot form the basis of a securities fraud claim" (Defs. Br. 15), is incorrect as a matter of fact and of law. First, the AC alleges that the facts about Baltos were not "known" in the market but rather uncovered by the diligence of sophisticated analysts.  Defendants' citation to Balto's "website" is actually a link to a third-party website called Y-Combinator (of which Balto was a participant) not to Balto's company website, which was then defunct. ¶81. *See In re BOFI Holdings, Inc. Sec. Lit.,* 977 F.3d 781, 794 (9th Cir. 2020), *cert. denied sub nom. BOFI Holding, Inc. v. Houston Mun. Emps. Sys.*, No. 20-1364, 2021 WL 4507646 (U.S. Oct. 4, 2021) (if other market participants had not done the same diligence, "then it is plausible that the [reports] disclosed

12

new information that the market had not yet incorporated into [the] stock price"). That Fubo's stock price plunged by over 25% on extremely high trading volume immediately after the market learned of the Kerrisdale report concerning Balto, bolsters the inference that the market regarded the information as new and credible. "A price drop of this magnitude would not be expected in response [] allegations perceived as unworthy of belief . . . ." *Id.* at 792.

Conversely, market reaction to the acquisition announcement, sending Fubo shares soaring, is strong evidence that investors had no clue about Balto's real status. Defendants at most raise fact issues whether the "corrective information [was] conveyed to the public with a degree of intensity and credibility sufficient to counter-balance . . . any misleading information created by the alleged misstatements*" See Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir. 2000). *Accord, In re Wells Fargo & Co. Sec. Litig.*, No. 20-04494, 2021 WL 4482102, at *21 (S.D.N.Y. Sept. 30, 2021).

### 4.    Defendants' Misstatements and Omissions Concerning Fubo's Competitive Advantage Over Its Peers

Defendants' repeatedly touted Fubo's "significant advantage not only over peers in the vMVPD space but also over traditional cable television" and that it offered consumers the "best value" of any other live TV streaming platform. ¶48. In its Prospectus and Registration Statement that became effective October 7, 2020, Fubo claimed that subscriber growth was due to competitive advantages, including channel offering and proprietary technology. ¶61. Gander also claimed in its November 10, 2020 shareholder letter that its differentiation was based on its "sports-focused programming and tech-first user experience." ¶69. During the 3Q 2020 earnings call the same day, Gandler highlighted "our ability to leverage our proprietary data" and technologies. ¶70.

However, as revealed by the Kerrisdale Report and confirmed by the CWs, Fubo does not possess "significant advantages" or differentiation. ¶¶96, 97. On the contrary, Fubo's does not

13

own the type of proprietary technology and data that would enable Fubo to collect meaningful user data to generate advertising revenue. ¶¶6, 97. Neither were Fubo's channel offerings meaningfully better than its peers. Like Hulu + Live and YouTubeTV, Fubo offered its services at the same price point for the same mainstream sports. ¶¶94, 108. Additionally, CW #2 and CW #3 stated that Fubo lagged behind its competitors in offering only limited DVR space and un-skippable advertisements. ¶¶108-09. CW #2 corroborated that Fubo's technological capability, including blackout abilities, were not unique. ¶107. These allegations, combined with its prohibitive contractual arrangements, undercut Fubo's claims of competitive advantages and differentiation.

### C.  The PSLRA Safe Harbor and Bespeaks Caution Doctrine Are Not Implicated

### 1.    Defendants' Misrepresentations Were Not Forward Looking

Defendants' argument that Fubo's misstatements are protected as forward-looking statements has little application to the claims asserted here (Def. Br. at 17 (citing ¶¶39, 45, 66, 73, 75, 81)) because the bespeaks-caution doctrine and the PSLRA safe harbor do not apply to a misstatement or of present fact. *In re MF Global, Holdings Ltd*. *Sec. Litig.*, 982 F. Supp. 2d 277, 304 (S.D.N.Y. 2013) (safe harbor does not apply to representations of present fact). "It would be perverse indeed if an offeror could knowingly misrepresent historical facts but at the same time disclaim those misrepresented facts with cautionary language." *In P. Stolz Fam. P'ship L.P. v. Daum*, 355 F.3d 92, 97 (2d Cir. 2004).

Here, the majority of Defendants' misstatements are devoted to touting Fubo's present achievements, which are not forward-looking statements. For example, in Fubo's Registration Statement, Defendants stated: "We believe a significant opportunity for fuboTV ***is*** to allow advertisers ***to access our audience by leveraging our technology, data, and measurability*** to drive returns on advertising spend." ¶62. Similarly, the misstatements Defendants claim are forward-looking are current and historic facts: (i) "fuboTV ***plans*** to leverage FaceBank's IP sharing

14

relationships with leading celebrities and other digital technologies to enhance *its already robust* sports and entertainment offerings." (¶45); (ii) "[O]ur financial model *is driven* by strong unit economics" (¶66); (iii) "[Fubo had] *already started* executing on its [wagering] strategy" (¶73); and (iv) "fuboTV *Acquires* Balto Sports *as First Step* Into Online Sports Wagering Market" and "[w]e believe *there are* significant synergies . . ." (¶75).[4]

Moreover, even if the misstatements are forward-looking, which they are not, it would not bar Plaintiff's claims because Defendants did not provide "meaningful" cautionary language. *Vivendi*, 838 F.3d at 247 ("To avail themselves of safe harbor protection . . . defendants must demonstrate that their cautionary language was not boilerplate and conveyed substantive information."). "Generalized disclosures of amorphous risks will not shield defendants from liability." *In re IPO Sec. Litig.*, 358 F. Supp. 2d 189, 211–12 (S.D.N.Y. 2004).

Defendants fail to explain how their "cautionary statements" relate to the specific allegations in the AC. Instead, Defendants cite to a laundry list of generalized statements, which do not directly address the allegations of the AC. Defs. Br. at 17-18. For example, Defendants point to Fubo's March 2020 Press Release that purportedly warned that "[a]ctual results or events could differ materially" due to "risks related to the ability to realize the anticipated benefits of the transaction, including [integration issues, effect of the announcement, disruptions to operations]…" (Defs. Br. at 18 (citing to Ex. B. at 3)). But this cautionary language does not address Fubo's omissions relating to its financial model, Fubo's proprietary technology, sports

---

[4] Defendants "forward-looking" statements are not protected for the independent reason that they were "made with actual knowledge by that person that the statement was false or misleading." 15 U.S.C. § 78u-5(c)(1); *Hall v. The Children's Place Retail Stores, Inc*., 580 F. Supp. 2d 212, 226 (S.D.N.Y. 2008) (safe harbor inapplicable where defendants had no basis for their optimistic statements and allegedly already knew that certain risks had become reality). In any event, whether a forward-looking statement is actionable "is generally not an appropriate basis on which to dismiss a complaint." *In re Vivendi Universal, S.A.,* 381 F. Supp. 2d 158, 182 (S.D.N.Y. 2003). Here, the CWs bolster Plaintiff's allegations that Defendants had "actual knowledge" that made the announcements false and misleading. *See Freudenberg*, 712 F. Supp. 2d at 194 ("Because Defendants are alleged to have made knowingly false statements, they are not protected by the PSLRA safe harbor provision.").

wagering or its purported advantage over its peers. Nor does it have anything to do with the statements Defendants claim are forward-looking. *See* Defs. Br. at 17 (citing to ¶¶39, 45, 66, 73, 75, 81)).

As to Fubo's financial model and profitability, the disclosures in Fubo's Registration Statement (Defs. Br. at 13 (citing Ex. L at 13)) stating that Fubo's "margin's may be adversely impacted," had nothing to do with the issues complained of. *See In re Nortel Networks Corp. Sec. Litig.*, 238 F. Supp. 2d 613, 628 (S.D.N.Y. 2003) ("[M]isstatement or omission will be considered immaterial if cautionary language is sufficiently specific to render reliance on the false or omitted statement unreasonable."). Neither did Fubo's warning that "failure to make accurate predictions [about content that subscribers enjoy] ***could*** materially adversely affect our ability to adequately attract and retain subscribers and sell advertising. . ." (Defs. Br. at 13 (citing Ex. L at 26)) meaningfully apprise investors of Fubo's then already-existing lack of differentiated user data to attract advertisers. *Meyer v. JinkoSolar Holdings Co.*, 761 F.3d 245, 251 (2d Cir. 2014) ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired.").[5] Contrary to Defendants' contention, Gandler's December 9, 2020 off-the-cuff statement that "no one should think of us as a . . . wagering company" (Defs. Br. at 13) was belied by his conflicting statement that becoming a licensed real money game operator was a "clear option." Gandler failed to neutralize Gandler's misleading proclamation that the acquisition was "instrumental" to Fubo's entry into the online sport betting, that Balto's possessed "very specific skill set," and that the Balto acquisition created enormous opportunity (*i.e.,* $155 billion addressable market), as is evidenced by Fubo's skyrocketing price on the announcement.

---

[5] Moreover, Defendants' purported "warnings" (Defs. Br. at 13-14) were published on October 5, 2020, six and a half months into the Class Period and after the majority of the misstatements were made. As such, the "warning" was ineffective in cautioning investors of the potential risks associated with Fubo's financial model, profitability, and cost escalators in its contracts with content providers.

### 2.    Defendants' Statements Are Not Puffery

Nor are Defendants' statements inactionable corporate optimism. Under Second Circuit law, puffery is reserved for statements "that are too general to cause a reasonable investor to rely upon them." *Vivendi,* 838 F.3d at 245. However, factual assertions capable of objective verification through discovery are not mere puffery. *In re Ford Fusion & C-MAX Fuel Econ. Lit.*, No. 13-MD-2450 (KMK), 2017 WL 3142078, at *10 (S.D.N.Y. July 24, 2017); *see Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 298 (S.D.N.Y. 2018) ("There is a difference between enthusiastic statements amounting to general puffery and opinion-based statements that are anchored in misrepresentations of existing facts."). [6]

Here, the challenged statements are subject to objective verification. For example, during the November 10, 2020 earnings call Gandler, in the context of discussing advertising sales, stated, "we made some really bold moves in the quarter and that really speaks to ***our ability to leverage our proprietary data***" (¶70). When read in context with the neighboring language, including Gandler's reference to "margin expansion" and "growing your sub[scriber] base," his statement is objectively false because Fubo's ability to collect meaningful user data, and thereby attract advertisers was limited due to its technological restrictions. ¶¶6, 97. Further, it was misleading because that Fubo could not offer advertisers the requisite scale of subscribers. ¶¶87, 96-98. *See Plumbers & Pipefitters Loc. Union No. 630 Pension-Annuity Tr. Fund v. Arbitron Inc.*, 741 F. Supp. 2d 474, 484-5 (S.D.N.Y. 2010), as corrected (Sept. 30, 2010) (defendants' statements that

---

[6] Defendants' citation to a laundry list of cases with cherry-picked phrases found to be inactionable puffery (Defs. Br. at 16) ignores that the falsity of statements must be judged from a standpoint of a "reasonable person reading the statement fairly and in context," and not in isolation. *See Omnicare*, 575 U.S. at 194. Accordingly, courts readily find misleading statements that companies were positioned for "booming" growth, "rapidly rising sales" and "[strong] pipeline [of products]" (*In re Comput. Assoc. Class Action Sec. Litig.*, 75 F. Supp. 2d 68, 71 (E.D.N.Y. 1999)) or that companies were "poised for future growth," occupied a "strategic position in the technology industry" and that it was "positioned . . . for dramatic revenue and earnings growth in the future" and "'still on track' to maintain its revenue and growth earnings model" (*Manavazian v. Atec Grp.*, 160 F. Supp. 2d 468, 474 (E.D.N.Y. 2001)).

17

the rollout of their technology was "performing well" at measuring minority demographics was not "mere puffery or a forward-looking projection.").

### 3.    Defendants' Misstatements Are Not Opinions

Contrary to Defendants' contention (Defs. Br. at 16-17), the vast majority of Defendants' misstatements are statements of present facts, as opposed to opinions, including statements relating to Fubo's financial model and profitability (¶¶43, 57, 49, 60, 66); Fubo's proprietary data and technology (¶¶56, 57, 61, 66, 70, 72 ); its entry into sport wagering market (¶¶65, 66, 69, 71, 73, 75, 79); and its competitive advantages (¶¶107-109).[7]

Even if some statements could be viewed as Defendants' opinions, they are nevertheless actionable. As the Supreme Court explained in *Omnicare*, 575 U.S. at 188,

> [A] reasonable investor may, depending on the circumstances, understand an opinion statement to convey facts about how the speaker has formed the opinion . . . . And if the real facts are otherwise, but not provided, the opinion statement will mislead its audience.

So, too, in this case, Defendants' claims that "significant opportunity [lies in] allow[ing] advertisers to access our audience by leveraging our technology, data, and measurability to drive returns on advertising spend" (¶62) or "[o]ur financial model is driven by strong unit economics" (¶66), would have misled investors to believe that Defendants had a reasonable basis for making this assertion and that it "fairly align[ed] with the information in [his] possession at the time." *Omnicare*, 575 U.S. at 189. In fact, however, Defendants knew that Fubo lacked technological capabilities and measurability necessary to attract advertisers and that its financial model was

---

[7] Defendants are wrong in arguing (Def. Br. at 16) that their use of qualifiers makes their statements non-actionable opinions that are immune from liability.  As the Court in *Omnicare*, 575 U.S. at 185, explained, "some sentences that begin with opinions like 'I believe' contain embedded statements of fact," such as Fubo's "significant advantage over its peers" (¶48); and also raise questions with investors about the speaker's basis for holding that view.  "And if the real facts are otherwise, but not provided, the opinion statement will mislead its audience." *Omnicare*, 575 U.S. at 188-89.  That is precisely the situation here.

hopelessly burdened by variable content cots, rendering their statements without any reasonable basis and totally misaligned with the information in their possession. *Id.*

### D. Plaintiff Sufficiently Pleads Scienter

Contrary to Defendants' contention, the AC alleges facts that support a strong inference of scienter under the PSLRA, that is, a mental state embracing intent to deceive or reckless disregard of the truth. A strong inference of scienter may be satisfied by alleging: (i) strong circumstantial evidence of conscious misbehavior or recklessness; or (ii) that defendants had motive and opportunity to commit fraud. *Ellenburg v. J.A. Solar Holdings Co.*, No. 08 Civ. 10475(JGK), 2010 WL 1983375, at *5 (S.D.N.Y. May 17, 2010).

The appropriate inquiry is whether the facts alleged, "taken collectively," give rise to a strong inference of scienter, "not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights., Ltd.*, 551 U.S. 308, 322-23 (2007). *Tellabs* explained that "[t]he inference of "scienter need not be irrefutable . . . or even the 'most plausible of competing inferences,'" but merely "at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324. If the inferences for and against scienter are in "equipoise," the complaint survives. *Id.* at 331. Here, the Complaint alleges several factors, which, taken together, demonstrate that Fubo and the Individual Defendants had the requisite scienter:

*First,* a strong inference of scienter is supported by allegations that the Defendants had "knowledge of facts or access to information contradicting their public statements." *Inv. Tech. Grp.*, 251 F. Supp. 3d at 620. Here, the AC reliably alleges that Defendants were aware of but failed to disclose material facts that went to the heart of Fubo's business operations: (i) the issues adversely impacting their subscription-based financial model, namely, that their contracts with content providers are short term, bear prohibitively high costs, and are subject to escalation, which had already caused a number of important deals to fall through (¶¶90-95); (ii) Fubo's lack of

19

proprietary data and technological capabilities to provide advertisers with meaningful differentiated user data that was needed to increase revenues (¶¶96-99); (iii) that the Baltos acquisition was inconsequential and had little or no impact on Fubo's entry into the sports wagering market (¶¶80-82, 100); and (iv) Fubo's shortcomings as compared to its peers like Hulu + Live, which offers more content/channels at the same price and unlike Fubo offered unlimited DVR storage and separate storage space to each user (¶¶107-109).

These critical issues were repeatedly discussed (albeit in one-sided, bullish pronouncements) in the Company's regulatory filings, earnings calls and analyst and industry conferences. ¶¶39-79. Courts will draw a strong inference that senior management was knowledgeable about the specific matters on which they publicly spoke, including adverse facts contradicting the misleading enthusiastic view they chose to present. *See e.g., In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.,* 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004) ("[W]hen contradictory facts of critical importance to the company either were apparent, or should have been apparent, and inference arises that high-level officers and directors had knowledge of those facts"); *Gauquie v. Albany Molecular Research, Inc.*, No. 14-CV-6637 (FB) (SMG), 2016 WL 4007591, at *2 (E.D.N.Y. July 26, 2016) ("Actively communicating with the public about this issue demonstrates defendants' sensitivity to it."); *City of Pontiac Gen. Empls. Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012) (specific statements made by executives regarding the company's information system was "strong circumstantial evidence that [they] were receiving some form of specific information").

Moreover, CW #1 confirmed that Gandler regularly held and was actively involved in "hands-on" meetings, during which Gandler gave updates on the financial and operating performance of Fubo's business. ¶140. CW #1 confirmed that some meetings were specifically

devoted to discussing content procurement, including meetings during which Gandler himself negotiated deals with content providers, such as HBO and Starz. *Id.* Gandler personally discussed PlayStation Vue deal, which ultimately fell through due to the short-term nature of Fubo's contracts and contractual escalation provisions embedded therein, which made the deal prohibitively expensive. ¶95. CW #3 also stated that Gandler specifically addressed Fubo's profitability, subscription growth, and package contents, which was consistent with his active participation in the day-to-day affairs of the Company. ¶¶140-41.

Placing defendants at meetings where the problems at issue were specifically discussed is sufficient to show scienter. *See Freudenberg*, 712 F. Supp. 2d at 183 (CW accounts held to be reliable and sufficiently detailed where the Company told employees confidentially in a meeting attended by Defendants that the Company was experiencing losses and expected more); *In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192, 219 (S.D.N.Y. 2004) (scienter based on Defendants attendance of meetings where advertising revenue and fraudulent deals were discussed.); *Cornwell v. Credit Suisse Grp.*, 689 F. Supp. 2d 629, 637 (S.D.N.Y. 2010).[8] *See also In re Marsh & McClennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 483 (S.D.N.Y. 2006) (Courts in the Second Circuit "ha[ve] consistently found the requisite inference of scienter where

---

[8] Defendants' authorities (Def. Br. at 22-23) are distinguishable or support Plaintiff. *See e.g., Francisco v. Abengoa, S.A.*, 481 F. Supp. 3d 179, 208 (S.D.N.Y. 2020) (declining to disregard confidential witnesses' statements who left prior to the class period, observing that "allegations concerning activity in one period can support an inference of similar circumstances in a subsequent period"); *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 591 (S.D.N.Y. 20111) (no allegations that confidential witnesses had contact with anyone at defendants' company); *Campo v. Sears Holdings Corp.*, 371 F. App'x. 212, 216-217 (2nd Cir. 2010) (no testimony that reports contained any of the relevant information, much less a contradictory information); *In re Doral Fin. Corp. Sec. Lit.*, 563 F. Supp. 2d 461 (S.D.N.Y. 2008), *aff'd,* 344 F. App'x 717 (2d Cir. 2009) (bare bones allegations that members of PwC attended audit committee meetings lacked specifics as to timeframe, their ranking, scope and manner of review to link Defendants to the false financial reports); *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 563 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015) (involving only statements of beliefs and opinions where CWs could only allege quality issues unrelated to product recall at issue); *In re Optionable Sec. Litig.*, 577 F. Supp. 2d 681, 691 (S.D.N.Y. 2008) (confidential witness was an analyst, not an employee, and no showing he had inside information about the company's bribes); *Lau v. Opera Ltd.*, 527 F. Supp. 3d 537 (S.D.N.Y. 2021) (the alleged misleading statements concerned subject matter that differed from that of which plaintiffs complained about).

defendants have been exposed to information contrary to their public statements.").[9] Thus, Gandler's involvement in negotiating those deals raises a strong inference that he knew or recklessly disregarded facts that contradicted his public statements and omissions.

*Second,* the alleged misleading statements relate to matters critical to Fubo's operations, which supports an inference of scienter. Where, as here, a plaintiff adequately alleged that a defendant made false or misleading statements about the core operations of a company – such as matters critical to its long-term viability or are a significant source of revenues – a supporting inference arises that the defendant knew or should have known the statements were false when made. *City of Pontiac*, 875 F. Supp. 2d at 371 (observing that the Second Circuit has "endorsed the idea behind the core operations doctrine as enhancing, if not independently supporting, an inference of scienter") (citing *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 14 & n.3 (2d Cir. 2011) ("allegations of a company's core operations . . . can provide supplemental support for allegations of scienter"); Here, Fubo's financial model, profitability, advertising revenue, entry into sport wagering and competitive advantages were all part of Fubo's core operations and Defendants regularly commented on those issues. ¶¶40-42, 48, 56-57, 65, 72, 73, 75, 77.

*Third,* temporal proximity supports an inference of scienter. The temporal proximity between the misleading statements and the corrective disclosures bolsters the allegations that

---

[9] These are not "generic[]" allegations of knowledge, as Defendants claim (Defs. Br. at 21), but allegations of specific contradictory information that was available to Defendants. *Marsh & Mclennan*, 501 F. Supp. 2d at 484. Indeed, none of Defendants' cases present a scenario analogous to the one at hand. *See Kuriakose v. Fed. Home Loan Mortg. Corp.*, 897 F. Supp. 2d 168, 184 (S.D.N.Y. 2012) (none of the findings in the memoranda that defendants were presented with suggested their statements were inaccurate); *Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 298 (S.D.N.Y. 2010) (no allegations of information that defendants were presented with that contradicted their statements); *In re Yukos Oil Co. Sec. Litig.*, No. 04-5243, 2006 WL 3026024, at *20 (S.D.N.Y. Oct. 25, 2006) (no particularized allegation that the CFO knew about the company's tax strategies); *Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 807 (S.D.N.Y. 2020) (signing of a certification without alleging any facts to show a concomitant awareness); *Lululemon*, 14 F. Supp. 3d at 580, 586 (no corroborating allegations by confidential witnesses).

22

Gandler and Bronfman were aware of Fubo's flawed financial model and other problems. *See In re Pareteum Sec. Litig.,* No. 19 CIV. 9767 (AKH), 2021 WL 3540779, at *16 (S.D.N.Y. Aug. 11, 2021) (finding allegations of temporal proximity support an inference of scienter); *see also S.E.C. v. Fiore*, 416 F. Supp. 3d 306, 324 (S.D.N.Y. 2019) (same).  For example, only a few weeks elapsed from Defendants' bullish pronouncement that the Balto acquisition was "instrumental" in Fubo's entry into the online sports betting market and the revelations beginning on December 23, 2020 that the Balto deal was insignificant. The temporal proximity supports an inference that Defendants were well aware of these adverse facts but chose not to disclose them to investors in or to perpetrate the illusion that entry into this multi-billion dollar market was a reality.

*Fourth,* Defendants had a motive to omit adverse information, which supports a finding of scienter.  The AC alleges that Fubo repeatedly touted its growth prospects and advantages over its peers in a calculated effort to raise capital by inflating its stock values. For example, the Company's acquisition of Balto led several securities analysts to raise their price targets and began incorporating Balto into Fubo's own valuation. *See Citiline Holdings, Inc. v. iStar Fin., Inc.*, 701 F. Supp. 2d 506, 514-16 (S.D.N.Y. 2010) (finding motive to conceal "deteriorating performance" to achieve specific goal). Moreover, the Individual Defendants stood to personally profit from the inflated stock price since their executive compensation is linked to their ability to attain "both short-term and long-term success," (*see* fuboTV Proxy Statement, SEC Form DEF 14A, dated November 19, 2020, at 22) and their bonuses paid "upon achievement of certain performance objectives." *Id* at 28. *See In re OSG Sec. Litig.*, 971 F. Supp. 2d 387, 404 (S.D.N.Y. 2013) (finding financial interests as motive where defendants prepared the defective and inaccurate prospectus); *Id*. n.119 (citing cases where financial gain was found to be sufficient to allege motive.).

### E. Plaintiff Has Sufficiently Pled Loss Causation

Loss causation "is the causal link between the alleged misconduct and the economic harm

23

ultimately suffered by the plaintiff." *Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003). One way loss causation can be established is by a corrective disclosure that reveals the falsity of prior misstatements, and the market reacts negatively to the disclosure. *In re Bear Stearns Cos., Inc. Sec., Deriv., & ERISA Litig.*, 763 F. Supp. 2d 423, 520 (S.D.N.Y. 2011). Here, Plaintiffs have sufficiently pled loss causation by alleging that following release of the short-seller reports, Fubo shares sharply declined on heavy trading volume.[10]

Nevertheless, Defendants erroneously argue that the short-seller reports should be rejected because: (i) short sellers have a self-interest in driving down the stock to realize financial gains; and (ii) short seller reports are merely negative opinions based on public information. Def. Br. at 23-24. Both arguments fail. As the court in *Behrendsen v. Yangtze River Port & Logistics Ltd.*, No. 19-00024, 2021 WL 2646353, at *15 (E.D.N.Y. June 28, 2021) recently explained, "a short seller's report can constitute a corrective disclosure, if the report reveals accurate information about a company that exposes actual misstatements by the company." *Id.* at *15 (citing *In re Winstar Commc'ns*, No. 01-11522, 2006 WL 473885, at *14-15 (S.D.N.Y. Feb. 27, 2006)) (loss causation alleged where short seller report revealed that company had insufficient cash flow to fund its operations and would likely default on its credit obligations); *see In re Chicago Bridge & Iron Co. N.V. Sec. Lit.*, No. 17 CIV. 01580 (LGS), 2019 WL 5287980, at *31 (S.D.N.Y. Oct. 18, 2019), *adopted,* 2020 WL 1329354 (S.D.N.Y. Mar. 23, 2020) ("So long as the [short seller] Prescience Report disclosed new and sufficiently corrective information to the market and caused a price impact, that ends the inquiry.").[11]

---

[10] Upon the release of the two Lightshed Reports and Kerrisdale Report, the price of Fubo shares dropped by 28.74%, 11.86%, and 25.72%, respectively. ¶¶ 86, 88 respectively.

[11] Defendants' purported authority is inapposite because the disclosures in those cases were neither new nor corrective. *Meyer v. Greene*, 710 F.3d 1189, 1201 (11th Cir. 2013) (involving short seller's asset impairment valuation derived from the company's widely publicized financial statements, and "not rev[elations] to the market about the company's prior disclosures."*)*; *Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*, 543 F. App'x 72, 75 (2d Cir. 2013) (information published by third-party was already public); *In re CRM Holdings, Ltd. Sec. Litig.*, No.

Here, the short seller reports were the result of private investigations that revealed new undisclosed facts, and not just a recharacterization of public information. Kerrisdale's due diligence was substantial, and included (1) interviews with former senior marketing executive at Sling TV, Fox Sports, Hulu Live (other streaming apps); (2) interviews with range of market participants and boutique media firms; and (3) reliance on a third party data analytics provider. *See* ECF No. 35-9 at 3, 6, 7, 15-16, 19. Based on its investigation, the Kerridale revealed that:  (a) Fubo's subscription business was inherently unprofitable due to its restrictive short term contractual provisions (¶90); (b) Fubo lacked data or inventory that is differentiated which was needed to sell more advertising (¶96); (c) the Balto acquisition was inconsequential (only 3 employees and a defunct inactive website) as to Fubo's ability to capture the sports betting market (¶100); and (d) Fubo had no competitive advantage over its peers in terms of pricing and content; indeed, its offered less features than its competition. (¶38). The next day Fubo shares declined by 25% closing at $28 on December 31, 2020. Accordingly, the AC adequately alleges loss causation.

### F.   Plaintiff Stated Claim Under Section 20(a)

Having alleged primary violation under Rule 10b-5, Plaintiff states claim for control-person liability under Section 20(a).

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss should be denied in its entirety. In the alternative, Plaintiff requests leave to amend to cure any pleading deficiencies.

Dated: November 9, 2021

**LOWEY DANNENBERG, P.C.**

---

10 CIV. 975 RPP, 2012 WL 1646888, at \*31 (S.D.N.Y. May 10, 2012) (defendants disclosed the risks, underfunding, and all actions taken before the stock drop); *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010) (accounting professors' commentary in news article that the events at Omnicon were suspicious did not disclose new information to the market); *C.D.T.S. v. UBS AG,* No. 12 CIV. 4924 KBF, 2013 WL 6576031, at \*7 (S.D.N.Y. Dec. 13, 2013), *aff'd,* 604 F. App'x 5 (2d Cir. 2015) (falsity not sufficiently alleged where the reports criticizing UBS' risk controls were published after the news of misappropriation of $2.3 billion by a UBS trader was made public).

*/s/David Harrison*
David C. Harrison
Andrea Farah
Scott V. Papp
44 South Broadway, Suite 1100
White Plains, New York 10601
Telephone: (914) 997-0500
Email:  dharrison@lowey.com
        afarah@lowey.com
        spapp@lowey.com

Anthony M. Christina (*pro hac vice*)
One Tower Bridge
100 Front Street, Suite 520
West Conshohocken, PA 19428
Telephone: (215) 399-4770
Email: achristina@lowey.com

*Counsel for Lead Plaintiff Nordine Aamchoune and the Lead Counsel for the Proposed Class*

**THE SCHALL LAW FIRM**
Brian Schall
2049 Century Park East, Suite 2460
Los Angeles, California 90067
Telephone: (424) 303-1964
Email: brian@schallfirm.com

*Additional Counsel for Lead Plaintiff*