**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#: _____
DATE FILED:  3/30/2023_____

**In re FuboTV Inc. Securities Litigation.**

**21-cv-01412 (ALC)**

**<u>OPINION AND ORDER</u>**

**ANDREW L. CARTER, United States District Judge:**

This lawsuit is a putative class action involving alleged federal securities fraud. Lead Plaintiff Nordine Aamchoune, individually and on behalf of a class of all persons or entities who purchased or otherwise acquired common shares of FuboTV stock, brings this action against Defendants FuboTv ("Fubo" or "the Company"),  along with David Gandler ("Gandler"), Edgar M. Bronfman Jr. ("Bronfman"), and Simone Nardi ("Nardi") (collectively "Individual Defendants" and together with Fubo, "Defendants") alleging violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder (Count I), and Section 20(a) of the Exchange Act (Count II). Defendants moved to dismiss Plaintiff's Amended Complaint in its entirety under Federal Rule of Civil Procedure 12(b)(6). For the following reasons, Defendants' Motion is **GRANTED**.

## BACKGROUND

### I.     Procedural Background

In February 2021, two lawsuits were filed against Defendants Fubo, Gandler, Bronfman, and Nardi alleging violations of the Exchange Act.[1] The Court consolidated the two actions and appointed Nordine Aamchoune as the lead plaintiff ("Plaintiff") on April 29, 2021. ECF No. 26.

---

[1] *Said-Ibrahim et al. v. FuboTV Inc. et al.*, No. 1:21- cv-01412 (ALC) (JLC) filed on February 17, 2021, and *Lee v. FuboTV Inc. et al.*, No. 1:21-cv-01641 (ALC) (JLC) filed on February 24, 2021.

On July 12, 2022, Plaintiff filed the Amended Complaint ("AC"). ECF No. 32. The AC alleges that all Defendants violated Sections 10(b) and Rule 10b-5 and that the Individual Defendants violated Section 20(a) of the Exchange Act. Defendants filed their motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) and supporting memorandum and papers on September 10, 2021 ("Defs.' Mot."). ECF Nos. 33-35. Plaintiff filed his opposition on November 9, 2021 ("Pl.'s Opp."). ECF Nos. 36. Defendants' reply was filed on December 9, 2021 (Defs.' Reply). ECF No. 38. Plaintiff additionally filed a letter motion seeking leave to file supplemental authority on December 17, 2021, ECF No 39, which Defendants opposed through a letter response. ECF No. 40. The Court granted Plaintiff leave to submit the supplemental authority and considered the parties' letters and the law cited therein. ECF No. 41. The motion is deemed fully briefed. After careful consideration, Defendants' motion to dismiss is **GRANTED**.

## II.    Factual Background

The following facts are taken from the allegations contained in Plaintiff's Amended Complaint, which are presumed to be true for purposes of this motion to dismiss. The Court also considers facts drawn from news releases, financial reports, and transcripts of earnings calls which Plaintiff quotes from extensively in the AC and are thus incorporated into the AC by reference. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

### A.  The Parties

Lead Plaintiff Nordine Aamchoune is a resident of Dubai, United Arab Emirates who acquired shares of Fubo and seeks to represent a class consisting of all those who purchased or otherwise acquired shares of Fubo throughout the period of March 23, 2020 and January 4, 2021, both dates inclusive (the alleged "Class Period"). AC ¶¶ 1, 16.

Defendant Fubo is a Florida corporation with a principal place of business in New York, NY. *Id.* ¶ 17. Defendant David Gandler is the co-founder of Fubo and has served as Fubo's Chief Executive Officer ("CEO") and as a Director of Fubo's Board of Directors since April 1, 2020. *Id.* ¶ 18. Defendant Edgar M. Bronfman, Jr. has served as Fubo's Executive Chairman since April 29, 2020. *Id.* ¶ 19. Defendant Simone Nardi has served as Fubo's Chief Financial Officer ("CFO") since May 31, 2020. *Id.* ¶ 20.

**B. History and Structure of Fubo**

Fubo was founded in 2015 and is a multichannel video programming distributor ("mMVPD") that offers subscribers access to thousands of live sporting events as well as news and entertainment content. AC ¶ 29. Fubo's streaming services is available in the United States, Canada, and Spain, and consists of different subscription level plans offering different channel packages. *Id.* Unlike traditional cable television or satellite providers, Fubo does not supply its own data transport infrastructure and instead, relies on subscribers to maintain their own internet connection to access to its services. *Id.* ¶ 30.

In March 2020, Fubo announced its merger with FaceBank, a virtual entertainment company focused on development, protection, and activation of the personal digital likeness assets of celebrities and consumers for use in artificial intelligence, entertainment, personal productivity, and social networking. *Id.* ¶ 33. After the merger, Fubo became a wholly owned subsidiary of FaceBank and FaceBank was renamed to FuboTV Inc. *Id.* Through this merger, which was completed on April 1, 2020, Fubo obtained a secured revolving line of credit of $100 million. *Id.*

In October 2020, Fubo publicly offered 18.3 million common shares for $10 per share, excluding the underwriters' option to purchase an additional 2.75 million common shares. *Id.* ¶59.

Fubo closed its public offering of 19,706,708 shares of common stock on October 13, 2020, generating $197 million in gross offering proceeds. *Id*.

In November 2020, Fubo announced its intention to expand into the online sports wagering market. *Id*. ¶ 66. On December 1, 2020, Fubo acquired Balto Sports, a company that develops tools for users to organize and play fantasy sports games. *Id*. ¶ 75. Following the news of this acquisition, several securities analysts raised price targets and began incorporating Balto Sport's valuation into Fubo's own valuation. *Id*. ¶ 82.

On December 23, 2020, Richard Greenfield of Lightshed Partners initiated coverage with a report of Fubo titled *Initiating FUBO with Sell Ratting and $8 Target Price*, with a sell recommendation for the Company and a $8 one-year price target. *Id*. ¶ 84. On the same day, Fubo was downgraded by BMO Capital Markets to "market perform" down from "outperform," noting that Fubo's "valuation had gotten overheated." *Id*. ¶ 85. The shares of Fubo then declined $17.82, or 28.74% over two days, from $62.00 on December 22, 2020 to close at $44.18 on December 24, 2020. *Id.* ¶ 86.

On December 27, 2020, Lightshed Partners filed another report in which it called Fubo, "a money-losing virtual MVPD" and reiterated its sell recommendation. *Id.* ¶ 87. The price of Fubo's shares then declined $5.24, or 11.86%, from $44.18 on December 24, 2020, to close at $38.94, on December 28, 2020. *Id*. ¶ 88.

On December 30, 2020, Kerrisdale Capital published a report ("Kerrisdale Report") that stated Fubo's core subscription business was "structurally unprofitable" due to "high variable content costs with contracted escalators." *Id*. ¶ 90. The Kerrisdale Report explained that Fubo "does not have any data or inventory that is differentiated and cannot provide the reach many advertisers crave." *Id*. ¶ 95. Furthermore, the Kerrisdale Report also concluded that Fubo's

acquisition of Balto Sports was a "foolish" attempt to enter the "already highly competitive space [of sport wagering]" and that Fubo's strategy of "dropping content to manage costs is reactionary and destined to cause eventual spikes in churn and subscriber acquisition cost." *Id.* ¶¶ 100-101. After the publication of the Kerrisdale Report, Fubo's shares declined another $9.70, or 25.72%, to close at $28.00 on December 31, 2020. *Id.* ¶ 102.

On January 4, 2021, just after the close of Q4 2020 but before the results for the quarter were released, the financial industry site *Motley Fool* published an article titled *There's a Big Problem with FuboTV Stock* with a subtitle "The wildly unprofitable streamer tries to put lipstick on a pig with a creative metric." *Id.* ¶ 103.   The *Motley Fool* article questioned the Company's business model, stating that the Company is "nowhere close to turning a profit" as the "direct costs of delivering its service are higher than revenue." *Id.* Fubo's shares declined an additional $3.99, or 14%, to close at $24.24 on January 4, 2021. *Id.* ¶ 106.

Fubo's revenues are almost entirely derived from the sale of subscription services and advertising in the United States. *Id.* ¶ 36. The primary source of Fubo's revenue is selling subscriptions to the users of its platforms. *Id.* In Fubo's quarterly results for Q3 2020 announced on November 16, 2020, Fubo reported $61.2 million in total revenue, of which $53.3 million was derived from subscriptions and related add-ons. *Id.* ¶ 36. Fubo also earns revenue through advertising; in Q3 2020, Fubo reported advertising revenue of $7.5 million.

### C.  Defendants' Statements During the Class Period

The AC includes 44 paragraphs under the heading "Materially False and Misleading Statements Issued During the Class Period." AC ¶¶ 39-83. The Plaintiff alleges that the "statements identified in ¶¶ 29 through 82" of the AC were "materially false and misleading statements and

failed to disclose material adverse facts about the Company's business, operational, and compliance policies." *Id*. ¶ 83. The "statements" are as follows.

On the first day of the Class Period, March 23, 2020, Fubo issued a press release, attached to Fubo's 8-K filing with the Securities and Exchange Commission ("SEC") the same day, entitled "Facebook Group And FuboTV Announce Definitive Merger Agreement - Combined Company To Be Named FuboTV, Inc.," wherein Defendant Gandler stated that "[t]he business combination of FaceBank Group and fuboTV *accelerates our ability to build a category defining company and supports our goal to provide consumers with a technology-driven cable TV replacement service for the whole family*." *Id.* ¶ 39. He added that "*fuboTV is well-positioned to achieve its goal of becoming a world-leading live TV streaming platform for premium sports, news and entertainment content*" and that "*[i]n the current COVID-19 environment, stay-at-home stocks make perfect sense. . . . Id.* (emphasis in original).

On April 2, 2020, FaceBank and Fubo issued a joint press release which quoted Defendant Gandler, stating "[w]ith today's closing, fuboTV is well-positioned to redefine the virtual MVPD space" and "[t]echnology-driven cable TV replacement services are more important than ever, especially at this time when people are staying safe at home watching television for needed information, entertainment and escape." *Id.* ¶ 40.

On May 4, 2020, Fubo issued its first post-merger letter to shareholders informing them about its select audited financial results for the year ending December 31, 2019. *Id.* ¶ 41. In their premerger results, Fubo reported a total revenue of $146.5 million for 2019, with subscription revenue of $133.3 million, and advertising revenue of $12.4 million, accounting for 8% of its total revenue. *Id.* The Company reported its Average Revenue Per User ("ARPU") at $53.80 in 2019. *Id.*

On May 20, 2020, at the 15th Annual Needham Virtual Technology, in a response to question on advertising, Defendant Gandler stated:

> Advertising is a growing component of our business model. I think it's important to clarify that we have a dual revenue stream…Ours is subscription and ads so it allows us to really grow our ARPU. So, advertising in 2018 was roughly 5% of total revenue. In 2019, it was just north of 8% of total revenue. We do not have an ad sales team but we're obviously thinking about how to start looking at direct ad sales as a way to continue to drive not only revenues but also our [cost per thousand] and sponsorship capabilities given some of the unit content that we [technical difficulty] introducing.

*Id.* ¶ 43. On May 29, 2020, Fubo filed its yearly report on Form 10-K with the SEC for the fiscal year that ended on December 31, 2019 (the "2019 Annual Report"). *Id.* ¶ 44. The 2019 Annual Report was signed by Defendants Gandler and Bronfman. *Id.* Appended as Exhibits 32.1 and 31.1 to the 2019 Annual Report were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX Certifications"), wherein Defendant Gandler certified that "the [2019 Annual Report] does not contain any untrue statements of a material fact" and that "the information included in the [2019 Annual Report] fairly presents, in all material respects, the financial condition and results of operations and cash flows of the [Company]" in compliance with Section 13(a) or Section 15(d), as applicable, of the Securities Exchange Act of 1934. *Id.*

The 2019 Annual Report explained that the business combination of "fuboTV's direct-to-consumer live TV streaming platform with FaceBank's technology-driven IP in sports, movies and live performances . . . *will create a content delivery platform for traditional and future-form IP*" and that Fubo "*plans to leverage FaceBank's IP sharing relationships with leading celebrities and other digital technologies to enhance its already robust sports and entertainment offerings.*" *Id.* ¶ 45 (emphasis in original). The 2019 Annual Report also listed various "competitive strengths" that Fubo "believe[s] that [their] revenue and subscriber growth are a result of," including: "Comprehensive Sports, News & Entertainment Content," "Technology-driven, Character-based

Entertainment IP," "Intuitive User Experience," "Proprietary Technology with Enhanced Features" and "Delivering Significant Value to Our Subscribers." *Id*. ¶ 46.

On July 6, 2020, Fubo filed its quarterly report on SEC Form 10-Q for the first fiscal quarter 2020 ("Q1 2020 Report"). *Id*. ¶ 47. Appended as Exhibits 31.1 and 31.2 and 32.1 to the Q1 2020 Report were signed SOX Certifications, wherein Defendants Gandler and Nardi, certified that "the [Q1 2020 Report] does not contain any untrue statements of a material fact" and that "the information included in the [Q1 2020 Report] fairly present in all material respects the financial condition, results of operations and cash flows of the [Company]" in compliance with Section 13(a) or Section 15(d), as applicable, of the Securities Exchange Act of 1934. *Id*. In connection with this Report, the Company issued a press release, summarizing the Company's financial and operational results, as well as a letter to shareholders released on July 8, 2020 from Defendant Gandler. *Id*. ¶ 48.

In this letter to shareholders, Defendant Gandler stated, "*We believe fuboTV is at the forefront of the streaming revolution and has a significant advantage not only over peers in the vMVPD space but also over traditional cable television*." *Id.* (emphasis in original). He also stated that "*we believe a fuboTV subscription offers consumers the best value of any other live TV streaming platform*," and that Fubo "*had an extremely productive Q1, despite a complete shutdown of sports, and we have made several significant recent announcements that highlight the competitive strength of our company and further differentiate us in the marketplace.*" *Id*. (emphasis in original). The letter explained that "*[w]e believe we are well positioned as a leader in the industry*." *Id*. (emphasis in original).

In the July 8, 2020 Press Release, the Company reported $46.4 million in subscription revenue, with the advertising component contributing $4.1 million. *Id*. ¶ 49. The Company

reported its ARPU at $54.16. *Id.* The Company ended the quarter with 287,316 paid subscribers and issued a forecast stating: "[w]e expect to drive revenue growth, continue to diversify our revenue mix, make progress on our path to profitability, and that our losses will decrease as a percentage of revenue." *Id.*

On August 13, 2020, Fubo filed its quarterly report on SEC Form 10-Q for the second fiscal quarter 2020 ("Q2 2020 Report"). *Id.* ¶ 51. Appended as Exhibits 31.1, 31.2 and 32.1 to the Q2 2020 Report were signed SOX Certifications, wherein Defendants Gandler and Nardi, respectively, certified that "the [Q2 2020 Report] does not contain any untrue statements of a material fact" and that "the information included in the [Q2 2020 Report] fairly presents, in all material respects, the financial condition and results of operations and cash flows of the [Company]" in compliance with Section 13(a) or Section 15(d), as applicable, of the Securities Exchange Act of 1934. *Id.*

In their Q2 2020 Report, under the "Risk Factors," Fubo explained that "[w]e have already failed to make minimum guarantee payments to certain key programmers and may not be in a position to make similar payments in the future. If we do not make these payments, then we may lose access to such content, which in turn may further depress subscriber acquisition or retention, cause other programmers to exercise termination rights due to the content mix available through our service, or impact our ability to obtain content from other programmers." *Id.* ¶ 52.

In connection with Q2 2020 Report, the Company issued a press release, which quoted Defendant Gandler as stating:

> We believe consumers will continue to choose streaming over traditional pay television, especially in the current economic climate because of its more personalized, premium viewing experience. *Macro trends towards streaming, combined with our strong second quarter results and continued momentum, reinforce our confidence in our business and the vMVPD space.* Looking ahead to Q3, with the gradual return of sports, we anticipate an increase in subscribers,

viewership and that our portion of revenue derived from advertising will grow. At the close of Q3 we expect paid subscribers to reach 340,000 - 350,000, which will be an increase of 20% year-over-year. The growth of streaming is one of the most significant changes to television, and television advertising, in the last several decades. *fuboTV is at the forefront of the streaming revolution and we are excited for existing and new investors to join us on this journey*.

*Id.* ¶ 53 (emphasis in original). The press release also reported revenues of $44.2 million, with subscription revenue of $39.5 million and advertising revenue of $4.3 million. *Id.* ¶ 54. The ARPU came out at $54.79, and the Company ended the quarter with 286,126 subscribers. *Id.* on August 13, 2020, Fubo also issued a letter to shareholders from Defendant Gandler. *Id.* The letter reiterated that Fubo was "at the forefront of the streaming revolution." *Id.* 55. The Defendant also stated that "[a]t the core of our offering is our proprietary technology platform optimized for live TV and sports viewership. Our proprietary technology stack has enabled us to regularly offer new features and functionality." *Id.* ¶ 56.

On September 15, 2020, Fubo issued another letter to shareholders addressed from Defendant Gandler, in which he stated that, *"[W]e continue to believe fuboTV is at the forefront of the streaming TV revolution," "fuboTV is the leading sports-first, live TV streaming platform," "[a]t the core of our offering is our proprietary technology platform optimized for live TV and sports viewership," and that "we believe fuboTV's sports package is unparalled in the marketplace."* *Id.* ¶ 57 (emphasis in original).

On August 11, 2020, Fubo filed a Registration Statement on Form S-1 with the SEC related to the proposed secondary offering of common stock. *Id.* ¶ 58. The Form was signed by Defendants Gandler, Nardi, and Bronfman. *Id.* On September 15, 2020, October 1, 2020, and October 5, 2020, Fubo filed revised versions of the Registration Statement on Forms S-1/A, each of which was signed by Defendants Gandler and Nardi. *Id.* On October 7, 2020, the Registration Statement was

declared effective by the SEC. The Prospectus Summary was incorporated into and formed part of the Registration Statement filed on October 9, 2020. *Id*. The Prospect Summary stated:

> Our business model is 'come for the sports, stay for the entertainment.' *This translates to leveraging sporting events to acquire Subscribers at lower acquisition costs, given the built-in demand for sports. We then leverage our technology and data to drive higher engagement and induce retentive behaviors such as favoriting channels, recording shows, and increasing discovery through our proprietary machine learning recommendations engine. Next, we look to monetize our growing base of highly engaged subscribers by driving higher average revenue per user (ARPU).*

*Id.* ¶ 60 (emphasis in original). The Registration Statement provided that "*the vast majority of our revenue is generated from monthly subscriptions*," and *"[w]e believe a significant opportunity for fuboTV is to allow advertisers to access our audience by leveraging our technology, data, and measurability to drive returns on advertising spend*." *Id.* ¶ 62 (emphasis in original). The Statement continued, "[w]e believe our leading, independent live TV streaming platform offers a unique opportunity to advertisers" and "[w]e believe our premium content and industry-leading consumer experience uniquely position us to rapidly grow our advertising business." *Id*. ¶¶ 63-64.

In a November 10, 2020 press release, Defendant Gandler explained that "[w]e believe that fuboTV sits firmly at the intersection of three megatrends: the secular decline of traditional TV viewership, the shift of TV ad dollars to connected TVs and online sports wagering, a market which we intend to enter" and "*[a]s a result, we believe our growth opportunities are numerous.*" *Id*. ¶ 65 (emphasis in original). In a letter to shareholders released the same day and signed by Defendant Bronfman, Fubo announced that it "intends to expand into the online sports wagering market," and that its "*goal with wagering is to develop a new revenue stream for fuboTV, and one which we believe will be an important contributor to our business*." *Id*. ¶ 66 (emphasis in original).

11

The letter to shareholders ended with a summary of the Company's claims of future revenue and growth, stating:

> The growth of advertising on our platform along with strong attachment rates on value-added services, such as cloud DVR storage and the ability to stream on multiple devices, continue to improve margins. Furthermore, we believe fuboTV's differentiation in the marketplace - sports-focused programming and a tech-first user experience - firmly positions the company for long-term growth. We are also excited about the potential growth and revenue opportunities around our intended expansion into online sports wagering.

*Id*. ¶ 69. On November 10, 2020, Fubo hosted an earnings call with financial market analysts to discuss its financial results and operations with Defendants Gandler and Nardi present. *Id*. ¶ 70. Defendant Gandler stated that "advertising sales . . . clearly plays an important role in margin expansion" and that "[a]t the end of the day, we made some really bold moves in the quarter and that really speaks to our ability to leverage our proprietary data." *Id*. Defendant Gandler went on to say:

> *Fubo is firmly at the intersection of three mega trends. The first is the secular decline of traditional television viewership. The second is the shift of TV ad dollars to connect the devices. And the third is online sports wagering a market we absolutely intend to enter. . . .* Supporting our offerings is our proprietary data and technology platform that fully optimized for live TV and sports, our platform has enabled us to regularly offer new features and functionality for our subscribers . . . We believe our platform offers a more differentiated, a more personalized premium viewing experience for sports fans. And that's really reflected in the recent reports highlighting customer satisfaction relative to our peers. And it also is reflected in our app ratings, and most importantly is reflected in our improving retention.

*Id*. ¶ 71-72 (emphasis in original). In that earnings call, Defendant Gandler represented that Fubo had "*already started executing on its [wagering] strategy*" and that the Company is "*going to be able to also sell in a lot of wagering opportunities*" given its "*acquisitions advantage*," "*engagement advantage,*" and "*monetization advantage*." *Id*. ¶ 73 (emphasis in original).

On November 16, 2020, the Company filed its quarterly report on SEC Form 10-Q for the third fiscal quarter 2020 ("Q3 2020 Report"). *Id*. ¶ 74. Appended as Exhibits 31.1, 31.2 and

32.2 to the Q3 2020 Report were signed SOX Certifications, wherein Defendants Gandler and

Nardi, respectively, certified that "the [Q3 2020 Report] does not contain any untrue statements

of a material fact" and that "the information included in the [Q3 2020 Report] fairly presents, in

all material respects, the financial condition and results of operations and cash flows of the

[Company]" in compliance with Section 13(a) or Section 15(d), as applicable, of the Securities

Exchange Act of 1934. *Id*.

On December 1, 2020, Fubo issued a press release entitled "fuboTV Acquires Balto Sports

as First Step Into Online Sports Wagering Market" announcing the acquisition of Balto Sports. In

the press release, Defendant Gandler promoted the move as an "instrumental" expansion of Fubo's

sports betting ambitions, stating as follows:

> *We believe there are significant synergies between consumers who enjoy wagering and our subscribers who enjoy streaming live sports, creating a flywheel opportunity. . . .* The acquisition of Balto Sports will enable us to build a first class, free to play experience that brings consumers the best games around live sports. From there, we see a natural progression to layer on real money wagering in regulated markets complementing fuboTV's live streaming video for a highly engaging user experience within our platform. We will be strategic in our approach to wagering as we consider and evaluate different opportunities and will adjust our plans accordingly. We're excited to launch sports wagering, integrate it into our core offerings and deliver what we believe will be a truly groundbreaking live TV streaming platform to consumers.

*Id*. ¶ 75 (emphasis in original). Plaintiffs allege, however, that this was not the Company's

"first step." *Id*. ¶ 80. Instead, it points out that Fubo had previously announced a partnership that

named FanDuel as its "exclusive sportsbook, online casino, horse racing, and DFS partner" but

this agreement terminated after a year for reasons that have never been publicly proved. *Id*.

On December 9, 2020, Fubo participated in a BMO Capital Markets 2020 Growth & ESG

Conference to give investors updates on the Company's performance. *Id*. ¶ 77. During the

conference, Defendant Gandler implied the use of algorithms as purportedly responsible for the

surge in viewership, stating, in relevant part:

> And so what happened with fubo I think it's really important for us and this is why
> we have confidence in our strategy is that while we weren't able to acquire
> anybody, we were really able to retain a lot of people. Viewing hours have gone
> from something like 120, 121, 123 to about 145 hours. . . . That is an enormous
> amount of viewing time. So couple takeaways from there. *One is the strategy
> works.* We were able to surface more and more content that people like and I think
> you hit the nail on the head when you said some people get you at hello, we got
> your wife in reality TV and *I think this gave us an opportunity to continue to play
> with our guys to look at our machine learning algorithms and to get people to watch
> more, which also led to obviously a better advertising* conversion. So that's what
> we were focused on before the sport season came back. *Id.* ¶ 77 (emphasis in
> original).

When asked about the acquisition of Balto Sports, Defendant Gandler stated:

> *And so we needed to make sure that this was a team that had a very specific skill
> set that we did not have, but yet was small enough that we can integrate into our
> larger group and allow them to leverage the resources and the metadata mapping
> and things that we think are going to allow us to really build something compelling.*
> And so the reason why Balto was because again, they are in the pick'ems game,
> they have had, over 30,000 players test the platform. They understand automation.
> We understand consumer journeys. We understand what we should be looking at
> from conversion funnels. And what this is going to allow us to do is launch a game
> at the end of the, I'll call it, first half of the year 2021. Don't hold me to it, but just
> say call it, June. These guys are going to be joining us, I think next week finally.
> So we're very excited about that. We've been planning.

Id. ¶ 78 (emphasis in original).  During the Conference, Defendant Gandler also stated, "no

one should think of us as a . . . wagering company, we're not competing with DraftKings." *Id.* ¶

79. When asked whether Fubo was looking to become a licensed real money gaming operator, like

DraftKings, Defendant Gandler said it was a "clear option." *Id.*

### III.    Fraud Allegations in the Amended Complaint

Plaintiff alleges that Defendants made or caused to be made a series of "materially false

and misleading statements and failed to disclose material adverse facts about the Company's

business, operational, and compliance policies." AC ¶ 83. Specifically, the Plaintiff alleges that

Defendants made false and/or misleading statements and failed to disclose to investors that: "(i) Fubo's offering of products would be subject to significant cost escalation; (ii) Fubo could not successfully compete and perform as a sports book operator and lacked the ability and resources needed to capitalize on its online sports wagering opportunity; (iii) Fubo's data and inventory was not differentiated to allow Fubo to achieve its long-term advertising growth goals; (iv): Fubo's valuation was substantially overstated in light of its total revenue and subscription levels, and (v) Fubo did not possess significant advantage over its peers as it publicly touted. *Id.* In his opposition brief, Plaintiff clarifies that the "AC identified four categories of misstatements in 15 pages that span" the Class Period. Pl.'s Opp. at 8, n.2. Plaintiff alleges that Fubo's public disclosures omitted material facts, including (i) exorbitantly high costs for programming content combined with escalation provisions that rendered Fubo's subscription-based profitability unattainable, and had caused several critical deals to crater;  (ii) Fubo's inability to collect and differentiate user data necessary to attract advertisers; (iii) the inconsequential impact of the Balto acquisition; and (iv) Fubo's lack of competitive advantages over its peers.[2] Pl.'s Opp. at 8.

**LEGAL STANDARD**

## I.      Motions to Dismiss under Rule 12(b)(6)

When deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). However, the Court need not credit "[t]hreadbare recitals of the elements of a

---

[2] In his opposition brief, the Plaintiff no longer mentions the allegation that "Fubo's valuation was substantially overstated in light of its total revenue and growth goals." Plaintiff appears to abandon this alleged adverse fact and therefore concedes that it fails. *In re UBS AG Sec. Litig.*, No. 07 civ. 11225 (RJS), 2012 WL 4471265, at *11 (S.D.N.Y. Sept. 28, 2012) (arguments not addressed in opposition brief are conceded).

cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Claims should be dismissed when a plaintiff has not pleaded enough facts that "plausibly give rise to an entitlement for relief." *Id.* at 679. A claim is plausible "when the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). While not akin to a "probability requirement," the plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556). Accordingly, where a plaintiff alleges facts that are "'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557.The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985).

Although the Court generally should not look outside of the pleadings to decide a motion to dismiss a complaint, the Court may consider "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit" of which a court may take judicial notice. *Sgalambo v. McKenzie*, 739 F.Supp.2d 453, 470 (S.D.N.Y. 2010) (quoting *ATSI Commc'ns,* 493 F.3d at 98); *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000); 5B Wright & Miller § 1357 (3d ed.2004 and Supp.2007).

## II.     Motions to Dismiss under Fed. R. Civ. P. 9(b) and the PLSRA

When a plaintiff has alleged securities fraud claims, the complaint is subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private

Securities Litigation Reform Act of 1995 (the "PSLRA"). Rule 9(b) requires that the complaint "state with particularity the circumstances constituting fraud or mistake." To satisfy the particularity requirement, a complaint must "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 403 (2d Cir. 2015).

The PSLRA holds private securities plaintiffs to an even more stringent pleading standard. Under the PSLRA, a plaintiff must "(1) specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading; and (2) state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007) (internal citation and quotation marks omitted) (quoting 15 U.S.C. § 78u-4(b)). To determine that an inference of scienter is strong, the court must decide whether "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.

These heightened pleading standards, when viewed together with the more general standards applicable to Rule 12(b)(6) motions to dismiss under *Twombly* and *Iqbal,* make clear that "plaintiffs must provide sufficient particularity in their allegations to support a plausible inference that it is more likely than not that a securities law violation has been committed." *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 570 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015) (citing *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009)).

## DISCUSSION

Plaintiff brings claims for violations of Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder, against all Defendants, as well as claims for violations of Section 20(a) against Defendants Gandler, Bronfman, and Nardi.

Section 10(b) of the Securities Exchange Act of 1934 prohibits using or employing, "in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance." 15 U.S.C. § 78j(b). Under Rule 10b-5, promulgated thereunder, it is unlawful for any person, directly or indirectly, by the use of any means specified in Section 10(b):

> (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. SEC Rule 10b–5 b "more specifically delineates what constitutes a manipulative or deceptive device or contrivance." *Francisco v. Abengoa, S.A.*, 481 F. Supp. 3d 179, 204 (S.D.N.Y. 2020) (quoting *Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 534 (2d Cir. 1999)).

To state a private civil claim under Section 10(b) and Rule 10b-5, Plaintiff must prove "'(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection with the purchase or sale of securities; (4) Plaintiff's reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *GAMCO Inv'rs, Inc. v. Vivendi Universal, S.A.*, 838 F.3d 214, 217 (2d Cir. 2016) (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014)).

Section 20(a) of the Exchange Act imposes liability on individuals who control any person or entity that violates Section 10. *See* 15 U.S.C. § 78t(a). Section 20(a) provides:

Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

*Id*. To establish a Section 20(a) claim, Plaintiff must show "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Commc'ns.*, 493 F.3d at 108.

Defendants assert that the AC fails to state a claim for violation of the Exchange Act. Defendants argue that Plaintiff's allegations fail to plausibly allege any actionable misstatement or omission with the requisite particularity, that they have failed to allege scienter, and that they have failed to allege loss causation.

## I.      Actionable Misstatements or Omissions under Section 10(b) and Rule 10b-5

To survive a motion to dismiss, Plaintiff must establish that Defendants "made a statement that was misleading as to a material fact." *Francisco*, 481 F. Supp. 3d at 207 (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011). As to falsity, a violation of Section 10(b) and Rule 10b-5 premised on misstatements "cannot occur unless an alleged material misstatement was false *at the time it was made*." *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 55, 571 (S.D.N.Y. 2014), *aff'd*, 605 F. App'x 62 (2d Cir. 2015). "The Second Circuit has repeatedly stated that plaintiffs must do more than simply assert that a statement is false—they must demonstrate with specificity why that is so." *Id*. Like the falsity of statements, omissions are only actionable if a defendant is under a duty to disclose information and fails to do so. *Id*. "Such a duty may arise when there is ... a corporate statement that would otherwise be inaccurate, incomplete, or misleading." *In re Nokia Corp. Sec. Litig.*, No. 19-CV-3509, 2021 WL 1199030, at *16 (S.D.N.Y.

Mar. 29, 2021) (quoting *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015)). Additionally, to be actionable under Section 10(b) and Rule 10b-5, "the alleged misstatement or omission must be material." *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d at 572 (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988)).   "[T]he test for whether a statement is materially misleading under Section 10(b) ... is whether the defendants' representations, taken together and in context, would have misled a reasonable investor." *Rombach v. Chang*, 355 F.3d 164, 172 n. 11 (2d Cir. 2004) (citation and internal quotation marks omitted); *see also Steamfitters' Indus. Pension Fund v. Endo Int'l PLC*, 771 F. App'x 494, 496 (2d Cir. 2019) ("[T]o fulfill the materiality requirement there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.").

Defendants specifically argue that Plaintiff fails to plead a material misrepresentation or omission for four principal reasons. First, the Plaintiff's "puzzle pleading" fails to satisfy the heightened pleading requirements under the PLSRA. Second, the Plaintiff fails to plead a material fact that was omitted. Third, the Plaintiff fails to allege with any particularity how any omitted facts rendered any statement misleading. Fourth, they argue that the PSLRA's safe harbor immunizes them from forward-looking statements and that the alleged misstatements amount to puffery and not actionable as pled.

The Court agrees that, except for two sets of challenged statements, the Plaintiff's use of "puzzle pleading" does not satisfy the heightened pleading requirements under the PLSRA. As to the remaining challenged statements, Plaintiff has still failed to plead a material misstatement or omission.

### A. Confidential Witnesses Statements

Before addressing Defendants' arguments regarding actionable misstatements or omissions, the Court will resolve the issue of Plaintiff's use of confidential witnesses' statements. In the AC, the Plaintiff relies on the statements of three confidential witnesses who are former Fubo employees. AC ¶¶23-28. CW #1 was a Project Manager; CW #2 was a Senior Director of Engineering; and CW #3 worked as a Quality Assurance Specialist. *Id.*

Defendants challenge the use of these witnesses, noting that CW #1 and CW #3 left the Company before the Class Period, and therefore the Court should reject all their allegations. The Defendants point to *Francisco v. Abengoa* explaining that "courts have rejected confidential witnesses allegation where the confidential witnesses left the company before the class period." 481 F. Supp. 3d at 208.  However, the Second Circuit has previously held that "allegations concerning activity in one period can support an inference of similar circumstances in a subsequent period." *Emps.' Ret. Sys. v. Blanford*, 794 F.3d 297, 307 (2d Cir. 2015). Additionally, a "complaint may rely on information from confidential witnesses if 'they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Id.* at 305. Plaintiff alleges CW #1 personally attended meetings on behalf of Fubo with content providers and only left one month before the Class Period began. Defendants argue Plaintiff does not describe CW #1's position with particularity to support the probability that they were in a position that would possess the information about fuboTV's advertising practices during the Class Period.

Although CW #1 attended such meetings where advertising was discussed, they were no longer at Fubo during the Class Period and therefore it is not likely CW #1 has any information that could support an inference of "contemporaneous falsity." *See In re Lululemon Sec. Litig.*, 14 F. Supp. 3d at 571, 580. ("without *contemporaneous* falsity, there can be no fraud"). CW #3 left

the Company seven months before the Class Period, and it is even less likely they have information that could support an inference of contemporaneous falsity. The Court will therefore disregard CW #1's and CW #3's allegations.

CW #2 was employed during the Class Period, and therefore, the Court will not discount any allegations made by CW #2.

### B. Puzzle Pleading–The Amended Complaint Fails to Plead Fraud with Particularity as to the Vast Majority of the Alleged "Materially False and Misleading Statements"

"Plaintiffs in this circuit have long been on notice that a complaint predominantly marked by lengthy block quotes followed by pro forma reasons why the statements quoted are allegedly false . . . fails to state a claim because it is insufficiently particular under the PSLRA. *Born v. Quad/Graphics, Inc*., 521 F. Supp. 3d 469, 477–78 (S.D.N.Y. 2021) (citation omitted). The use of "large block quotes . . . followed by generalized explanations of how the statements were false or misleading are not sufficient to satisfy the heightened pleading requirements." *In re Nokia Corp. Sec. Litig*., 2021 WL 1199030, at *14 (citing *Tabor v. Bodisen Biotech, Inc.*, 579 F. Supp. 2d 438, 452-53 (S.D.N.Y. 2008)).

Here, Plaintiff includes 44 paragraphs, AC ¶¶39-83, under the heading "Materially False and Misleading Statements Issued During the Class Period." These lengthy paragraphs, many of which include long block quotes, are mostly excerpts from Fubo's SEC filings and investor calls during the nine-month Class Period. In paragraph 83, the AC explains "[t]he above statements identified in ¶¶ 29 through 82 were materially false and misleading statements and failed to disclose material adverse facts about the Company's business, operational, and compliance policies." *Id.* ¶ 83. The AC then list five adverse facts that Defendants allegedly failed to disclose, described in Part III of the Background section of this opinion. The crux of Plaintiff's allegations

is that the Defendants failed to disclose these five material facts, which rendered their statements during the Class Period materially false and misleading statements.

Under the subsequent heading "The Truth Begins to Emerge," the AC recreates a timeline of the Company's stock's drop in valuation following the publication of several negative analyst reports. AC ¶¶ 84-109. The section includes quotes from the reports but then mostly fails to point to the specific "materially false and misleading statements" made by the Defendants and explain why they are now rendered false and misleading. Out of the nine months' worth of statements it included in the AC, this section only points to two set of statements, one of which he did not even include in the preceding section entitled "Materially False and Misleading Statements Issued During the Class Period." *Id*. ¶¶39-83. One statement was made in the 2019 Annual Report, *id*. ¶ 98, and the other set of statements is from the July 6, 2020 Q1 2020 Report and related July 8, 2020 letter to shareholders. *Id*. ¶ 108. As to all the other statements in the preceding section, the Court is left to guess which statements are "materially false and misleading" and why. *See e.g., Born*, 521 F. Supp. 3d at 479 ("Plaintiffs' Complaint does little to describe[ ] what portion of each quotation constitutes a false representation, instead placing the burden on the Court to sort out the alleged misrepresentations and then match them with the corresponding adverse fact"); *see also* 15 U.S.C. § 78u-4(b)(1) ("[T]he complaint shall specify *each statement* alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.").

This type of pleading is insufficient to support Plaintiff's allegation that over 9 months' worth of statements are all false or misleading. For example, Plaintiff's bolding "does little to assist the Court in identifying the falsity of Defendants' statements." *Born*, 521 F. Supp. 3d at 478.

At times, the Plaintiff bolds almost the entirety of these block quotations. AC ¶¶ 39, 48, 57, 60, 66. To meet the heightened pleading standard of the PLSRA and Rule 9(b), the plaintiff "must do more than simply assert that a statement is false—[he] must demonstrate with specificity why that is so." *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d at 571 (quoting *Rombach*, 355 F.3d at 174).

The Plaintiff attempts to rectify this fatal pleading error in his opposition brief by (1) grouping the challenged statements into four categories corresponding to one of the alleged adverse facts and (2) rephrasing the original adverse facts.[3] Pl.'s Opp. at 8-14. On its face, however, the AC does not with any particularity attempt to connect the vast majority of the challenged statements with the alleged omitted material facts.

The Court therefore dismisses the Amended Complaint for failing to meet the heightened pleading standards or Rule 9(b) and the PLSRA, except as to the challenged statements in the 2019 Annual Report and the July 8, 2020 Letter to Shareholders.

## C. Remaining Challenged Statements – Plaintiffs Have Not Pleaded a Material Misstatement or Omission

As to the remaining challenged statements, the Court finds that the Plaintiff has failed to plead material misstatements or omissions. The Court will address both set of challenged statements in turn.

### 1. 2019 Annual Report

Plaintiff alleges that the statements in Fubo's 2019 Annual Report were false or misleading because it omitted a material fact. The 2019 Annual Report states that the Company is

---

[3] For example, in the AC, the Plaintiff alleges the first adverse omitted material fact to be that "Fubo's offering of products would be subject to significant cost escalation." AC ¶ 83. In the opposition brief, the Plaintiff states that the Defendants' public disclosures omitted the material fact that "exorbitantly high costs for programming content combined with escalation provisions that rendered Fubo's subscription-based profitability unattainable and had caused several critical deals to crater." Pl.'s Opp. at 8. The Plaintiff then goes on to group the challenged statements connected to this adverse fact as "misstatements and omissions about Fubo's financial model." *Id.*

"increasingly leveraging our data and analytics capabilities to optimize advertisements for both users and advertisers." AC ¶ 98.[4] The Court assumes that this challenged statement corresponds to Plaintiff's second adverse fact alleging that "Fubo's data and inventory was not differentiated to allow Fubo to achieve its long-term advertising growth goals." *Id.* ¶ 83. In his opposition brief, the Plaintiff expands on what this adverse fact entails. He elaborates that Defendants omitted the material fact of "Fubo's inability to collect and differentiate user data necessary to attract advertisers." Pl.'s Opp. at 8. He also rephrased this adverse fact later in the brief as "Fubo's lack of proprietary data and technological capabilities to provide advertisers with meaningful user data that was needed to increase revenues. *Id.* at 20.

Plaintiff appears to argue that Defendants had a duty to disclose this omitted fact because without its disclosure, the challenged statement would otherwise be misleading to a reasonable investor. In explaining this omission, the Plaintiff points out that the Kerrisdale Report revealed that Fubo "does not have any data or inventory that is differentiated and cannot provide the reach many advertisers crave." AC ¶ 96. Additionally, Plaintiff points to CW #1's allegations that Fubo "did not possess enough lucrative data that could be shared with content providers to be used to target advertisers" and that Fubo was "very limited on targeted ads." *Id.* ¶ 97. Plaintiff notes that CW #1 specified that at meetings with content providers, Fubo's negotiating team admitted that it does not have the ability to provide user data as a result of limitations in the technical backend of the Company. *Id.* ¶ 97, 99.  As explained previously, CW #1 was not at the Company during the Class Period and all the meetings they attended were before the Class Period began. Therefore, the Court will not consider these allegations.

---

[4] In the 2019 Annual Report, the Company also stated that Fubo "rel[ies] on our ability to increase advertising revenues" and "[o]ur ability to leverage our data to provide users with relevant ads and measure the effectiveness of these advertisements on our platform is also a key factor to an increased wallet share of advertising budgets spent on our platform." AC ¶ 98.

However, even if the Court were to consider CW #1's allegations, it is unclear how they would render the challenged statements false or misleading. The 2019 Annual Report statements, as described in the amended complaint, do not discuss the Company sharing user data with content providers or advertisers. Without these allegations, the Plaintiff must rely on Kerrisdale Report's statement regarding Fubo's data and inventory. The Kerrisdale Report, however, also does not state anything about the Company sharing user data or about targeted advertising. It is unclear how the Plaintiff's reference to only the Kerrisdale Report renders the challenged statement misleading or false. Plaintiff has failed to plead "particularized, factual material that would permit the Court to infer that Defendants' statements were false or misleading when made" and therefore the Plaintiff has failed to allege adequately that Defendants' statements were false or misleading. *Born*, 521 F. Supp. 3d at 480.

### 2.   July 8, 2020 Letter to Shareholders and July 6, 2020 Q1 2020 Report

Plaintiff also alleges that the statement in the July 8, 2020 Letter to Shareholders was misleading or false because the Defendants failed to disclose a material fact. The letter stated, "and we have made several significant recent announcements that highlight the competitive strength of our company and further differentiate us in the marketplace." AC ¶¶ 48, 108. On its face, it is unclear which omitted fact this challenged statement corresponds to. In his opposition brief, the Plaintiff elaborates that this statement is rendered misleading or false by Fubo's failure to disclose that the company "did not possess significant advantage over its peers as it publicly touted."[5] *Id.* ¶ 83; Pl.'s Opp. at 13-14.  Additionally, Plaintiff points to Defendant Gandler's statement from the Q1 2020 Report, dated July 6, 2020, where he said "[w]e believe fuboTV is at the forefront of the

---

[5] Later in his opposition brief, the Plaintiff describes the omitted material fact as "Fubo's lack of competitive advantages over its peers," Pl.'s Opp. at 8, and "Fubo's shortcomings as compared to its peers like Hulu+ Live, which offers more content/channels at the same price and unlike Fubo offered unlimited DVR storage and separate storage space to each user." *Id*. at 20.

streaming revolution and has a significant advantage not only over peers in the vMVPD space but also over traditional cable television" and "we believe a fuboTV subscription offers consumers the best value of any other live TV streaming platform." AC ¶¶ 48, 109.

In explaining how the omitted fact renders these statements misleading or false, Plaintiff relies on CW #2 and CW #3. CW #2 attests that Hulu and YouTube TV were the vMVPDs with the same "blackout abilities"[6] as Fubo and therefore could be considered peers to Fubo in the vMVPD sector. AC ¶ 107. Plaintiff explains that even though Fubo's peers have similar pricing for packages, Fubo lagged behind its competitors in offering "not unique" blackout abilities. *Id.* ¶ 108; Pl.'s Opp. at 14. The Plaintiff also relies on CW #3's allegations that Fubo additionally lagged behind its competitors because it could only offer limited DVR space and un-skippable advertisements. AC ¶ 109. However, as described above, CW #3 left the Company seven months before the Class Period even began and therefore this Court will not consider CW #3's allegations.

Therefore, Plaintiff's contention is that these challenged statements about "competitive strength," the "best value," and being "at the forefront of the streaming revolution" are rendered misleading or false because Hulu and YouTube TV are "considered Fubo's peers," Fubo's competitors offered similar pricing for its streaming packages, and Fubo had the "same 'blackout abilities'" as Hulu and YouTube TV. *Id.* ¶ 107. Again, Plaintiff appears to argue that Defendants had a duty to disclose this alleged omitted fact because the challenged statements would otherwise be misleading to a reasonable investor. This argument fails.

First, Plaintiff's contention ignores the disclosure made by Defendants. In the Company's S-1A filing, the Defendants did disclose that both Hulu Live and YouTube TV "offer streaming

---

[6] According to the AC, "'[b]lackout Abilities' enables distributors to handle blackouts and deliver alternate streams of content, when required" and "[t]his usually arises with respect to regional sports networks and broadcast TV stations." AC ¶ 107, n.9.

products that compete with our platform." *See* ECF No. 35, George Decl. Ex. L at 14, Excerpts of fuboTV Inc.'s Amendment No. 3 to Form S-1, Registration Statement, filed with the SEC on October 5, 2020. Additionally, the Defendants warned that "we expect competition in TV streaming from the large technology companies and service operators described above…to increase in the future," that "this increased competition could result in pricing pressure, lower revenue, and gross profit," and that "we may not have sufficient resources to continue to make the investments needed to maintain our competitive edge." *Id*.

Second, the July 8 Letter does not address subscription costs, which were publicly known facts. *See Lau v. Opera Ltd.*, 527 F. Supp. 3d 537, 553 (S.D.N.Y. 2021) (no liability for failing to disclose a "fact readily accessible in the public domain"). Third, Gandler's statements do not mention blackout abilities and it is therefore unclear how these alleged omitted facts render his statements false or misleading. Finally, even if the Court were to ignore Defendants' disclosures, as to the challenged statements concerning Fubo's "competitive strength," the Court finds this non-actionable puffery.

Statements of puffery are "optimistic statement[s] that [are] so vague, broad, and non-specific that a reasonable investor would not rely on [them]," *In re Nokia Corp. Sec. Litig.*, 2021 WL 1199030, at *17 (citations omitted). Here, the Company highlights its "competitive strength." *See generally Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 398-99 (S.D.N.Y. 2018) (statements about the company's "competitive advantage" were mere puffery); *Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551, 569-70 (S.D.N.Y. 2018) (statements suggesting "Xerox's confidence in its competitiveness" and "vaguely and enthusiastically describ[ing] Xerox's performance, [and] expectations of business success" were non-actionable puffery). Contrary to Plaintiff's argument, this statement is not capable of objective verification.

Therefore, the Court also dismisses Count I as it relates to these two sets of challenged statements. Because the Court has dismissed the Amended Complaint for failure to meet the heightened pleading standards of Rule 9(b) and the PLSRA, the Court gives no opinion as to Plaintiff's arguments concerning scienter and loss causation.

## II.      Section 20(a)

As Plaintiff has failed to adequately allege his § 10(b) claim, his claim under § 20(a) fails as a matter of law. Section 20(a) requires a predicate violation of the Exchange Act, which the AC does not adequately plead. See *S.E.C. v. First Jersey Sec., Inc*., 101 F.3d 1450, 1472 (2d Cir. 1996), *cert. denied*, 522 U.S. 812 (1997) ("plaintiff must show a primary violation by the controlled person and control of the primary violator by the targeted defendant"); *accord Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 139 (2d Cir. 2011). Therefore, Count II is dismissed.

## III.     Leave to Amend

Defendants request that the Court deny Plaintiff's Amended Complaint with prejudice. Plaintiff requests leave to amend to cure any pleading deficiencies. Rule 15 of the Federal Rules of Civil Procedure instructs courts to "freely give leave" to replead "when justice so requires." Fed. R. Civ. P. 15(a)(2); *see also Foman v. Davis*, 371 U.S. 178 (1962). The "usual practice" in this Circuit upon granting a motion to dismiss is to permit amendment of the complaint. *Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F. Supp. 3d 401, 446–47 (S.D.N.Y. 2014) (citing *Ronzani v. Sanofi S.A.*, 899 F.2d 195, 198 (2d Cir. 1990)). Plaintiff is therefore granted leave to amend the amended complaint.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is **GRANTED** without prejudice. The Clerk of the Court is respectfully directed to terminate the motion at ECF No. 33. Plaintiff is granted leave to file a second amended complaint by **April 20, 2023.**

**SO ORDERED.**

**Dated:**   **March 30, 2023**
           **New York, New York**

                                             **ANDREW L. CARTER, JR.**
                                           **United States District Judge**