**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

*IN RE FUBOTV INC. SECURITIES*
*LITIGATION*

**Case No. 1:21-CV-01412 (ALC)**

**CLASS ACTION**

**JURY TRIAL DEMANDED**

## SECOND AMENDED CLASS ACTION COMPLAINT

Lead Plaintiff Nordine Aamchoune, on behalf of himself and all others similarly situated, by and through his undersigned counsel, hereby brings this Second Amended Class Action Complaint for violations of federal securities law ("SAC") against Defendant FuboTV Inc. (the "Company" or "Fubo") and Individual Defendants David Gandler ("Gandler"); Edgar M. Bronfman Jr. ("Bronfman"); and Simone Nardi ("Nardi") (collectively, "Individual Defendants," and together with the Company, "Defendants"), based upon, *inter alia*, the investigation conducted by counsel, which included a review of the Company's public documents, conference call transcripts, Company announcements, U.S. Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding the Company, financial analysts' reports and advisories about the Company, interviews with former Fubo employees who have specific, personal knowledge of the facts alleged herein, and other information upon information and belief.

Plaintiff's counsel's investigation into the matters alleged herein is ongoing and many relevant facts are known only to, or are exclusively within the custody or control of, the Company and the Individuals Defendants. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## <u>NATURE OF THE ACTION</u>

1.      This is a federal securities class action on behalf of a class consisting of all persons or entities other than Defendants who purchased or otherwise acquired common shares of Fubo stock between May 20, 2020 and January 4, 2021, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.      Founded in 2015, Fubo is a Florida corporation headquartered in New York. Fubo is a virtual multichannel video programming distributor ("vMVPD") that offers subscribers access to

thousands of live sporting events as well as news and entertainment content. Fubo's platform allows customers to access content through "streaming" devices as well as on "smart TVs,"[1] mobile phones, tablets, and computers. In its regulatory filings and public statements, Fubo positions itself as a content distributor at the intersection of three "megatrends" described in detail herein: cord-cutting, connected TV advertising, and online sports wagering. While Fubo revenues are almost entirely derived from the sale of subscription services and advertising in the United States, it also provides streaming services in Canada and Spain.

3.    During the Class Period, Defendants disseminated false and misleading statements that misrepresented Fubo's financial prospects and true operating condition. These misleading statements and omissions related principally to Fubo's business operations and performance metrics, including, among others, the Company's ability to attract and generate advertising revenue and its highly touted entry into online sports wagering.

4.    For example, Fubo repeatedly told investors that there was a "significant opportunity" for the Company "to allow advertisers to access our audience by leveraging our technology, data, and measurability to drive returns on advertising spend."  In addition, Fubo also told investors that "we made some really bold moves in the quarter and that really speaks to our ability to leverage our proprietary data."  Yet, what Fubo did not tell investors was that the Company had zero technical ability to harness, leverage, or use any of its proprietary data related to its customers for the purpose of increasing its advertising revenue.  Thus, any prospects of increasing Fubo's advertising revenue was severally limited and handicapped.

5.    A well-placed confidential witness revealed that Fubo lacked the ability to provide "user data" to content providers. User data includes information about a viewers' location, age, how

---

[1] A "smart TV" is a television set with integrated internet features (using a home's Wi-Fi connection) that allows users to stream music and videos, and browse the internet.

many hours they spend viewing a particular show or what type of content they are viewing, as well as other demographic information. User data is vitally important to helping content providers allocate advertising dollars.  However, Fubo acknowledged in meetings with content providers that it lacked the capability to collect user data, in part, due to limitations in the technical backend of Fubo's platform. Other former employees have independently confirmed that the Company did not have the technical ability to access to relevant user data on its proprietary platform in order to attract advertisers or to encourage content providers to partner with the Company under more favorable terms. As a result, Fubo was placed at a competitive disadvantage in its negotiations with content providers.

6.    Additionally, the Company gave a wholly unrealistic portrayal of its prospects for entering the online sport wagering business in connection with its December 1, 2020 announcement of Balto Sports. The December 2020 announcement and related disclosures misleadingly claimed that acquiring Balto Sports was the first step in entering the online sports wagering market, thereby boosting market expectations and inflating the price of Fubo's common stock. The Company's stock price increased from $26.74 at closing on December 1, 2020 to open at $28.50 on December 2, 2020, an increase of 6%. On the same day, ROTH Capital analyst Darren Aftahi increased his price target for Fubo from $29 to $36, as a result of Fubo's Balto Sports acquisition. Unbeknownst to investors, the Company lacked the financial wherewith and internal expertise needed to scale its sports wagering business. One market analyst later described Fubo's strategy as "putting a lipstick on a pig." Former employees of Fubo have corroborated this reality in acknowledging that Fubo had neither the financing nor the expertise to navigate the complex web of state regulatory approvals needed to engage in an online sports wagering business.

7.    Investors gradually learned the cold hard truth about Fubo's business operations and diminishing prospects through a series of research reports, beginning on December 23, 2020.  These reports disclosed, among other material information, that:

(i) Fubo's user data and inventory were not differentiated to allow Fubo to achieve its long-term advertising growth goals; and

(ii) Fubo could not successfully compete and perform as a sports book operator since it lacked the capabilities and resources needed to capitalize on its online sports wagering opportunity.

8.     As detailed herein, these material facts rendered Defendants' statements during the Class Period materially false and misleading.

9.     Following these disclosures, the price of Fubo's common stock fell precipitously, by 54% from a close of $62.00 on December 22, 2020, to a close of $24.24 on January 4, 2021. As a result, Plaintiff and other Class members have suffered significant damages.

10.    Post-Class Period developments further bolster Plaintiff's allegations. Fubo announced its Q4 2020 and 2020 year-end financial results on March 2, 2021.  The Company reported annual losses that reached $570 million; adjusted losses of $2.47 per share were much wider than the reported loss of $1.07 per share for the same quarter during the previous year.  On this news, the Company's shares dropped 18% from $41.89 on March 2, 2021, to close at $34.14 on March 3, 2021. The Company's guidance for Q1 2021 further disappointed some analysts and led investment bank BMO Capital Markets to trim its price target from $50 to $45, noting that the guidance implies more moderate growth in average revenue per user, along with dampened gross margins.

11.    Throughout the rest of 2021, all of 2022, and the first five months of 2023 Fubo's stock price continued to plummet, closing at just $1.87 per share on by May 22, 2023.  Even to this day, Fubo's stock price has never come close to returning to its pre-disclosure levels.

## JURISDICTION AND VENUE

12.    The claims asserted herein arise under Section 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

14.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b), as the alleged misstatements and omissions were made or omitted, and the subsequent damages took place in this Judicial District. Pursuant to Fubo's most recent quarterly report (SEC Form 10-Q), as of April 30, 2023, there were 291,850,035 shares outstanding of the Company's common stock. Fubo's common stock trades on the New York Stock Exchange ("NYSE"). Accordingly, there are presumably hundreds, if not thousands, of investors in Fubo's common stock located within the United States, some of whom undoubtedly reside in this Judicial District.

15.     In connection with the acts alleged in this Second Amended Class Action Complaint, Fubo, directly or indirectly, used the instrumentalities of interstate commerce, including interstate wires, U.S. Postal Service mail, wireless spectrum, and the national securities exchange.

## PARTIES

### A.     Plaintiff

16.     Lead Plaintiff Nordine Aamchoune ("Plaintiff") is a resident of Dubai, United Arab Emirates. As set forth in his Certification (ECF No. 21-3), previously filed with this Court and incorporated by reference herein, Plaintiff acquired shares of Fubo during the Class Period, at artificially inflated prices, and was damaged by the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

### B.     Defendants

17.     Defendant FuboTV, Inc. ("Fubo" or "Company") is a Florida corporation with a principal place of business at 1290 Avenue of the Americas, New York, NY 10104. Fubo's shares trade on the NYSE under the ticker symbol "FUBO."

18.    Defendant David Gandler is the co-founder of the Company and has served as the Company's CEO and a Director on the Company's Board of Directors since April 1, 2020.

19.    Defendant Edgar M. Bronfman Jr. has served as the Company's Executive Chairman since April 29, 2020, when he replaced John Textor. Defendant Bronfman was previously the chairman and CEO of Warner Music.

20.    Defendant Simone Nardi previously served as the Company's CFO from May 31, 2020 to February 7, 2022.

21.    Defendants Gandler, Bronfman, and Nardi are referred to herein as the "Individual Defendants." The Individual Defendants, together with Fubo, are collectively referred to herein as the "Defendants."

22.    The Individual Defendants possessed the authority to control the contents of statements made by Fubo in the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.,* the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged in the Second Amended Class Action Complaint to be misleading prior to, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Due to their positions with Fubo and their access to Fubo's material information that was unavailable to the public, the Individual Defendants knew that the adverse facts described herein were not disclosed to and were being concealed from investors. The Individual Defendants are liable for the false statements and omissions alleged herein.

## NON-PARTY CONFIDENTIAL WITNESS

23.    The allegations made herein are further supported by the first-hand, personal knowledge of one non-party confidential witness ("CW #_").  This confidential witness was a senior former Fubo employee who worked as an Engineer and later as a Project Manager and provided facts

and information from departments within the Company directly relevant to the claims asserted herein. As detailed below, the confidential witness served in relevant positions at Fubo which provided them with access to the information and relevant knowledge of the facts they are alleged to possess during the course of their employment.

24.     The confidential witness's information also corroborates information from other sources received and/or reviewed by Plaintiff's counsel.

**A.    <u>CW #1</u>**

25.     CW #1 initially joined Fubo as a Triage Engineer in June 2017 and worked at the Company's New York City headquarters. CW #1 reported to Senior Technical Program Manager, who in turn reported to Vice President of Product and Innovation. After the departure of the Senior Technical Program Manager, CW #1 reported to Senior Project Manager/Manager of the Platform Operations. As a Triage Engineer at Fubo, CW #1 acted as a conduit between the Company's customer care and engineering teams. As a part of this position, CW #1 also helped resolve technical problems across Fubo's production platforms.

26.     In January 2018, CW #1 became a Project Manager. In this capacity, CW #1 coordinated projects within the Company's engineering team. CW #1's work primarily involved onboarding new channels onto Fubo's platform. As a part of CW #1's duties, CW #1 attended meetings with content providers and Fubo. According to CW #1, these meetings were also attended by Senior Vice President – Head of Content Strategy and Acquisition. While in a Project Manager role within the Company's engineering team, CW #1 had relevant understanding and internal knowledge of Fubo's content provider contracts, tracking of user growth, and the onboarding of new channels. CW #1 left the Company in February 2020.

## SUBSTANTIVE ALLEGATIONS

### A.    Industry and Company Background

27.    Founded in 2015, Fubo is a sports-geared virtual multichannel video programming distributor ("vMVPD"), offering subscribers access to thousands of live sporting events as well as news and entertainment content. First launched as a soccer streaming service, Fubo changed to an all-sports provider in 2017, and then to its current vMVPD format. Fubo's streaming service is available in the United States, Canada, and Spain, and consists of different subscription level plans offering different channel packages. In its regulatory filings and public statements, Fubo positions itself as a content distributor at the intersection of three "megatrends:" cord-cutting, connected television advertising, and online sports wagering.

28.    vMVPDs, like Fubo, aggregate live and on-demand television content for delivery over the internet. Unlike traditional cable television or satellite providers, Fubo does not supply its own data transport infrastructure (e.g., the fiberoptic cable) and instead, relies on subscribers to maintain their own internet connections to access its service. vMVPDs offer service and product bundles to subscribers, offering television channels at a lower monthly rate than offered by traditional cable television/satellite providers. In 2019 there were approximately 271 online video service vMVPDs that provide viewers with content from broadcast and cable network as well as streaming providers. Internet-based streaming services and corresponding distribution platforms have progressed at a staggering pace, allowing for faster and cost-effective transmissions. According to industry experts, nearly six million subscribers dropped their traditional pay TV services in the third quarter of 2019 alone (what is commonly known as "cord-cutting"). In light of this trend, companies such as Fubo aggressively sought to capitalize on this growing new market.

29.    In recent years, platforms like Fubo have gained popularity over legacy set-top cable boxes and satellite providers, as a way to view live television. For example, Dish Network first

introduced its service known as "Sling TV" in 2015, through which it offered a selection of popular cable networks delivered via mobile apps and other digital media players, or over the internet. By 2018, AT&T, Hulu, Sony, and YouTube TV had all entered the market as vMVPDs. S&P Global Markets Intelligence media research group reports that the number of virtual multichannel service households will reach 15.3 million by the end of 2022.

### B.    The FaceBank Merger Provides Needed Capital

30.    In the lead up to Fubo's merger with FaceBank Group Inc. ("FaceBank"), the Company was burning through cash at an alarming rate. As indicated in the Company's October 5, 2020 S-1 amended Registration Statement. Fubo was generating significant losses as shown by the ballooning working capital deficits.

| | Year Ended December 31, | |
| --- | --- | --- |
| | 2019 | 2018 |
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | |
| Net loss | $ (173,701) | $ (129,312) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation and amortization | 616 | 440 |
| Stock-based compensation | 1,511 | 952 |
| Change in fair value of convertible note derivatives | - | (4,697) |
| Non-cash interest expense | 160 | 1,032 |
| (Gain) loss on extinguishment of debt | (102) | 4,171 |
| Amortization of debt issuance costs | 43 | 32 |
| | | |
| Changes in assets and liabilities: | | |
| Accounts receivable | (2,108) | (3,211) |
| Prepaid affiliate rights | 242 | 14,681 |
| Prepaid expenses and other current and long-term assets | (625) | (294) |
| Accounts payable | 14,490 | 20,093 |
| Accrued expenses and other current and long-term liabilities | 52,612 | 16,526 |
| Deferred revenue | 5,007 | 2,540 |
| Deferred rent | (154) | (106) |
| **Net cash used in operating activities** | (102,009) | (77,153) |
| | | |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | | |
| Capital expenditures | (136) | (434) |
| **Net cash used in investing activities** | (136) | (434) |
| | | |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | | |
| Proceeds from borrowings | 16,150 | 3,050 |
| Proceeds from term loan | - | 25,000 |
| Repayment of borrowings | (5,000) | - |
| Issuance cost related to term loan | - | (204) |
| Proceeds from issuance of convertible preferred stock, net | 90,549 | 46,294 |
| Exercises of stock options | 174 | 84 |
| **Net cash provided by financing activities** | 101,873 | 74,224 |
| | | |
| NET CHANGE IN CASH, CASH EQUIVALENTS AND RESTRICTED CASH | (272) | (3,363) |
| CASH, CASH EQUIVALENTS AND RESTRICTED CASH, BEGINNING OF PERIOD | 15,911 | 19,274 |
| CASH, CASH EQUIVALENTS AND RESTRICTED CASH, END OF PERIOD | $ 15,639 | $ 15,911 |

31.     In March 2020, Fubo announced its merger with FaceBank, a leading virtual entertainment company, focused on development, protection, and activation of the personal digital likeness assets of celebrities and consumers, for use in artificial intelligence, entertainment, personal productivity and social networking.[2] Pursuant to the merger agreement between FaceBank and Fubo, Fubo became a wholly owned subsidiary of FaceBank, and FaceBank was renamed to FuboTV Inc. According to the press release, through this merger, completed on April 1, 2020, Fubo "obtained a secured revolving line of credit of $100 million" (the "revolver") for the benefit of FuboTV as an "inducement to the willingness of the FuboTV" to enter into the merger agreement. At the time of the merger, FaceBank's stock was traded over the counter under the ticker "FBNK."

32.     While news of the line of credit was featured prominently in the merger, according to a December 30, 2020 report issued by Kerrisdale Capital (the "Kerrisdale Report"), the loan's likely purpose was "to project calm to vendors, employees, and programmers that even during a pandemic and the cancellation of sports globally, Fubo had access to liquidity." However, Fubo never drew on the facility beyond the initial advance at the merger close while continuing to sell equity and take on expensive borrowings in the months that followed, which the Kerrisdale Report found to be quite "odd."

### C.      Fubo's Business Model

33.     Fubo's revenues are almost entirely derived from the sale of subscription services and advertising in the United States. Subscription sales are the primary source of revenue The Company offers users two packages: Fubo's "Starter Pack" is priced at $64.99 per month, while the "Elite Pack" is for $79.99 per month. Additionally, Fubo offers add-ons such as "Latino Quarterly" for $33 per

---

[2] FaceBank's prior name was Pulse Evolution Group, which gained popularity for computer-generated holographic images of Tupac Shakur at the 2012 Coachella concert and Michael Jackson at the 2014 Billboard Music Awards. Pulse's technology also was used for digital visual effects in such movies as "The Curious Case of Benjamin Button," "Star Wars: Episode III – Revenge of the Sith," "Rango," and "Transformers."

month. Fubo earns additional revenue if a subscriber opts for features like "Cloud Storage," which comes in two sizes, "Family Share" feature and "Unlimited Screens." In their quarterly results for Q3 2020 announced on November 16, 2020, Fubo reported $61.2 million in total revenue, of which $53.3 million, or 87%, were derived from subscriptions and related add-ons.

34.    Fubo also earns revenue through advertising fees. Fubo has commercial ad breaks during live programming and the frequency and length of these ads are determined by the content provider. Advertising revenue is an important source for the company and is important for its future growth. In Q3 2020, Fubo reported advertising revenue of $7.5 million, which was 12.25 % of its total revenue.

35.    The disparity between the amount of Fubo's subscription and advertising revenue is a function of the structural nature of Fubo's platform. According to the Kerrisdale Report, "Fubo is by orders of magnitude too small and it is merely a content aggregator, not a content producer. After moving slowly at first, content broadcasters are now leaning in and selling inventory they own programmatically." With nothing to differentiate itself, Fubo does not have any levers to pull to improve its pricing. The Kerrisdale Report stated that unlike Fubo, "Hulu's ownership of content, its ability to deliver massive reach, its direct relationships with brands and advertisers all contributes to its ability to sell out of inventory, which in turn allows it to charge a premium. Fubo has no ability to do any of this. Fubo cannot guarantee X number of impressions on Shark week because it doesn't own the content and has relatively few relationships with brands and agencies. Fubo sells its inventory through private marketplace (PMP) deals where, as the Trade Desk[3] executive put it, agencies are bidding on 'leftover' inventory priced at a discount to [programmatic guaranteed] PG deals."

---

[3] As described in the Kerrisdale Report, Trade Desk "is one of the largest demand side platform operators in the world offering agencies, aggregators, and their advertisers best-in-class technology. They are a leading player when it comes to Connected TV (CTV) advertising."

**D.        Materially False and Misleading Statements Issued During the Class Period**

36.        On May 20, 2020, at the 15th Annual Needham Virtual Technology & Media Conference, Defendant Gandler touted that advertising revenue was a "growing component" of Fubo's business." In response to a question, Defendant Gandler stated:

> Advertising is a growing component of our business model. I think it's important to clarify that we have a dual revenue stream…Ours is subscription and ads so it allows us to really grow our ARPU.[4] So, advertising in 2018 was roughly 5% of total revenue. In 2019, it was just north of 8% of total revenue. We do not have an ad sales team but we're obviously thinking about how to start looking at direct ad sales as a way to continue to drive not only revenues but also our CPMs[5] and sponsorship capabilities given some of the unit content that we [technical difficulty] introducing.

37.        On May 29, 2020, Fubo—then known as FaceBank Group, Inc.—filed its yearly report on Form 10-K with the SEC for the fiscal year ended December 31, 2019 (the "2019 Annual Report"). The 2019 Annual Report was signed by Defendants Gandler and Bronfman. Appended as Exhibits 32.1 and 31.1 to the 2019 Annual Report were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX Certifications"), wherein Defendant Gandler certified that "the [2019 Annual Report] does not contain any untrue statements of a material fact" and that "the information included in the [2019 Annual Report] fairly presents, in all material respects, the financial condition and results of operations and cash flows of the [Company]" in compliance with Section 13(a) or Section 15(d), as applicable, of the Securities Exchange Act of 1934.

38.    Fubo's 2019 Annual Report stated that the Company is "increasingly leveraging our data and analytics capabilities to optimize advertisements for both users and advertisers. We need to continue to maintain an appropriate advertising inventory for the growing demand for ads on our

---

[4] Average revenue per user ("ARPU") sometimes known as average revenue per unit, is a measure used primarily by digital media companies, defined as the total revenue divided by the number of subscribers.

[5] Cost per thousand ("CPM"), also called cost per mille, is a marketing term used to denote the price of 1,000 advertisement impressions on one web page.

platform." The Company also stated that Fubo "rel[ies] on our ability to increase advertising revenues. Our ability to leverage our data to provide users with relevant ads and measure the effectiveness of these advertisements on our platform is also a key factor to an increased wallet share of advertising budgets spent on our platform."

39. On August 10, 2020, the Company changed its name to FuboTV Inc., and as of May 1, 2020, the Company's trading symbol on the NYSE was changed to "FUBO."

40. In connection with the Q2 2020 Report, the Company issued a press release, summarizing the Company's financial and operational results. The press release quoted Defendant Gandler, stating:

> Looking ahead to Q3, with the gradual return of sports, we anticipate an increase in subscribers, viewership and that our portion of revenue derived from advertising will grow. At the close of Q3 we expect paid subscribers to reach 340,000 - 350,000, which will be an increase of 20% year-over-year. The growth of streaming is one of the most significant changes to television, and television advertising, in the last several decades.

41. In the same Press Release, Company reported revenues of $44.2 million, with subscription revenue of $39.5 million and advertising revenue of $4.3 million. The ARPU came out at $54.79, and the Company ended the quarter with 286,126 subscribers.

42. Also, in connection with the Q2 2020 Report, the Company furnished a letter to shareholders dated August 13, 2020, from Defendant Gandler. Reiterating its earlier claims, Defendant Gandler stated:

> We continue to believe fuboTV is at the forefront of the streaming revolution. fuboTV is the leading sports-first, live TV streaming platform, offering subscribers access to tens of thousands of live sporting events annually as well as leading news and entertainment content. At the core of our offering is our proprietary technology platform optimized for live TV and sports viewership. Our proprietary technology stack has enabled us to regularly offer new features and functionality.

13

43.    On August 13, 2020, Fubo filed its quarterly report on SEC Form 10-Q for the second fiscal quarter 2020 ("Q2 2020 Report"). Appended as Exhibits 31.1, 31.2 and 32.1 to the Q2 2020 Report were signed SOX Certifications, wherein Defendants Gandler and Nardi, respectively, certified that "the [Q2 2020 Report] does not contain any untrue statements of a material fact" and that "the information included in the [Q2 2020 Report] fairly presents, in all material respects, the financial condition and results of operations and cash flows of the [Company]" in compliance with Section 13(a) or Section 15(d), as applicable, of the Securities Exchange Act of 1934.

44.    On August 11, 2020, Fubo filed with the SEC a Registration Statement on Form S-1 signed by Defendants Gandler, Nardi, and Bronfman, relating to the proposed secondary public offering of common stock. On September 15, 2020, October 1, 2020, and October 5, 2020, Fubo filed revised versions of the Registration Statement on Forms S-1/A, each of which was signed by Defendants Gandler and Nardi. On October 7, 2020, the Registration Statement was declared effective by the SEC. The Prospectus Summary was incorporated into and formed part of the Registration Statement filed on October 9, 2020.

45.    Fubo offered to sell to the public 18.3 million common shares (excluding the underwriters' option to purchase an additional 2.75 million common shares), for $10 per share. FuboTV closed its public offering of 19,706,708 shares of common stock on October 13, 2020, including the full exercise of the underwriters' option, generating $ 197 million in gross offering proceeds.

46.    Regarding the Company's growth, the Registration Statement provided, in relevant part and among other things that Fubo "believe[s] a significant opportunity for fuboTV is to allow advertisers to access our audience by leveraging our technology, data, and measurability to drive returns on advertising spend:

47.    Rather than disclose the truth, the Registration Statement highlighted the Company's

purported success in growing advertising revenue, stating, in pertinent part:

> Advertisers
>
> We believe our leading, independent live TV streaming platform offers a unique opportunity to advertisers. As cord cutting continues and traditional linear TV viewers decline, advertisers are increasingly allocating their ad budgets to OTT platforms to reach these audiences. fuboTV's sports-first live TV platform offers advertisers a growing and increasingly valuable live audience and provides unskippablead inventory on high quality content. We believe our growing subscriber base and increasing household viewing hours makes the platform highly attractive to advertisers. Advertisers also benefit from combining traditional TV advertising formats with the advantages of digital advertising including measurability, relevancy and interactivity.

48.    The Registration Statement likewise stated: "We believe our premium content and industry-leading consumer experience uniquely position us to rapidly grow our advertising business."

49.    But Fubo failed to disclose material information, namely that it did not have the technical capability to harness its proprietary data necessary to attract advertisers in order to grow that segment of its business.

50.    On November 10, 2020, Fubo issued a press release announcing financial results for the third quarter ending September 30, 2020. The November 10th press release touted the Company's results, stating that the Company "delivered the strongest quarter in its history and exceeded previously raised guidance with solid growth in revenue, subscription and engagement." Defendant Gandler reiterated in the November 10th press release these audacious claims, stating that Fubo had "the strongest quarter in FuboTV's history, exceeding targets in all of [its] key metrics." Similarly, Defendant Bronfman echoed these positive sentiments, claiming that:

> We believe that fuboTV sits firmly at the intersection of three megatrends: the secular decline of traditional TV viewership, the shift of TV ad dollars to connected TVs and online sports wagering, a market which we intend to enter. As a result, we believe our growth opportunities are numerous. Our optimism in the future of fuboTV and the live TV streaming business has never been stronger.

51.     In a shareholder letter, signed by Defendant Bronfman and released on the same day, November 10, 2020, the Company touted its "proprietary data and technology platform" as purportedly being the key to its success and future growth, stating, in relevant part:

> Our financial model is driven by strong unit economics. We expect margin improvement to continue over time, aided by a number of initiatives. This includes the growth of advertising on our platform along with strong attachment rates on value-added services, such as cloud DVR storage and the ability to stream on multiple devices.
>
> We believe fuboTV sits firmly at the intersection of three industry megatrends: the secular decline of traditional TV viewership, the shift of TV ad dollars to connected TVs and online sports wagering. Our strong subscriber growth indicates consumers are cutting the cord faster than ever before, and our increased viewer engagement has driven fuboTV's ad sales growth.

52.     The November 10 shareholder letter also touted online wagering as an additional revenue opportunity:

> We've previously said that we see the online wagering space - a market expected to reach $155 billion by 2024 according to Zion Market Research - as complementary to our sports-first live TV streaming platform. We believe there is a flywheel opportunity with video content and interactivity. As our cable TV replacement product is sports-focused, we believe a significant portion of our subscribers would be interested in online wagering, creating a unique opportunity to drive higher subscriber engagement and open up additional revenue opportunities. Simply put, we expect wagering will lead to more viewing, and this increased engagement will lead to higher ad monetization, better subscriber retention and a reduction in subscriber acquisition costs.
>
> Therefore, we are excited to announce that fuboTV intends to expand into the online sports wagering market. Our goal with wagering is to develop a new revenue stream for fuboTV, and one which we believe will be an important contributor to our business.
>
> We expect to share more tactical details as appropriate. And, of course, we expect to continue to grow our subscribers which will positively impact any decision we make on wagering.

53.     The November 10th letter to shareholders ended with a summary of the Company's claims of future revenue and subscription growth and promising growth of advertising, stating, in relevant part:

> The growth of advertising on our platform along with strong attachment rates on value-added services, such as cloud DVR storage and the ability to stream on multiple devices, continue to improve margins. Furthermore, we believe fuboTV's differentiation in the marketplace - sports-focused programming and a tech-first user experience - firmly positions the company for long-term growth. We are also excited about the potential growth and revenue opportunities around our intended expansion into online sports wagering.

54.     On the same day, November 10, 2020, the Company hosted an earnings call with financial market analysts to discuss its financial results and operations with Defendants Gandler and Nardi present. During the earnings call, Defendant Gandler touted the Company's results, stating as follows:

> And advertising sales, which I've already highlighted earlier, clearly plays an important role in margin expansion. At the end of the day, we made some really bold moves in the quarter and that really speaks to our ability to leverage our proprietary data. And so it also speaks to our the quality of our execution. As you all know, it's tough to expand margins while growing your sub base at this current pace.

55.     However, the Company never disclosed that it did not have the technical capability tp collect its own proprietary customer data necessary to leverage and target advertisers and therefore increase its advertising revenue.

56.     Regarding the Company's future growth, Defendant Gandler assured investors on the earnings call that Fubo was positioned for future growth due to tailwinds from "three mega trends:"

> The tailwinds have never been stronger. Fubo is firmly at the intersection of three mega trends. The first is the secular decline of traditional television viewership. The second is the shift of TV ad dollars to connect the devices. And the third is online sports wagering a market we absolutely intend to enter.

57.    In response to Evercore ISI analyst, Kevin Rippey's question in the November 10, 2020 earnings call regarding Fubo's plans on expanding sports gambling, Defendant Gandler represented that Fubo had "already started executing on its [wagering] strategy" and that the Company is "going to be able to also sell in a lot of wagering opportunities" given its "acquisitions advantage," "engagement advantage," and "monetization advantage."

58.    On November 16, 2020, the Company filed its quarterly report on SEC Form 10-Q for the third fiscal quarter 2020 ("Q3 2020 Report"). Appended as Exhibits 31.1, 31.2 and 32.2 to the Q3 2020 Report were signed SOX Certifications, wherein Defendants Gandler and Nardi, respectively, certified that "the [Q3 2020 Report] does not contain any untrue statements of a material fact" and that "the information included in the [Q3 2020 Report] fairly presents, in all material respects, the financial condition and results of operations and cash flows of the [Company]" in compliance with Section 13(a) or Section 15(d), as applicable, of the Securities Exchange Act of 1934.

59.    On December 1, 2020, the Company issued a press release entitled "fuboTV Acquires Balto Sports as First Step Into Online Sports Wagering Market," announcing the acquisition of Balto Sports, a company that develops tools for users to organize and play fantasy sports games. In the press release, Defendant Gandler promoted the move as "instrumental" expansion of Fubo's sports betting ambitions, stating as follows:

> We believe there are significant synergies between consumers who enjoy wagering and our subscribers who enjoy streaming live sports, creating a flywheel opportunity. As we've previously expressed, one of our goals with wagering is to expand our total available market (TAM) by developing another important revenue stream for fuboTV, as we are doing with our growing ad sales business.
>
> The acquisition of Balto Sports will enable us to build a first class, free to play experience that brings consumers the best games around live sports. From there, we see a natural progression to layer on real money wagering in regulated markets complementing fuboTV's live streaming video for a highly engaging user experience within our platform. We will be strategic in our approach to wagering as we consider and evaluate different opportunities and will adjust our plans accordingly.

> We're excited to launch sports wagering, integrate it into our core offerings and deliver what we believe will be a truly groundbreaking live TV streaming platform to consumers.

60.    On December 9, 2020, Fubo participated in a BMO Capital Markets 2020 Growth & ESG Conference to give investors updates on the Company's performance. During the conference, Defendant Gandler stated that FUBO retained a lot of its customers and that viewing hours increased, and that a key takeaway from that was that it "led to obviously a better advertising conversion."

61.    When asked about the acquisition of Balto Sports, Defendant Gandler highlighted the synergies between the two companies, stating, in relevant part:

> And so we needed to make sure that this was a team that had a very specific skill set that we did not have, but yet was small enough that we can integrate into our larger group and allow them to leverage the resources and the metadata mapping and things that we think are going to allow us to really build something compelling.
>
> And so the reason why Balto was because again, they are in the pick'ems game, they have had, over 30,000 players test the platform. They understand automation. We understand consumer journeys. We understand what we should be looking at from conversion funnels. And what this is going to allow us to do is launch a game at the end of the, I'll call it, first half of the year 2021. Don't hold me to it, but just say call it, June. These guys are going to be joining us, I think next week finally. So we're very excited about that. We've been planning.

62.    Regarding gambling opportunities, at one point during the conference Defendant Gandler provided conflicting commentary, stating at one point that "We're building our free to play our strategy right now. Doing all the data mapping. Understanding which gains were and then eventually as we get into the second phase of this is where we're looking for an entry point into wagering in terms of potentially becoming a sports book." At a different point during the conference, Defendant Gandler sought to tamp down expectations for Fubo's sports betting, stating instead, that "no one should think of us as a . . . wagering company, we're not competing with DraftKings." The BMO Capital Markets analyst picked on Defendant Gandler's contradictory statements and asked

point-blank whether FuboTV was looking to become a licensed real money gaming operator (*i.e.* a DraftKings or a FanDuel), to which Defendant Gandler did stated it was a "clear option."

63.     Furthermore, despite the title of the December 1, 2020 press release itself, and the fact that Fubo said it would mark "the company's first move into the online sports wagering market," the Balto Sports deal did not represent Fubo's "first step."  What Fubo failed to disclose in that press release was that on May 23, 2019, Fubo had previously announced a partnership that named FanDuel as its "exclusive sportsbook, online casino, horse racing and DFS partner." According to the Kerrisdale Report that agreement was terminated after only a year for reasons that have never been publicly provided.

64.     Despite Fubo's hype, Balto Sports appeared to have a defunct, inactive website. Activity on their website appears to cease in February 2020, months before Fubo's acquisition.

65.     The Company's positive statements about the acquisition of Balto Sports worked. Following this news, several securities analysts raised price targets and began incorporating Balto Sports' valuation into Fubo's own valuation.

66.     The above statements identified in ¶¶ 36 through 63 were materially false and misleading statements and failed to disclose material adverse facts about the Company's business, operational, and compliance policies.

67.     Specifically, Defendants made false and/or misleading statements and failed to disclose to investors that: (i) Fubo could not successfully compete and perform as a sports book operator and lacked any ability and resources needed to capitalize on its online sports wagering opportunity and (ii) Fubo's proprietary data and inventory was not, nor could it be, differentiated to allow Fubo to achieve its long term advertising growth goals. As detailed herein, these material facts rendered Defendants' statements during the Class Period materially false and misleading.

## THE TRUTH BEGINS TO EMERGE

68.     On December 23, 2020, following days of meteoric rise in the price of the Company's stock, Richard Greenfield of Lightshed Partners ("Lightshed") initiated coverage with a report of Fubo titled Initiating FUBO with Sell Ratting and $8 Target Price, with a sell recommendation for the Company and a $8 one-year price target. In connection with initiating coverage, Lightshed called the prospects of Fubo achieving success with sports betting a "fantasy." Lightshed further observed that the Company "[may be] the most compelling short we have ever identified in our career as analysts."

69.     On the same day, Fubo was downgraded by BMO Capital Markets to "market perform," down from "outperform," noting that Fubo's "valuation had gotten overheated" and explaining that "Fubo parted ways with WarnerMedia networks earlier this year, so it won't have a chunk of NBA regular-season games or the NCAA men's basketball tournament."

70.     On this news, the shares of the Company declined $17.82, or 28.74% over two days, from $62.00 on December 22, 2020 to close at $44.18 on December 24, 2020.

71.     On December 27, 2020, Lightshed filed another report, titled "FuboTV is a Money Losing vMVPD, FuboTv is not Roku nor FanDuel; Sell Now," in which Lightshed called Fubo a "money losing virtual MVPD" and reiterated its sell recommendation. Lightshed questioned whether Fubo can turn its "fundamentally flawed MVDP/vMVPD business into a good one, especially if it lacks scale and other product bundles." Lightshed differentiated Fubo among its competitors, stating that: "Fubo is not Netflix, Fubo is not Flutter/FanDuel, DraftKings nor even Penn/Barstool Sports, Fubo is not Roku and Fubo is not Trade Desk. Fubo is simply just another virtual multichannel video programming distributor (vMVPD) facing the same obstacles and financial challenges as every other vMVPD[s]."

72.    Following the publication of Lightshed's second report, which harshly criticized Fubo's business model, the price of Fubo's shares declined $5.24, or 11.86%, from $44.18 on December 24, 2020 to close at $38.94, on December 28, 2020.

73.    On December 28, 2020, the barrage by securities analysts continued with Hedgeye analyst, Andrew Freedman, questioning the Company's valuation on the grounds that "a more bullish scenario with 1.5M paid subscribers, $100 ARPU, and 15% adjusted EBITDA margin still only gets the stock up to $23/share."

74.    Fubo's shares continued to spiral downward on December 30, 2020, when Kerrisdale Capital published their report (i.e., the Kerrisdale Report), which comprehensively dismantled Fubo's business model and exposed Fubo's flawed strategy.  More specifically, the Kerrisdale Report reported that Fubo's core subscription business was "structurally unprofitable," due to "high variable content costs with contracted escalators."

75.    The Kerrisdale Report further revealed that Fubo "does not have any data or inventory that is differentiated and cannot provide the reach many advertisers crave." The Kerrisdale Report explained that traditional connected TV, which is the source of advertising revenue, has been on a decline in the past two years, with a massive increase in ad inventory being anticipated in the coming years. Contrary to Fubo's bullish statements, the Company had "nothing to differentiate itself" in order to sell more advertising or "levers [to] pull to meaningfully improve its pricing."

76.    CW #1 corroborated the additional claims made by the Kerrisdale Report. For example, CW #1 stated that Fubo did not possess enough lucrative user data that could be utilized to target advertisers.  CW#1 participated in Fubo's contract meetings with content providers where the issue of Fubo's technical inability to target advertisements was discussed often, stating "I remember a lot of conversation about this."

77.     Rather, Fubo was "very limited on targeted ads." CW #1, who attended meetings with senior executives of Fubo, including Ben Grad (Senior Vice President – Head of Content Strategy and Acquistion) and content provider, also stated that Fubo admitted to content providers in these meetings that "we don't have the ability" to provide user data." CW #1 explained that user data refers to a "users' location, age, how many hours they spend watching particular types of content, the types of content they watch and the location where they're watching, in addition to other demographic information." Content providers who put ad dollars towards advertising want to know this type of information.

78.     Fubo's 2019 Annual Report stated that the Company is "increasingly leveraging our data and analytics capabilities to optimize advertisements for both users and advertisers. We need to continue to maintain an appropriate advertising inventory for the growing demand for ads on our platform." The Company also stated that Fubo "rel[ies] on our ability to increase advertising revenues. Our ability to leverage our data to provide users with relevant ads and measure the effectiveness of these advertisements on our platform is also a key factor to an increased wallet share of advertising budgets spent on our platform." In reality, Fubo did not have the capability to track lucrative "user data" sought by advertisers, including large content providers like Fox and NBC, according to CW#1.

79.     CW #1 stated that Fubo was not able to provide user data to content providers partly because of "technical" reasons on Fubo's "back end." CW #1's recalled at meetings that content providers would "request to collect user data" but the Company had to refuse by saying "we can't do that."

80.     The Kerrisdale Report also concluded that Fubo's acquisition of Balto Sports as a "foolish" attempt to enter the "already highly competitive space [of sport wagering]." The Company misleadingly used the popular field of legal sports betting as an attractive bait for investors by announcing that "fuboTV intends to expand into online sports wagering market," in its November

10th letter to shareholders. However, Defendants failed to disclose that Balto Sports is "a company with 3 employees," with "no valuable IP," and "a failed test product" that "had mothballed operations during the pandemic."

81.    Fubo's acquisition of Balto Sports came shortly before Dish Network's Sling TV's strategic sports betting deal with DraftKings, a fully established and operating sports book with an existing online and mobile gambling infrastructure, which ultimately proved to be threatening competition for Fubo. Balto Sports had none of these capabilities.

82.    On the publication of the Kerrisdale Report, Fubo's shares declined another $9.70, or 25.72%, to close at $28.00 on December 31, 2020, on unusually high trading volume.

83.    On January 4, 2021, just after the close of Q4 2020 but before the results for the quarter were released, the financial industry site Motley Fool published an article titled "There's a Big Problem with FuboTV Stock" with a subtitle "The wildly unprofitable streamer tries to put lipstick on a pig with a creative metric." The Motley Fool article questioned the Company's business model, stating that the Company is "nowhere close to turning a profit" as the "direct costs of delivering its service are higher than revenue." Relatedly, the article noted that "subscriber related expenses, which include affiliate distribution rights and cloud computing charges, among other things, were slightly higher than revenue in the third quarter."

84.    The Motley Fool article's claim that the Company is "nowhere close to turning a profit" is borne out by Fubo's consistent and continuing report of losses. The Company reported a net loss of $570 million for year ending 2020, including a $248.9 million impairment charge for intangible goods and assets. The Company announced its Q4 2020 results on March 2, 2021 and reported a net loss of $167 million. Once again in their Q1 2021 financial results reported on May 11, 2021, the Company reported a net loss of $70 million. Even though the Company has continued to

report a growth in subscribers and increased their subscription cost, those modest increases are far outweighed by the Company's soaring expenses described herein.

85.    The Motley Fool article also questioned Fubo's financial metrics including Non-GAAP adjusted contribution margin, which Fubo reported to be 16.1%. The Motley Fool accused Fubo of "concoct[ing] a profitability metric that's positive," ultimately concluding:

> It should now be pretty clear that fuboTV's adjusted contribution margin is a meaningless number. It's a function of how quickly the company is gaining subscribers, not a representation of profitability. The fact that the company reports such a misleading metric is a huge red flag. It's reason enough to stay far away from the stock.

86.    On this news, Fubo's shares declined an additional $3.99, or 14%, to close at $24.24 on January 4, 2021.

## POST CLASS ALLEGATIONS

87.    Soon after the Class Period ended, Lightshed Partners published another report on January 19, 2021, lowering Fubo's price target to $6.50. Reiterating its "sell" recommendation, Lightshed Partners concluded that s that the Company would need at least $1 billion in 2021 to finance its "sports betting fantasy." Following the release of this report, Fubo's stock price dropped 5% to $30.74 a share.

88.    On March 2, 2021, Fubo reported a net loss of $167 million for Q4 2020, which dwarfs Company's earnings of $105 million in the quarter. The annual losses of the Company ballooned to a whopping $570 million. Fubo reported Q4 2020 adjusted losses of $2.47 per share, more than double the reported loss of $1.07 per share for the same quarter a year ago. On this news, the shares of Fubo dropped from $43.21 on March 2, 2021 to close at $34.14 on March 3, 2021, representing a drop of almost 21%.

89.     The guidance for Q1 2021 further disappointed analysts. For example, BMO Capital Markets trimmed its price target from $50 to $45 noting that guidance implies "more moderate growth in average revenue per user, along with dampened gross margins."

90.     In their letter to shareholders for Q4 2020 dated March 3, 2021, Fubo stated "We believe our expected expansion into wagering and interactivity will further differentiate us from our peers." But Fubo failed to even mention the newly announced partnership between DraftKings and Dish Network. DraftKings is a fully established sportsbook and its partnership with Dish Network to integrate live TV and sports wagering had a big impact on Fubo's plans, which is reflected by a 8% drop in Fubo's share price on March 4, 2021, upon this announcement.

91.     On March 8, 2021, Fubo's President, Jordan Fiksenbaum resigned from the Company effective immediately to become a consultant at Pulse Evolution Corporation, a majority owned subsidiary of Fubo. On news of this public announcement, Fubo's stock dropped another 9% to close at $26.85 on March 24, 2021. Overall, Fubo's stock has dropped 37% in the month of March 2021 alone, failing to rebound from its pre-disclosure levels.

92.     One thing is certain—Fubo still remains unprofitable. Fubo continues to spend more on content and delivery fees than it generates from subscriber fees. This is basic math. Given that these problems have continued beyond the Class Period, Fubo once again saw a drop of 8% on April 12, 2021 to close at $21.35. Then, on May 11, 2021, the Company reported a net loss of $70.2 million for Q1 2021. Importantly, Fubo continues to report losses even though Fubo reported approximately 590,961 subscribers and has steadily increased its subscription price. *See* Q1 2021 Form 10-Q.

93.     For the Q2 2021 results, the Company again portrayed an encouraging picture of the sports wagering business and stated "[w]e believe that our evolving sports wagering integration, our talented team, distinctive partnerships and nimble technology stack position us well to build a category-defining company." The Company also announced that the launch of wagering business

impacted EPS and adjusted revenue and they expect a $4.3 million negative impact from payment associated with the buildup of the wagering business.

94.     The Company continued to string along investors and in their Q3 2021 results, where Fubo stated that their "wagering business also continues to evolve" and a $33.7 million cash outflow related to wagering business.

95.     Raising further questions on the Company's deteriorating financial health, Defendant Gandler has steadily parted with his common stock of the Company. On November 23, 2020, Defendant Gandler sold 26 (1%) of his shares at $24.87 and sold 170,336 (8%) of his shares on March 4, 2021 while the stock was trading at $32.26, parting with 9% of his stake in the two transactions. More recently, Gandler sold 482,000 shares (16%) of Fubo stock on June 25, 2021, at $32.57 per share, and another 88,642 shares (6%) of Fubo stock on June 29, 2021, at $35.00 per share, disposing of 22% of his personal holdings within the span of a week.

96.     In their Q4 2021 results, Fubo once again highlighted the "long-term growth opportunities in the company's streaming, advertising and wagering businesses and the potential to deliver significant value to all of our stakeholders." The Company also announced a $1.06 impact from expenses incurred and a $25 million cash flow related to the wagering business. Defendant Gandler further projected to the investors that "we expect [wagering business] will become a major beneficiary of our flywheel and a contributor to our growth in 2023."

97.     Fubo continued to hype up its hollow claims of sports wagering.  In their Earnings Call for Q1 2022 dated March 31, 2022, Fubo highlighted that Sports Wagering remains a "key pillar of our strategy to integrate interactivity…and our differentiated approach of bringing to market our proprietary Fubo Sportsbook, which integrates live sports and wagering into a single ecosystem will disrupt both video and gaming."  Fubo also noted that out of the negative $120 million in operating cash flow, $7.5 million were associated with the wagering business.

27

98.     But the true nature and disastrous impact of Fubo's sports-wagering business started coming to light in their Q2 2022 earnings call. On August 4, 2022, Fubo finally disclosed the truth regarding its wagering activities after months of stringing along the investors and boosting its share value by inconsequential acquisitions, at the same time continuing to spend money and loss money on their wagering business.  At their August 4, 2022 Earnings Call, the Company stated "our online sports wagering business [is] under strategic review. We will no longer pursue this opportunity on our own and are exploring the best path forward to scale the business."

99.     The Company once again burned $7.7 million associated with its wagering business. But Fubo's stock price actually increased on this announcement. The shares rose almost 17% on the announcement that Fubo had put its sports wagering plans under review.  This is a clear indication that Fubo was burning too much cash and investors were actually happy that Fubo was disbanding its sports wagering business that had never materialized despite Fubo trying for more than 2 years.

100.    However, this only turned out to be the half-truth. On October 17, 2022, Fubo announced that "Following our previously announced strategic review, we have concluded that continuing with Fubo Gaming and Fubo Sportsbook in this challenging macroeconomic environment would impact our ability to reach our longer term profitability goals" and stated "[a]s a result, FuboTV will close its Fubo Gaming subsidiary and cease operation of its owned-and-operated Fubo Sportsbook effective immediately." Shortly after, Fubo held an earnings call dated November 4, 2022 for their Q3 2022 results where they confirmed that "[Fubo has] ceased operations of our owned and operated Fubo sportsbook." The Company blamed their shrinking cash book and long-term profitability goals. The Company also burned $8.6 million towards its wagering business in the third quarter.

101.    Fubo announced its Q4 2020 results on February 27, 2023 and disclosed that the Company had sold 36.7 million common shares, which is about 17% outstanding shares as of January

31 for gross proceeds of $68.1 million. The shares were sold in block trades to multiple investors under the company's "at-the-market" program at what it called negotiated discounts. The proceeds imply that the shares were sold at about $1.86 each, which is 19.8% below previous Friday's closing price of $2.32. Analyst Shweta Khajuria lowered the firm's rating on Fubo shares to in-line from outperform and cut the per-share price target to $3 from $6, noting that in a "challenging" macroeconomic environment, along with additional competition, it's difficult to see how Fubo keeps growing at the same pace.

102.    Throughout the Class Period and beyond, Fubo knew it did not have enough cash to scale its sports wagering operations neither did it plan to meaningfully try to launch its Sportsbook by acquiring establish sports wagering platforms. Fubo at all times knew that Balto Sports was a small startup without a tested product and small-scale company with only three employees who objectively could not have made Fubo's sports wagering business strategy a reality.  Fubo also knew it was depleting its cash book very fast and it would run out of money before the sportsbook was brought up to scale. Despite this, Fubo continued to string investors along and worse, continued throwing cash at it and has now has to sell stock at discounted prices to sustain other parts of its business.

## CLASS ACTION ALLEGATIONS

103.    Plaintiff brings this action pursuant to Rules 23(a) and (b) of the Federal Rules of Civil Procedure, on its own behalf and as representative of a Class, consisting of all those who purchased or otherwise acquired shares of Fubo during the Class Period (the "Class") and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

104.     The Class is so numerous and geographically dispersed that joinder of all members is impracticable. Throughout the Class Period, Fubo's shares were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be readily identifiable from information and records in the possession of Defendants or the Company's transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

105.     Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and members of the Class sustained damages from the same wrongful conduct of Defendants. The injuries and damages of each member of the Class were directly caused by Defendants' wrongful conduct in violation of the laws described herein.

106.     Plaintiff will fairly and adequately protect and represent the interests of members of the Class. Plaintiff is an adequate representative of the Class and has no interest which is averse to the interests of absent Class members. Plaintiff has retained counsel competent and experienced in class action litigation, including class actions in the financial services industry.

107.     Common questions of law and fact exist as to all members of the Class, which predominate over questions affecting solely individual members of the Class. These common questions of law include, without limitation:

- whether statements made by Fubo and the Individual Defendants to investors during the Class Period included misrepresentations of material facts about the financial condition, operations and oversight of operations at Fubo;

- whether Fubo and the Individual Defendants acted knowingly or recklessly in issuing false and misleading statements or omitting material information that would correct the misstatements;

- whether Fubo's and the Individual Defendants' acts as alleged herein constitute violations of the federal securities laws;

- whether the prices of Fubo's shares during the Class Period were impacted by Fubo's and the Individual Defendants' conduct described herein;

- injury suffered by Plaintiff and Class members; and

- the appropriate measure of damages suffered by Plaintiff and Class members.

108.    A class action is superior to other methods for the fair and efficient adjudication of the controversy because joinder of all Class members is impracticable.  Treatment as a class will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender.

109.    Class treatment will also permit the adjudication of claims by many Class members who could not afford individually to litigate claims such as those asserted in this Second Amended Class Action Complaint. The cost to the court system of adjudication of such individualized litigation would be substantial. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for Fubo and the Individual Defendants.

110.    Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

**APPLICABILITY OF PRESUMPTION OF RELIANCE**
**FRAUD ON THE MARKET DOCTRINE**

111.    The market for Fubo's shares was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Fubo's shares traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired the Company's shares relying upon the integrity of the

market price of Fubo's shares and market information relating to Fubo and have been damaged thereby.

112.    During the Class Period, the artificial inflation of Fubo's shares was caused by the material misrepresentations and/or omissions particularized in this Second Amended Class Action Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Fubo's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Fubo's financials and its business, operations, and prospects, thus causing the price of the Company's shares to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Fubo's shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing Fubo's shares at such artificially inflated prices, and each of them has been damaged as a result.

113.    Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine as:

- Fubo and the Individual Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- these misrepresentations and omissions were material to Plaintiff and the Class;

- Fubo's shares were traded on the NYSE and were covered by numerous analysts;

- Fubo's shares were liquid and traded with significant volume during the Class Period;

- the misrepresentations and omissions alleged herein would likely induce a reasonable investor to misjudge the value of the Fubo's shares; and

- Plaintiff and Class members purchased and/or sold shares of Fubo between the time Fubo and the Individual Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

114.    As a result of the foregoing, the market for Fubo's shares promptly digested current information regarding Fubo from all publicly available sources and reflected such information in Fubo's share price. Under these circumstances, all purchasers of Fubo's shares during the Class Period suffered similar injury through their purchase of Fubo's shares at artificially inflated prices. Thus, a presumption of reliance applies.

115.    Accordingly, Plaintiff and Class members are entitled to a presumption of reliance upon the integrity of the market.

116.    In the alternative, Plaintiff and Class members are entitled to a presumption of reliance established by the Supreme Court in Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128 (1972), because Defendants omitted material information during the Class Period violating a duty to disclose such information as described above. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## LOSS CAUSATION

117.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

118.    During the Class Period, Plaintiff and the Class purchased Fubo's shares at artificially inflated prices and were damaged thereby. The price of Fubo's shares significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

33

## NO SAFE HARBOR

119.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to the allegedly false statements and omissions pled in this Second Amended Class Action Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and circumstances. To the extent certain of the statements alleged to be false and misleading may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made and were not accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward looking statements. Alternatively, to the extent that the statutory safe harbor is intended to apply to any forward-looking statements pled herein, Fubo and the Individual Defendants are liable for those false and misleading forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and misleading, and/or the forward-looking statement was authorized and/or approved by an executive officer of Fubo who knew that those statements were false and misleading when made.

## SCIENTER ALLEGATIONS

120.    As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Fubo and Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Fubo, their control over, and/or receipt and/or modification of Fubo's allegedly materially misleading misstatements and/or their associations with

the Company which made them privy to confidential proprietary information concerning Fubo, participated in the fraudulent scheme alleged herein.

121.    After its merger, Fubo embarked on a campaign to establish itself as a major player in the vMPVD market space. After its public listing on the NYSE, Fubo repeatedly touted its growth prospects, including the potential for increased advertising revenue and the additional of a sports-wagering business.  But these exaggerated and unsubstantiated claims omitted key information. Specifically, the Company's acquisition of Balto Sports led several securities analysts to raise their price targets and began incorporating Balto Sports' valuation into Fubo's own valuation. But this strategy was never realistic. A report by Lightshed Partners dated January 19, 2021 concluded that the Company would need at least $1 billion in 2021 to finance its "sports betting fantasy."  In addition, the Company never disclosed to shareholders that it did not have the technical capability to collect and/or leverage its proprietary customer data in order increase revenue form advertising sales.

122.    Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information that they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.  For example, the Defendants knew but failed to disclose that it had no way of leveraging its customer data and analytics to drive up advertising revenue.  Fubo simply had no capability of using its proprietary customer data to increase its advertising sales.

123.    The Individual Defendants, because of their positions with Fubo, made and/or controlled the contents of the Company's public statements during the Class Period. Each Defendant was provided with or had access to the information alleged herein to be false and/or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, these

Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were materially false and misleading. For example, Defendant Gandler shared frequent reports of subscriber growth and had access to software like Datadog, which tracked the user and subscriber data. As a result, each of these Defendants is responsible for the accuracy of Fubo's corporate statements and are therefore responsible and liable for the representations contained therein.

124.    Individual Defendants, by virtue of their roles at the Company, as well as attesting to, and signing the requisite SEC filings, were all actively involved in the affairs of the Company. Because of their positions and access to material non-public information, Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were materially false and misleading.

125.    For example, according to CW #1, Defendant Gandler was very "hands-on," during CW # 1's initial time with the Company, as he knew all employees' names and asked for their input about the direction of the Company. At these Company-wide all-hands meetings, Defendant Gandler told employees "My goal is to become a publicly traded company," and, "We're going to have the subscriber growth or whatever we need within a year or two years," according to CW #1. Attesting to Defendant Gandler's involvement in the day-to-day affairs of the Company and his influence during content provider negotiation process, CW #1 further indicated that Defendant Gandler attended meetings with content providers, such as HBO and Starz.

126.    Additionally, Defendant Bronfman was found guilty of a charge of insider trading on trades made in Vivendi Universal by a Paris Trial Court on January 21, 2011. The conviction was affirmed by the Paris Court of Appeal in May 2014 and subsequently by the Appellate Court in April

36

2017. The final judgment entered by Paris Court of Appeal ordered Defendant Bronfman to pay € 2.5 million euros. Despite being convicted of insider trading, Fubo still appointed Defendant Bronfman to its Board of Directors in the capacity of Executive Chairman.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### (Violation of Section 10(b) of the Exchange Act and
### Rule 10b-5 Promulgated Thereunder) Against All Defendants

127.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

128.    During the Class Period, Fubo and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved false statements which they knew or deliberately disregarded in that they contained misrepresentations and failed to disclose material facts to make the statements made not misleading.

129.    The Individual Defendants at all times were directly involved in the Company's affairs. Individual Defendants actively led the Company to its stock exchange listing, they led regular meetings to discuss Fubo's key metrics like subscriber growth, content provider contracts, and new packages introduced by Fubo. Defendant Gandler shared frequent reports of subscriber growth and had access to software like Datadog, which tracked the user and subscriber data. Defendant Gandler knew the limitations of his customer proprietary data and knew that Fubo would not be able to increase advertising revenues given this limitation.

130.    Fubo and the Individual Defendants violated § 10(b) of the 1934 Act and Rule 10b-5 by: (a) making false statements of material facts or omitted to state material facts needed to make the statements not misleading; or (b) engaging in acts and practices that operated as a fraud or deceit upon

Plaintiff and others similarly situated in connection with purchases of Fubo's shares during the Class Period.

131.    Fubo and the Individual Defendants acted with scienter because they knew that the statements issued in the name of Fubo were materially false and misleading; knew that these statements would be disseminated to investors; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of these statements as primary violations of securities laws. Fubo and the Individual Defendants, through receipt of information reflecting true facts about Fubo, their control over, and/or receipt of or modification to Fubo's allegedly materially misleading statements, which made them aware of Fubo's confidential proprietary information, participated in the fraudulent scheme complained of herein.

132.    The Individual Defendants had actual knowledge of material omissions and/or the falseness of material statements set forth by Fubo, and intended to deceive Plaintiff and Class members, or at a minimum, recklessly disregarded the truth through their failure to ascertain and disclose the truth in statements made by them or other Fubo employees to investors, including Plaintiff and Class members. These misrepresentations and omissions were material. A reasonable investor would consider the facts—such as the structural unprofitability of Fubo's core subscription model—important in deciding whether to buy shares of Fubo stock and would have viewed the aggregate of information available to be significantly altered by the disclosure of this and other material facts.

133.    Pursuant to the foregoing, the price of Fubo's shares was artificially inflated during the Class Period. Due to their lack of knowledge of the false nature of statements made by Fubo and the Individual Defendants, Plaintiff and Class members relied on the statements made by Fubo and the Individual Defendants and/or the integrity of the market price of Fubo's shares during the Class

Period in purchasing shares of Fubo at prices that were artificially inflated due to false and misleading statements made by Fubo and the Individual Defendants.

134.    Had Plaintiff and Class members been made aware that the market price of Fubo's shares were artificially and falsely inflated by the misleading statements made by Fubo and the Individual Defendants, as well as by the material adverse information that Fubo and the Individual Defendants failed to disclose, they would not have purchased Fubo's shares at artificially inflated prices, or purchased them at any price.

135.    Based on the wrongful conducted alleged herein, Plaintiff and Class members have suffered damages in an amount to be determined at trial. Fubo and the Individual Defendants violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiff and Class members for significant damages suffered via their purchases of shares of Fubo during the Class Period.

### SECOND CLAIM FOR RELIEF
#### (Violation of Section 20(a) of the Exchange Act)
#### Against the Individual Defendants

136.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

137.    During the Class Period, the Individual Defendants were involved in the management and operation of Fubo's business affairs. Due to their senior positions, they had knowledge of adverse non-public information regarding Fubo's business model, strategy, valuation, and revenue targets and goals and false representations in connection therewith.

138.    As directors and/or officers of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information regarding Fubo's financial condition and results of operations, and to correct any public statements issued by Fubo which were materially false or misleading.

39

139.    Due to their positions of authority at Fubo, the Individual Defendants controlled the contents of various public filings, press releases and reports which Fubo disseminated in the market during the Class Period. During the Class Period, the Individual Defendants utilized their authority to cause Fubo to execute the wrongful acts alleged herein. The Individual Defendants were therefore "controlling persons" at Fubo pursuant to Section 20(a) of the Exchange Act. On this basis, they were participants in the unlawful conduct alleged which caused the prices of Fubo's shares to be artificially inflated.

140.    As information provided by CW #1 has emerged, Defendant Gandler provided regular updates on subscriber growth during Company-wide all-hands meetings. In many of these meetings Defendant Gandler told employees "[m]y goal is to become a publicly traded company," and, "[w]e're going to have the subscriber growth or whatever we need within a year or two years," according to CW #1.  Defendant Gandler's day-to-day involvement is further indicated by the fact that Defendant Gandler attended meetings with content providers, such as HBO and Starz.

141.    Based on the conduct described above, the Individual Defendants are liable for the violations committed by Fubo pursuant to Section 20(a) of the Exchange Act.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully demands relief as follows:

A.    Certifying this lawsuit as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, certifying Plaintiff as Class Representative;

B.    Awarding damages in favor of Plaintiff and members of the Class against Fubo and the Individual Defendants, jointly and severally, for all damages sustained as a result of Fubo's wrongdoing, in an amount to be proven at trial;

C.    Awarding Plaintiff and members of the Class their costs of suit, including reasonable attorneys' fees and expenses, and including expert fees, as provided by law;

D.      Awarding Plaintiff and members of the Class pre- and post-judgment interest at the maximum rate allowable by law; and

E.      Directing such further relief as it may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

Dated: May 22, 2023

**LOWEY DANNENBERG, P.C.**

*/s/ Andrea Farah*
Andrea Farah
Christian Levis
David C. Harrison
44 South Broadway, Suite 1100
White Plains, New York 10601
Telephone: (914) 997-0500
Email:  afarah@lowey.com
        clevis@lowey.com
        dharrison@lowey.com

Anthony M. Christina (admitted *pro hac vice*)
One Tower Bridge
100 Front Street, Suite 520
West Conshohocken, PA 19428
Telephone: (215) 399-4770
Email: achristina@lowey.com

*Counsel for Lead Plaintiff Nordine Aamchoune and the Class*

**THE SCHALL LAW FIRM**
Brian Schall
2049 Century Park East, Suite 2460
Los Angeles, California 90067
Telephone: (424) 303-1964
Email: brian@schallfirm.com

*Additional Counsel for Lead Plaintiff*