**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE FUBOTV INC. SECURITIES
LITIGATION

Case No. 1:21-CV-01412 (ALC) (JLC)

CLASS ACTION

**PLAINTIFF'S MEMORANDUM OF LAW**
**IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**
**THE SECOND AMENDED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................................ 1

STATEMENT OF FACTS ................................................................................................. 2

    A.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS.................................................. 3

        1.   Misstatements About Leveraging User Data to Enhance Advertising Revenue .......... 3

        2.   Defendants' Misstatements Concerning the Sport Wagering Market ......................... 5

        3.   The Truth is Gradually Revealed ............................................................... 6

ARGUMENT ..................................................................................................................... 8

    A.    LEGAL STANDARD ................................................................................................ 8

    B.    THE SAC SUFFICIENTLY PLEADS FALSE AND MISLEADING STATEMENTS AND OMISSIONS ................................................................................................ 8

        1.   The SAC Does Not Employ Puzzle Pleading ................................................. 9

        2.   Misstatements Concerning Leveraging User Data to Boost Ad Revenue .................. 10

        3.   Misstatements Concerning the Sport Wagering Market ....................................... 12

    C.    THE PSLRA SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE NOT IMPLICATED ...................................................................................... 15

        1.   The Safe Harbor Is Inapplicable ................................................................ 15

        2.   The Statements Lacked Meaningful Cautionary Language........................................ 16

    D.    DEFENDANTS' MISSTATEMENTS ARE NOT PUFFERY ..................................................... 17

    E.    DEFENDANTS' OMNICARE ARGUMENT IS UNAVAILING .............................................. 20

    F.    PLAINTIFFS HAVE SUFFICIENTLY PLED SCIENTER ...................................................... 20

    G.    PLAINTIFFS HAVE SUFFICIENTLY PLED LOSS CAUSATION .......................................... 23

CONCLUSION ................................................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**                                                                                                      **Page(s)**

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*,
19 F.4th 145 (2d Cir. 2021) ................................................................................................. 8, 9

*Arkansas Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*,
77 F.4th 74 (2d Cir. 2023) ..................................................................................................... 19

*Behrendsen v. Yangtze River Port & Logistics Ltd.*,
No. 19-cv-00024 (DLI)(LB), 2021 WL 2646353 (E.D.N.Y. June 28, 2021) ........................... 24

*Bishins v. CleanSpark, Inc.*,
No. 21-cv-511 (LAP), 2023 WL 112558 (S.D.N.Y. Jan. 5, 2023) ........................................... 15

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
750 F.3d 227 (2d Cir. 2014) ................................................................................................... 23

*Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*,
543 F. App'x 72 (2d Cir. 2013) ............................................................................................... 25

*City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp.*,
875 F. Supp. 2d 359 (S.D.N.Y. 2012) ................................................................................. 21, 22

*Constr. Laborers Pension Tr. for S. California v. CBS Corp.*,
433 F. Supp. 3d 515 (S.D.N.Y. 2020) ...................................................................................... 9

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005) ................................................................................................................ 23

*Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*,
343 F.3d 189 (2d Cir. 2003) ................................................................................................... 23

*Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*,
794 F.3d 297 (2d Cir. 2015) ............................................................................................... 8, 11

*Freudenberg v. E*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010) ........................................................................... 17, 22, 24

*Galestan v. OneMain Holdings, Inc.*,
348 F. Supp. 3d 282 (S.D.N.Y. 2018) ...................................................................................... 15

*Ganino v. Citizens Utilities Co.*,
228 F.3d 154 (2d Cir. 2000) ............................................................................................... 17, 19

*Gauquie v. Albany Molecular Rsch., Inc.*,
No. 14-cv-6637 (FB)(SMG), 2016 WL 4007591 (E.D.N.Y. July 26, 2016) ............................ 21

*Greco v. Qudian Inc.*,
No. 1:20-CV-577-GHW, 2022 WL 4226022 (S.D.N.Y. Sept. 13, 2022) ........................... 11, 12

*Hall v. The Children's Place Retail Stores, Inc.*,
580 F. Supp. 2d 212 (S.D.N.Y. 2008) ................................................................................ 17

*In re Alibaba. Grp. Holdings Ltd. Sec. Lit.*,
No. 20 Civ. 9568 (GBD), 2023 WL 2601472 (S.D.N.Y. Mar. 22, 2023) ................................ 21

*In re Alstom SA*,
406 F. Supp. 2d 433 (S.D.N.Y. 2005) .................................................................................. 9

*In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*,
381 F. Supp. 2d 192 (S.D.N.Y. 2004) ................................................................................ 22

*In re Arcimoto Inc., Sec. Litig.*,
No. 21-cv-2143 (PKC), 2022 WL 17851834 (E.D.N.Y. Dec. 22, 2022) ................................. 25

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
324 F. Supp. 2d 474 (S.D.N.Y. 2004) ................................................................................ 21

*In re BHP Billiton Ltd. Sec. Litig.*,
276 F. Supp. 3d 65 (S.D.N.Y. 2017) .................................................................................. 18

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
No. 17 Civ. 01580 (LGS), 2019 WL 5287980 (S.D.N.Y. Oct. 18, 2019) .............................. 24

*In re Doral Fin. Corp. Sec. Litig.*,
563 F. Supp. 2d 461 (S.D.N.Y. 2008) ................................................................................ 12

*In re EHang Holdings Ltd. Sec. Litig.*,
No. 21 Civ. 1392 (GBD), 2022 WL 17718546 (S.D.N.Y. Dec. 15, 2022) .............................. 25

*In re eSpeed, Inc. Sec. Litig.*,
457 F. Supp. 2d 266 (S.D.N.Y. 2006) ................................................................................ 23

*In re Gen. Elec. Sec. Litig.*,
No. 09 Civ. 1951 (DC), 2009 WL 2259502 (S.D.N.Y. July 29, 2009) .................................. 24

*In re Inv. Tech. Grp., Inc. Sec. Litig.*,
251 F. Supp. 3d 596 (S.D.N.Y. 2017) ................................................................................ 14

*In re Lululemon Sec. Litig.*,
   14 F. Supp. 3d 553 (S.D.N.Y. 2014) ................................................................................. 10

*In re MF Glob. Holdings Ltd. Sec. Litig.*,
   982 F. Supp. 2d 277 (S.D.N.Y. 2013) ........................................................................ 16, 17

*In re Nokia Corp. Sec. Litig.*,
   No. 19 Civ. 3509, 2021 WL 1199030 (S.D.N.Y. Mar. 29, 2021) ...................................... 14, 19

*In re Nortel Networks Corp. Sec. Litig.*,
   238 F. Supp. 2d 613 (S.D.N.Y. 2003) ................................................................................. 17

*In re NTL, Inc. Sec. Litig.*,
   347 F. Supp. 2d 15 (S.D.N.Y. 2004) ..................................................................................... 9

*In re Omnicom Grp., Inc. Sec. Litig.*,
   597 F.3d 501 (2d Cir. 2010) ..................................................................................... 23, 25

*In re Pareteum Sec. Litig.*,
   No. 19 Civ. 9767 (AKH), 2021 WL 3540779 (S.D.N.Y. Aug. 11, 2021) ................................ 23

*In re Romeo Power Inc. Sec. Litig.*,
   No. 21 Civ. 3362 (LGS), 2022 WL 3701095 (S.D.N.Y. Aug. 25, 2022) ................................ 15

*In re Scholastic Corp. Sec. Litig.*,
   252 F.3d 63 (2d Cir. 2001) ................................................................................. 8, 12, 15

*In re Vale S.A. Sec. Litig.*,
   No. 1:15-cv-9539 (GHW), 2017 WL 1102666 (S.D.N.Y. Mar. 23, 2017) .............................. 24

*In re Vale S.A. Sec. Litig.*,
   No. 19-cv-526 (RJD)(SJB), 2020 WL 2610979 (E.D.N.Y. May 20, 2020) ............................. 18

*In re Veeco Instruments, Inc. Sec. Litig.*,
   235 F.R.D. 220 (S.D.N.Y. 2006) ......................................................................................... 11

*In re Vivendi, S.A. Sec. Litig.*,
   838 F.3d 223 (2d Cir. 2016) ..................................................................................... 9, 16, 17

*In re Winstar Commc'ns*,
   No. 01-cv-11522, 2006 WL 473885 (S.D.N.Y. Feb. 27, 2006) ........................................ 23, 24

*Iowa Pub. Employees' Ret. Sys. v. MF Glob., Ltd.*,
   620 F.3d 137 (2d Cir. 2010) ..................................................................................... 11, 17

*Kalnit v. Eichler*,
   264 F.3d 131 (2d Cir. 2001) ........................................................................ 21

*Kusnier v. Virgin Galactic Holdings, Inc.*,
   639 F. Supp. 3d 350 (E.D.N.Y. 2022) .......................................................... 10

*Lapin v. Goldman Sachs Grp., Inc.*,
   506 F. Supp. 2d 221 (S.D.N.Y. 2006) ........................................................... 14

*Lea v. TAL Educ. Grp.*,
   837 F. App'x 20 (2d Cir. 2020) .................................................................... 24

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011) ......................................................................................... 8

*Meyer v. Greene*,
   710 F.3d 1189 (11th Cir. 2013) .................................................................... 25

*Meyer v. Jinkosolar Holdings Co.*,
   761 F.3d 245 (2d Cir. 2014) ......................................................................... 16

*New Jersey Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*,
   709 F.3d 109 (2d Cir. 2013) .......................................................................... 11

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
   455 F. App'x 10 (2d Cir. 2011) .................................................................... 22

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
   575 U.S. 175 (2015) ................................................................................. 9, 20

*P. Stolz Fam. P'ship L.P. v. Daum*,
   355 F.3d 92 (2d Cir. 2004) ........................................................................... 15

*Plymouth Cnty. Ret. Ass'n v. Array Techs., Inc.*,
   No. 21 Civ. 4390 (VM), 2023 WL 3569068 (S.D.N.Y. May 19, 2023) ........... 19, 20

*Slayton v. Am. Exp. Co.*,
   604 F.3d 758 (2d Cir. 2010) ......................................................................... 16

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007) ...................................................................................... 21

*Tongue v. Sanofi*,
   816 F.3d 199 (2d Cir. 2016) .......................................................................... 20

v

*Van Dongen v. CNinsure Inc.*,
   951 F. Supp. 2d 457 (S.D.N.Y. 2013) ...................................................................... 24

*Wilson v. LSB Indus., Inc.*,
   No. 15-cv-7614 (RA), 2017 WL 7052046 (S.D.N.Y. Mar. 2, 2017) ...................................... 15

**Statutes**

15 U.S.C. § 78u-4(b)(2)(A) ................................................................................ 20

15 U.S.C. § 78u-5(c)(1) ................................................................................... 17

**Rules**

Fed. R. Civ. P. 9(b) ...................................................................................... 8

**Regulations**

17 C.F.R. § 240.10b-5(B) ................................................................................. 9

Lead Plaintiff Nordine Aamchoune ("Plaintiff") respectfully submits this Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Second Amended Class Action Complaint[1] ("SAC") filed by Defendants fuboTV, Inc. ("Fubo" or the "Company"), and David Gandler (CEO), Edgar Bronfman Jr. (Executive Chairman), and Simone Nardi (CFO) (the "Individual Defendants," and together with Fubo, the "Defendants") ("Defs. Br."). ECF No. 51.[2]

## INTRODUCTION

Fubo is a sports-geared virtual multichannel video programming distributor ("vMVPD") that offers subscribers access to live sporting events, news and entertainment content. The Court granted Defendants' motion to dismiss Plaintiff's Amended Class Action Complaint with leave to amend on March 30, 2023. *See* ECF No. 42 ("Order"). On May 22, 2023, Plaintiff filed the SAC[3]. ECF No. 45. The SAC cures the deficiencies the Court identified in its Order by narrowing the claims to two sets of statements that conveyed a misleading impression about Fubo's core business and growth by omitting material adverse facts. Defendants repeatedly touted Fubo's ability to accelerate ad revenues by leveraging user data that could be segregated and was measurable, when they were well aware this feature was constrained by the platform's technical limitations. Defendants also hyped Fubo's acquisition of Balto Sports ("Balto") as "instrumental" and its "first step" into the $155 billion sports wagering market, when Balto was a woefully insignificant player, without the necessary resources or expertise Fubo needed to become a gaming operator.

When the truth about Fubo's current status and prospects was revealed, the stock declined by over 60 percent, from its high of $62 on December 22, 2020, to $24 on January 4, 2021, at the end of the Class Period. Ad revenues subsequently declined as a percentage of total revenues and

---

[1] Paragraphs in the SAC are cited as "¶[number]".
[2] Pursuant to the Court's Individual Rules, the parties made letters submissions addressing the SAC, ECF Nos. 45, 47, and this Court entered the briefing schedule agreed to by the parties. ECF No. 50
[3] The Class Period is May 20, 2020 through January 4, 2021, both dates inclusive.

Fubo abandoned its online sports wagering venture. The stock currently trades at around $2.67.

In their defense, Defendants not only dispute the allegations, but they assert that Plaintiff's claims are based solely on negative opinions of short sellers who were engaged in a "battle of bulls and bears." Def. Br. at 5. But this case is not grounded on the competing analysts' views. Instead, Plaintiff's claims result from new and material information that analysts disclosed which revealed the misleading nature of Defendants' bullish pronouncements, and triggered a stock drop. Several facts were separately corroborated by a former Fubo employee ("CW#1"). Consistent with Second Circuit law, Plaintiff is entitled to the plausible inference that the circumstances that existed when CW#1 left Fubo a few months before the Class Period continued well into the Class Period. The allegations considered together and in context are sufficient to state a Rule 10b-5 claim.

Defendants remaining arguments, which question the falsity or materiality of their representations (Def. Br. at 8-14), claim their statements are nonactionable puffery, opinions, or forward-looking statements (*id.* at 14-17), raise a competing version of events to defeat scienter (*id.* at 17-22) or challenge the alleged corrective disclosures (*id.* at 22-23), raise disputed questions of fact. Defendants' motion to dismiss should be denied in its entirely.

<b><u>STATEMENT OF FACTS</u></b>

Based in New York, Fubo's platform allows customers to access live sporting events as well as news and entertainment content through "streaming" devices as well as on "smartTVs," mobile phones, tablets and computers. ¶2. Out of the 11.6 million total vMVPD subscribers as of year-end 2020, Fubo held a modest 4% market share. Unlike its better financed competitors, such as Hulu and YouTube TV, Fubo does not produce its own content; it merely collects, and streams content generated by large networks. ¶¶28, 35. Without its own programming Fubo has limited ability to charge consumers premium prices or command higher fees from advertisers. ¶35. In

2

2020, Fubo reported $184 million (84.6%) in subscriber revenues as compared to $24.9 million (11.4%) in advertiser revenue.[4]

### A. Defendants' False and Misleading Statements

### 1. Misstatements About Leveraging User Data to Enhance Advertising Revenue

Advertising delivered directly over the internet through streaming video services or devices is known as "OTT (over-the-top) advertising."[5] The channel allows media buyers to target precise audience segments and provides them advanced measurement capabilities. User data includes information about a viewers' location, age, how many hours they spend viewing a particular show or what type of content they are viewing, as well as other demographic information. ¶5.

As detailed in the SAC, Defendants repeatedly touted the importance of tracking and sharing Fubo's proprietary technology and its ability to leverage and convert user data to increase advertising dollars and contribute a larger percentage of the Company's revenues. For example, in Fubo's 2019 Annual Report, dated May 24, 2020, signed by Defendants Gandler and Bronfman, stated that Fubo is "*increasingly leveraging our data and analytics capabilities to optimize advertisements for both users and advertisers.*"[6] Defendants emphasized that "[o]ur ability to *leverage our data to provide users with relevant ads and measure the effectiveness of these advertisements on our platform* is also a key factor in the increased wallet share of advertising budget spent on our platform. ¶¶37-38, 78.[7] On October 9, 2020, Fubo's sold 18.3 million shares in a public offering. ¶45. The Prospectus, signed by the Individual Defendants, proclaimed a "significant opportunity" for the Company to "*allow advertisers to access our audience by*

---

[4] *See* 2020 Annual Report, *available at* https://www.sec.gov/Archives/edgar/data/1484769/000149315221006813/form10-k.htm.

[5] Tara Johnson, *What Is OTT Advertising: A Breakdown of Over-The-Top Ads*, Tinuiti (Aug. 18, 2023), *https://tinuiti.com/blog/ott-over-the-top-ads/ott-advertising-guide/*

[6] Emphasis added unless otherwise indicated.

[7] Defendants also represented that an increase in subscribers generated higher advertising revenue. *See* ¶40 (Q2 2020 earnings release) (quoting Gandler); ¶51 ("our increased user engagement has driven Fubo's ad sales growth").

*leveraging our technology, data, and measurability to drive returns on advertising spend*." This capability made Fubo's platform "highly attractive to advertisers." ¶47. Defendants also represented that, advertisers benefited from "the advantage of digital advertising including measurability, relevance and interactivity." ¶47. Similarly, during the November 10, 2020, 3Q 2020 earnings call, Defendant Gandler reiterated that Fubo could *"leverage [its] proprietary data"* to drive *"advertising sales"* and *"margin expansion*.[8] ¶54.

Unbeknownst to investors, the Company had significant constraints in its ability to "leverage" proprietary user data, that is, present it in measurable ways to advertisers. As initially revealed by Kerrisdale Capital ("Kerrisdale Report"), Fubo "does not have any data or inventory that is differentiated and cannot provide the reach many advertisers crave." ¶75. A former Fubo employee independently confirmed and amplified on this disclosure. CW#1 reported that the Company did not have the technical ability to access relevant user data on its proprietary platform in order to attract advertisers or to encourage content providers to partner with the Company under more favorable terms. ¶¶55, 75. CW#1 identified contract meetings with content providers where the issue of Fubo's technical inability to target advertisements was discussed often, saying "I remember a lot of conversation about this." ¶76. CW#1 attended those meetings with Fubo executives, including Ben Grad (SVP and Head of Content Strategy and Acquisition), and content providers, and Defendant Gandler, who was "hands on" and attended meetings that involved negotiation with content providers, such as HBO and Starz. ¶125. CW#1 conceded that Fubo admitted to content providers that "we don't have the ability" to provide user data and when they

---

[8] During the Nov. 10, 2020 earnings call, Defendant Gandler stated "advertising sales, which I've already highlighted earlier, clearly plays an important role in margin expansion. At the end of the day, we made some really bold moves in the quarter and that really speaks to our ability to leverage our proprietary data." ¶54. Moreover, when discussing Fubo's purported competitive strengths, Defendants asserted: "proprietary technology and first party data" allowed Fubo to "capture and analyze how our subscribers engage [its] offering." ¶42.

4

"request[ed] to collect user data," Fubo had to refuse saying "we can't do that." ¶79. CW#1 explained that lack of "technical" prowess on Fubo's "back end" caused these constraints, which meant that Fubo was not able to close deals with providers like Fox and NBC. ¶¶77-78.

### 2.  Defendants' Misstatements Concerning the Sports Wagering Market

Even before the Company publicly announced its decision to acquire Balto, Defendants began to prime the market regarding its "entry" into sports wagering. ¶52. In a shareholder letter dated November 10, 2020, Defendant Bronfman stated that entering the $155 billion sports wagering arena was "complementary to our sports-first live TV streaming platform" and would provide "a new revenue stream for [Fubo], and … will be an important contributor to Fubo's business." *Id.* Defendants also represented that sports wagering was key to Fubo's growth: "[W]agering will lead to more viewing and this increased engagement and will lead to more ad monetarization, better subscriber retention and a reduction in subscriber acquisition costs." ¶52. During the earnings call that same day, when questioned by an Evercore ISI analyst regarding Fubo's plans on sports gambling, Gandler represented that Fubo had already started "executing on its [wagering] strategy" and will be "able to also sell a lot of wagering opportunities." ¶57.

Having set high market expectations, Defendants had no difficulty convincing investors three weeks later that the Balto acquisition was "instrumental" to Fubo's entry into online sports wagering. In its release issued on December 1, 2020, Defendant Gandler stated that the Balto acquisition would deliver a "truly groundbreaking live TV streaming platform to consumers," ¶59; and that "significant synergies" existed between consumers that enjoy sports wagering and Fubo subscribers, which Fubo could monetize by expanding its "total available market" and "developing another important revenue stream for fuboTV." *Id.*

Fubo's s stock rose from $26.74 on December 1, 2020 to open at $28.50 on December 2, 2020. ROTH Capital increased its price target for Fubo from $29 to $36, citing the Balto

acquisition. ¶6. On December 9, 2020, Defendant Gandler represented at a BMO Capital Markets Conference that the venture will "allow [Fubo] to really build something compelling," based on its "very specific skill set" as well as Balto's "resources and the metadata mapping." ¶61. Michael Pachter from Wedbush (December 15, 2020) rated Fubo "Outperform" with a $40 target price. He called Balto "a massive opportunity to take share of the burgeoning domestic market," ECF No. 53-4 at 8. In line with Defendant Gandler's statements, Pachter concluded that Fubo is "positioning itself to become a key player in the rapidly growing" market, where "sports wagering [will] drive engagement in sporting events, new subscriber growth, and the company's monetarization capabilities." *Id.* at 19.

On December 22, 2022, Fubo shares leaped to $62 after the release of a Needham report prepared by Laura Martin. Consistent with Defendants' statements, Martin expected Fubo to be a "key beneficiary" of the $155 billion online sports wagering market. ECF No. 53-4 at 4.

### 3. The Truth is Gradually Revealed

Beginning on December 23, 2020, a series of short-seller reports revealed the misleading nature of Defendants' pronouncements. ¶68. Richard Greenfield of Lightshed Partners ("Lightshed") initiated coverage of Fubo with a price target of $8. Greenfield explained that Fubo's profitability depended on expanding subscriber margins through increased advertising and sports betting but was "deeply skeptical of the magnitude of both revenue streams." *See* ECF No. 53-9 at 3. First, the report disclosed that Fubo's supposed entry into sports betting was nothing of the sort. Greenfield explained that Balto "was a failed free-to-play start-up . . . (which had no product or revenue or even a website.)." *Id.* at 5. Lightshed also provided additional information that alerted investors just how immaterial the Balto acquisition was, including (i) Fubo had no obvious casino partners that could facilitate access to States with legalized gambling; and (ii) sports betting on home TV screens presented regulatory and consumer hurdles that had no ready solutions. *Id.* The

6

Lightshed report observed: "Fubo's statements had created the misimpression that the Companh was actually executing on its foray into sport betting" given management's "talking up the long-term potential of sports betting without specifics." *Id.* Following the report, Fubo shares dropped over 28%, or $17.82, to close at $44.18 on December 24, 2020.[9] ¶70.

On December 30, 2020, the Kerrisdale Report gave additional details exposing the misimpression conveyed to investors. ¶80. Specifically, the report stated:

> On December 1st, Fubo issued a press release stating "fuboTV Acquires Balto Sports as First step into Online Sports Wagering Market." **They declined to mention what a trivial first step the acquisition truly represented.** As confirmed by Fubo IR [investor relations], Balto had 3 employees, a failed test product, and had mothballed operations during the pandemic. **That Fubo would promote this move as an "instrumental" expansion of Fubo's sports betting ambitions is but one example of the way in which Gandler had a tendency to exaggerate the positioning of his company and the opportunities ahead of it.**
>
> * * * *
>
> Amazingly, Fubo's publicity stunt worked! In the days that followed several sell-side research firms (bookrunners and co-managers on the October public offering) raised price targets and began incorporating valuations for a completely non-existent sports-betting business.

ECF No. 53-7 at 17.

The Kerrisdale Report further revealed that Fubo "does not have any data or inventory that is differentiated and cannot provide the reach many advertisers crave." ¶75. This undermined Fubo's ability to attract advertisers and boost advertising revenue. The Kerrisdale Report also explained that the Company had "nothing to differentiate itself" in order to sell more advertising or "levers [to] pull to meaningfully improve its pricing." *Id.*

---

[9] On December 27, 2020, Lightshed issued its second report, elaborating on its prior conclusions, revealing that Fubo operated a "fundamentally flawed MVDP/vMVPD business" that "lack[ed] scale and other product bundles." ¶71. On this news, Fubo declined nearly 12%, or $5.24. ¶72.

7

Following the publication of the Kerrisdale Report, Fubo's shares declined another $9.70, or 25.72%, to close at $28.00 on December 31, 2020, on unusually high trading volume. ¶82.[10]

## ARGUMENT

### A.     Legal Standard

To state a claim under §10(b) and Rule 10b-5(b), a plaintiff must allege: (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011). On a motion to dismiss a court must "accept all factual claims in the complaint as true and draw all reasonable inferences in the plaintiff's favor." *Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 307 (2d Cir. 2015) (internal citations and quotations omitted). The heightened pleading standards under the PSLRA and Fed. R. Civ. P. 9(b)., "do not require the pleading of detailed evidentiary matter in securities litigation." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001) ("*Scholastic Corp.*"); *see Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 19 F.4th 145, 151 (2d Cir. 2021) ("*Altimeo*"). ("[E]ven securities plaintiffs need not prove their entire case within the confines of the complaint") (internal citation omitted). Dismissal is appropriate only where Plaintiff "can prove no set of facts consistent with the complaint that would entitle them to relief." *Id.* at 150 (citation omitted).

### B.     The SAC Sufficiently Pleads False and Misleading Statements and Omissions

Rule 10b-5 makes it unlawful to "make any untrue statement of material fact or to omit to state a material fact necessary to make the statements made, in light of the circumstances under

---

[10] On January 4, 2021, just after the close of Q4 2020 but before the results for the quarter were released, the financial industry site Motley Fool published an article titled "There's a Big Problem with FuboTV Stock" with a subtitle "The wildly unprofitable streamer tries to put lipstick on a pig with a creative metric." ¶83; *see* ¶85 ("the fact that company reports such a misleading metric is a huge red flag"). Fubo's shares declined an additional $3.99, or 14%, to close at $24.24 on January 4, 2021, the close of the Class Period. ¶86.

which they were made, not misleading." 17 C.F.R. § 240.10b-5(B). Statements may be "misleading under . . . Rule 10b-5 by virtue of what they omit to disclose." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239-40 (2d Cir. 2016) ("*Vivendi*") ("The rule against half-truths, or statements that are misleading by omission, comports with the common-law tort of fraudulent misrepresentation, according to which a statement that contains only favorable matters and omits all reference to unfavorable matters is as much a false representation as if all the facts stated were untrue"). A statement or omission is materially misleading where there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having "significantly altered the total mix of information made available to the market." *Altimeo*, 19 F.4th at 151 (citation omitted). Literal accuracy will not suffice where the "omission . . . affirmatively create[ed] an impression of a state of affairs that differ[ed] in a material way from the one that actually existe[ed]." *In re Alstom SA*, 406 F. Supp. 2d 433, 453 (S.D.N.Y. 2005). Statements "although literally accurate, can become, through their context and manner of presentation, devices which mislead investors." *Altimeo,* 19 F.4th at 151. The determination "whether a statement is misleading depends on the perspective of a reasonable investor," which is inherently a fact-sensitive inquiry. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 186 (2015).

### 1.    The SAC Does Not Employ Puzzle Pleading

Where, as here, the SAC "identifies misstatements and omissions, describes relevant predicate events, and alleges how those events make the statements false or misleading" it provides sufficient notice and is not a puzzle pleading. *Constr. Laborers Pension Tr. for S. California v. CBS Corp.*, 433 F. Supp. 3d 515, 530 (S.D.N.Y. 2020). *See also In re NTL, Inc. Sec. Litig.*, 347 F. Supp. 2d 15, 22 (S.D.N.Y. 2004) (no puzzle pleading when complaint alleges the "date, publication

9

and speaker of each of the alleged misstatements or omissions."); *Kusnier v. Virgin Galactic Holdings, Inc.*, 639 F. Supp. 3d 350, 368 (E.D.N.Y. 2022) (same).

Contrary Defendants' contention (Def. Br. 7-8), the SAC easily satisfies this standard by identifying two sets of misstatements that are distinct in both content (advertising revenues, *e.g.,* ¶¶47-54; online sports betting, *e.g.,* ¶¶59-63; and time (wagering representations began in November 2020), and explains why each type of misstatement was false and misleading.

Defendants' reliance on *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553 (S.D.N.Y. 2014), *aff'd,* 604 F. App'x 62 (2d Cir. 2015) is misplaced. Def. Br. at 7. *Lululemon* does not even address the question of puzzle pleading. Rather, that case turned on the fact that generic statements about product quality, such as the "highest in the industry," and being "paramount and superior," were "at most non-actionable statements of opinion or belief." *Id.* at 576. The specific statements here are far afield from those superlatives in *Lululemon*.

### 2.      Misstatements Concerning Leveraging User Data to Boost Ad Revenue

The SAC sufficiently alleges that Defendants repeatedly and falsely touted Fubo's proprietary technology and its ability to leverage user data to increase advertising dollars, as shown in the table below:

| STATEMENT | DOC/ DATE |
|---|---|
| Fubo is "*increasingly leveraging our data and analytics capabilities to optimize advertisements for both users and advertisers*." Defendants emphasized that *"[o]ur ability to leverage our data to provide users with relevant ads and measure the effectiveness of these advertisements on our platform is also a key factor in the increased wallet share of advertising budget spent on our platform." *¶¶37-38, 78. | 2019 Annual Report |
| Significant opportunity [] to *allow advertisers to access our audience by leveraging our technology, data, and measurability* to drive returns on advertising spend," so that Fubo's platform was "highly attractive to advertisers." ¶¶46, 47 | Registration Statement Oct. 7, 2020 |
| "We believe our premium content and industry-leading consumer experience uniquely position us to rapidly grow our advertising business." ¶48 | Registration Statement Oct. 7, 2020 |

10

| We expect margin improvement to continue over time, aided by a number of initiatives. This includes the growth of advertising on our platform . . . The growth of advertising on our platform . . . ¶¶52, 53 | Shareholder Letter November 10 |
|---|---|
| Fubo could "*leverage [its] proprietary data*" to drive "advertising sales" and "margin expansion." ¶54 | November 10, 2020, 3Q Earnings Call |

However, the Kerrisdale Report revealed that Fubo did not have data or inventory that was differentiated and could not "provide the reach that many advertisers craved." ¶75. CW#1 independently corroborated these facts in confirming that Fubo did not possess enough lucrative data that could be shared with content providers for targeted advertising. See p. 4, supra. CW#1 is a long-term employee, working since 2017, and was involved in onboarding new channels onto Fubo's platform. CW#1, by virtue of their position and attendance in meetings where advertising revenue was discussed, lends credibility to Plaintiff's allegations and the information provided in the Kerrisdale and Lightshed Reports. *See, e.g., New Jersey Carpenters Health Fund v. Royal Bank of Scotland Grp.*, 709 F.3d 109, 123–24 (2d Cir. 2013) (plaintiffs may rely on unnamed sources that are described sufficiently to "support the probability that a person in the position occupied by the source would possess the information alleged.'"); *In re Veeco Instruments Sec Litig.*, 235 F.R.D. 220, 229 (S.D.N.Y.2006) (same).

Contrary to Defendants' contention, the fact the CW#1 left a few months before the Class Period does not automatically disqualify the information CW#1 provided. In *Greco v. Qudian Inc.*, No. 1:20-CV-577-GHW, 2022 WL 4226022, at *13 (S.D.N.Y. Sept. 13, 2022) *("Qudian")*, a fellow Judge in this District rejected this same argument on nearly identical facts, explaining:

> "**[A]llegations concerning activity in one period can support an inference of similar circumstances in a subsequent period.**" *Employees' Ret. Sys. of Gov't of the Virgin Islands*, 794 F.3d at 307. Although CW#4 left Qudian at least a few months prior to the Class Period, the fact that banks were not conducting independent credit assessments in the summer of 2018 supports the inference that the banks continued that practice into the Class Period. *See Iowa Pub. Employees'*

11

*Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 143 n.13 (2d Cir. 2010) ("Depending on the problem, its existence in February 2008 may support an inference that it was present six months earlier.").

Applying *Qudian's* rationale. CW#1's long-term involvement and the content of the information provided support a plausible inference that the limitations in providing differentiated user data to advertisers continued during the Class Period. Unlike *In re Doral Fin. Corp. Sec. Litig.*, 563 F. Supp. 2d 461, 466 (S.D.N.Y. 2008), cited by Defendants, (Br. at 10), where the witness made general statements about "representatives," here, the CW#1 specifically identifies Fubo executives with whom CW#1 attended the meetings and engaged in negotiations.

Post-class period events further support CW#1's credibility. Based on Defendants' bullish representations, analysts at Wedbush modeled the growth rate from advertising revenue **to nearly double** "at roughly 20% of total revenues by 2023." ECF No. 53-4 at 6. Yet, advertising's contribution to revenues actually *declined* from 2020 to 2022 from 11.4% to 10%.[11] *See* Fubo's 2020 Form 10-K[12] and 2022 Form 10-K.[13] This lackluster performance supports a strong inference that Fubo's inability to leverage customer data continued even beyond the class period. *See Scholastic Corp.*, 252 F.3d at 72 (allowing post-class period data to support claim).

### 3. Misstatements Concerning the Sport Wagering Market

Defendant Gandler began to create excitement for Fubo's expansion based upon its positioning "at the intersection of three megatrends," including the $155 billion sports wagering industry, "a market we absolutely intend to enter." ¶56. During the 3Q 2020 earnings call,

---

[11] It is also disingenuous for Defendants to ask this Court to disregard all post-Class Period developments regarding its sports wagering business, while relying on the subsequent results to support (albeit incorrectly) their argument regarding advertising. Defs. Br. at 11. Defendants cannot have it both ways. In any event, just because the advertising revenues increased as the number of subscribers increased does not make the Class Period statements true or disprove that they were misleading.

[12] fuboTV, Inc., Annual Report (Form 10-K) (Mar. 25, 2021) available at https://www.sec.gov/Archives/edgar/data/1484769/000149315221006813/form10-k.htm.

[13] fuboTV, Inc., Annual Report (Form 10-K) (Feb. 27, 2023) available at https://www.sec.gov/ix?doc=/Archives/edgar/data/0001484769/000162828023005135/fubo-20221231.htm.

Defendant Gandler announced that Fubo already started "executing on its [wagering] strategy" and that it will be "an important contributor to Fubo's business." ¶¶52, 57. The fanfare surrounding the December 1, 2020 announcement of the Balto acquisition conveyed the misimpression that Balto constituted the successful execution of Fubo's wagering strategy. Defendant Gandler reinforced this perception by referring back to his prior statement that sports wagering will "expand our total revenue market (TAM) by developing another important revenue stream from Fubo, as we are doing with our growing ad sales business." ¶59. The December 1 release also proclaimed that "Balto Acquires Balto Sports as First Step Into Online Sports Wagering Business," and told investors the move was "instrumental" in the "launch of sports wagering, [and] intergrat[ing] it into our core offerings." *Id.* Furthermore, on December 9, 2020, Defendants affirmatively represented that the acquisition will "allow [Fubo] to really build something compelling," based on the "very specific skill set" as well as Balto's "resources and the metadata mapping." ¶61. Defendants thus created a false impression that Fubo would engage a billion-dollar constituency of potential subscribers. These and other bullish pronouncements sent Fubo stock soaring. ¶6.

The Lightshed and Kerrisdale Reports revealed that Balto did not represent the successful "execution" of [Fubo's] wagering strategy" and would not "be an important contributor to Fubo's business." ¶¶52, 57. Instead, Balto was inconsequential – its website was shut down before Fubo's acquisition – it had 3 employees, "a failed test product, and had "mothballed operations during the pandemic." ¶80. Thus, the acquisition was neither "instrumental" nor a "first step" into the $155 billion market. *Id.* Lightshed also explained Fubo's failings which required hundreds of millions of dollars in technology, marketing and expertise dealing with State regulators. Lightshed concluded that "Fubo's statements had created the misimpression that the Company was actually executing on its foray into sport betting," and Kerrisdale called out "Gandler['s] tendency to

13

exaggerate the positioning of his company and the opportunities ahead of it." *See* ECF No. 53-I.

Defendants argue that the SAC fails to allege falsity because "[n]one of challenged statements mentions Balto's gaming operator abilities (or its number of employees or intellectual property value or its website)." Def. Br. at 12. They support this contention by lifting a quote from the Court's Order discussing "blackout abilities" and assert that, as to Balto, "it is unclear how these alleged omitted facts render [the challenged] statements false or misleading." *Id.* quoting Order at 28. This argument fails to acknowledge that Rule 10b-5 prohibits both making false statements as well as failing to disclose material facts needed to make a "corporate statement . . . [not] inaccurate, incomplete, or misleading." Op. at 19-20, quoting *In re Nokia Corp. Sec. Litig.,* 19 Civ. 3509, 2021 WL 1199030, at *16 (S.D.N.Y. Mar. 29, 2021) ("*Nokia*"). Here, Defendants' bullish pronouncements about how "instrumental" the Balto acquisition was in executing Fubo's sports wagering strategy conveyed a misimpression that could only be tempered with the truth about Balto's defunct operations. *See In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 612 (S.D.N.Y. 2017) (having discussed features of its business model and the advantages it offered, the company was "obligat[ed] to ensure its statements were both accurate and complete").

Post Class Period developments confirm Plaintiff's allegations. Despite continuing to represent that sports wagering remains a "key pillar of our strategy," ¶97. Fubo announced in Q2 2022, that its sports wagering business was under "strategic review," and, in October 2022, shut down the sportsbook operations for good. ¶¶98-100. These post-class period disclosures support an inference that Defendants were aware that their glowing pronouncements about the sports wagering business were without substance. *See Lapin v. Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221, 237 (S.D.N.Y. 2006) ("The Second Circuit has explicitly recognized that plaintiffs may rel[y] on post-class period [statements] to confirm what a defendant should have known during the

14

class period."), citing *Scholastic Corp.*, 252 F.3d at 72.

### C.    The PSLRA Safe Harbor and Bespeaks Caution Doctrine Are Not Implicated

#### 1.    The Safe Harbor Is Inapplicable

Defendants' argument that Fubo's misstatements are protected forward-looking statements has little application to the claims asserted here (Def. Br. at 16) because the bespeaks-caution doctrine and the PSLRA safe harbor do not apply to a misstatement or of present fact. *See, e.g.*, ¶46 (We believe a significant opportunity for fuboTV ***is*** to allow advertisers ***to*** *access our audience by leveraging our technology, data, and measurability* to drive returns on advertising spend."); ¶59 ("fuboTV ***Acquires*** Balto Sports ***as First Step*** Into Online Sports Wagering Market" and "[w]e believe ***there are*** significant synergies . . ."). *See In re Romeo Power Inc. Sec. Litig.*, No. 21 Civ. 3362 (LGS), 2022 WL 3701095, at *4 (S.D.N.Y. Aug. 25, 2022) (no safe harbor for "present-tense statements"). "It would be perverse indeed if an offeror could knowingly misrepresent historical facts but at the same time disclaim those misrepresented facts with cautionary language." *In P. Stolz Fam. P'ship L.P. v. Daum*, 355 F.3d 92, 97 (2d Cir. 2004).

There is also no reasonable dispute that the principal allegations of the SAC concern material omissions necessary to correct the misimpression Defendants created.  The safe harbor is therefore inapplicable. *See*, *e.g.*, *Bishins v. CleanSpark, Inc.*, No. 21-cv-511 (LAP), 2023 WL 112558, at *9 (S.D.N.Y. Jan. 5, 2023) ("Defendants assert that the Estimates fall within the PSLRA's safe harbor. The Court disagrees. The Estimates are best characterized as material omissions, which the PSLRA's safe harbor does not protect."); *Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 304 (S.D.N.Y. 2018); *Wilson v. LSB Indus., Inc.*, No. 15-cv-7614 (RA), 2017 WL 7052046, at *3 (S.D.N.Y. Mar. 2, 2017).

### 2. The Statements Lacked Meaningful Cautionary Language

Even if the PSLRA safe harbor applied to Defendants' misrepresentations and omissions, (it does not) it would not bar Plaintiff's claims because Defendants did not provide "meaningful" cautionary language. *Vivendi*, 838 F.3d at 247 ("To avail themselves of safe harbor protection . . . defendants must demonstrate that their cautionary language was not boilerplate and conveyed substantive information."). Cautionary language must be "too prominent and specific to be disregarded" and must "warn investors of exactly the risk" that was not disclosed." *In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 304 (S.D.N.Y. 2013) ("*MF Global*"). Defendants must show the cautionary language contained "the major factors that the defendants faced at the time the statement was made." *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 771 (2d Cir. 2010).

Here, Defendants cite to a laundry list of generalized statements, which do not directly address the allegations of the SAC. Def. Br. at 16-17. For example, in the December 1, 2020 Balto release, Fubo cautioned that it "can give no assurance that [its] expectations will prove to be correct." ECF No. 53-7 at 2. They also disclosed that the risks include "our ability to successfully develop and market a sports marketing offering," and those "related to FUBO's growth, evolution of our industry . . . and market[ing] a sports wagering offering." *Id.* at 13. These boilerplate risk disclosures that Fubo points to does not meaningfully apprise investors of Fubo's then already-existing lack of differentiated user data to attract advertisers. *See Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 251 (2d Cir. 2014) ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired."). Contrary to Defendants' contention (Def. Br. at 13), Defendant Gandler's December 9, 2020 off-the-cuff remark during the BMO Conference that "no one should think of us as a . . . wagering company" (*id.*) was belied by his conflicting statement that becoming a licensed real money game operator was a "clear option."

16

¶62. Considered in context, Defendant Gandler failed to neutralize his misleading statements that the acquisition was "instrumental" to Fubo's entry and a "first step" into the online sport betting, that Balto possessed a "very specific skill set," and created enormous opportunity (*i.e.*, $155 billion addressable market). Fubo's skyrocketing price following the announcement bolsters this conclusion. *See In re Nortel Networks Corp. Sec. Litig.*, 238 F. Supp. 2d 613, 628 (S.D.N.Y. 2003) (cautionary language must be "sufficiently specific to render reliance on the false or omitted statement unreasonable."). Here, the cautionary statements communicated no substantive information to neutralize Defendants' misleading statements and is not to shield them from liability. *MF Global*, 982 F. Supp. 2d at 304.[14]

### D.      Defendants' Misstatements Are Not Puffery

Defendants' argument that many of the challenged statements are non-actionable puffery is without merit. Br. at 13-14. Statements cannot be dismissed as mere corporate optimism if they could have, and should have had, some basis in objective and verifiable fact. *Iowa Pub. Employees' Ret. Sys.*, 620 F.3d at 143 ("[T]here is a discernible difference between a forecast and a fact, and courts are competent to distinguish between the two"). Defendants' statements were not vague assertions about amorphous concepts such as ethics, integrity or reputation. *See Vivendi*, 838 F.3d at 245 ("Puffery encompasses 'statements that are too general to cause a reasonable investor to rely upon them,' . . . and thus 'cannot have misled a reasonable investor.'); *see also Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 162 (2d Cir. 2000) (statement is immaterial as a matter of law

---

[14] Defendants "forward-looking" statements are not protected for the independent reason that they were "made with actual knowledge by that person that the statement was false or misleading." 15 U.S.C. § 78u-5(c)(1); *Hall v. The Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 226 (S.D.N.Y. 2008) (safe harbor inapplicable where defendants had no basis for their optimistic statements and allegedly already knew that certain risks had become reality). Whether a forward-looking statement is actionable "is generally not an appropriate basis on which to dismiss a complaint." *Vivendi*, 381 F. Supp. 2d at 182. Here, the CW#1 bolsters Plaintiff's allegations that Defendants had actual knowledge" that made the statements about leveraging user data were false and misleading. *See Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 194 (S.D.N.Y. 2010) ("Because Defendants are alleged to have made knowingly false statements, they are not protected by the PSLRA safe harbor provision.").

only when it is "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of [its] importance."). Rather, the statements at issue are verifiable as they relate to (1) Defendants' claim they could leverage user data, assuring investors they could segregate and present user metrics that would generate higher fees from advertising, ¶46 ("allow advertisers to access our audience by leveraging our technology, data, and measurability"); and (2) Defendants' claim that the Balto deal was "instrumental" and a "first step" in the development of another important revenue stream." *See* ¶¶59, 78. Investors understood these statements to mean, at the very least, that Defendants had the advantages that they promoted. *See e.g.,* ¶¶44-65.

Defendants also commented positively on these two aspects in their public statements provided to the investors. *See e.g.,* ¶¶44-65. "[W]hen the statements are 'made repeatedly in an effort to reassure the investing public' about matters particularly important to the company and investors, those statements may become material to investors." *In re Vale S.A. Sec. Litig.*, No. 19-cv-526 (RJD)(SJB), 2020 WL 2610979, at *12 (E.D.N.Y. May 20, 2020) ("*Vale*") ("While Vale's statements about safety and sustainability may be generic, because it repeatedly emphasized its commitment to such priorities, Vale 'put the topic at issue such that the Court cannot say that, as a matter of law, investors would not find certain representations material.'") (citing *In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 80 (S.D.N.Y. 2017) (repeated "representations about [the company's] commitment to safety" not puffery).

The Court should also reject Defendants' effort to cherry-pick irrelevant snippets from the SAC in service of their puffery argument. *See e.g.,* Def. Br. at 14 (Fubo had "strong unit economics," "strong growth," made "bold moves," and "[o]ur optimism . . . has never been stronger."). Moreover, to the extent that Defendants argue that no reasonable investor would have relied on Defendants' misrepresentations because they were mere puffery, this assertion is

18

contradicted by the actions of analysts in response to the Balto release "raising prices targets" and "incorporating valuations" for the sports-betting business." ECF No. 53-7 at 17. *See Arkansas Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74, 103 (2d Cir. 2023) (analyst commentary evidence of materiality of alleged misstatements). Given the stock's favorable response to the Balto release, it is inappropriate to rule that these statements are "obviously unimportant to a reasonable investor." *Ganino*, 228 F.3d at 162.

Defendants' reliance on *Nokia* and *Plymouth Cnty. Ret. Ass'n v. Array Techs., Inc.*, No. 21 Civ. 4390 (VM), 2023 WL 3569068, at *10 (S.D.N.Y. May 19, 2023) (Defs. Br. 14-15) is misplaced. In *Nokia*, the statements characterizing the progress of integration as "complete," "successful" or "went beautifully" were general statements of corporate optimism that did not create a misimpression regarding the true state of affairs.[15] 2021 WL 1199030 at *15. In contrast, the alleged misstatements here are specific and created the misimpression that Fubo's sports wagering and advertising revenue strategies were being implemented successfully.

*Plymouth* addressed use of a similar phrase, namely, that Array was "leveraging" its supply chain and economies of scale to reduce product costs. *Id.* at *10. But the facts are far different. In *Plymouth*, Defendants' optimistic statements were based on a proven track record (23% cost reduction from 2017-2019), whereas the claims constituted classic fraud-by-hindsight after the unprecedented, and publicly reported, rise in steel prices due to COVID. *Id.* at *11. Here, however, Defendants' statements were not based upon successful past results. On the contrary, advertising results were stagnant – with revenues stuck at around 10% of Fubo's revenues. It was misleading to tout a plan to accelerate results by leveraging user data without disclosing current adverse facts

---

[15] For the *same* reasons, *In re Solarcity Corp. Sec.Litig.*, 274 F. Supp. 3d 972, 994-95 (N.D. Cal. 2017) ("more growth," "highly optimistic," "demand remained strong") and *Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551, 569-70 (S.D.N.Y. 2018) ("helps us differentiate," "making progress," "increased profitability") which involve extremely generic, "feel good monikers" are also inapposite.

19

that undercut Fubo's ability to implement this strategy and raise rates. Unlike *Plymouth,* the statements at issue were misleading when made.

### E.  Defendants' *Omnicare* Argument Is Unavailing

Contrary to Defendants' contention (Def. Br. at 15), many of Defendants' misstatements are statements of present fact, as opposed to opinions, and not protected under *Omnicare*. *See e.g.,* ¶ 54 ("advertising sales, which I've already highlighted earlier, clearly plays an important role in margin expansion. . . . [through] our ability to leverage our proprietary data."). Even if some statements could be viewed as opinions, they are "actionable if the speaker omits information whose omission make the statement misleading to a reasonable investor." *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016); *see Omnicare*, 575 U.S. at 188-89 ("a reasonable investor expects [that] the opinion . . . fairly aligns with the information in the issuer's possession at the time").

Here, Defendants claimed "significant opportunity [lies in] allow[ing] advertisers to access our audience by leveraging our technology, data, and measurability to drive returns on advertising spend" (¶ 46) and Balto was an "instrumental" "first-step" that will "allow [Fubo] to really build something compelling," given its "very specific skill set," and "resources and the metadata mapping." (¶61), even as they omitted material facts that significantly undercut the basis for their statements. Thus, even if treated as opinions, Defendants' statements "did not fairly align with the information in [their] possession at the time" and are actionable. *Omnicare*, 575 U.S. at 189.

In any event, Defendants' arguments at most raise questions of fact whether their bullish statements (either fact or opinion) are materially misleading.

### F.      Plaintiffs Have Sufficiently Pled Scienter

The SAC alleges facts that, when viewed collectively, support a strong inference of scienter, that is, a mental state embracing intent to deceive or reckless disregard of the truth. 15 U.S.C. § 78u-4(b)(2)(A). A strong inference of scienter may be satisfied by alleging strong

20

circumstantial evidence of conscious misbehavior or recklessness. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 319 (2007). "The inference of "scienter need not be irrefutable . . . or even the 'most plausible of competing inferences,'" but merely "at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324. Here, the Complaint alleges several factors, which, taken together, demonstrate scienter:

**First**, scienter is supported by allegations showing "defendants' knowledge of facts or access to information contradicting their public statements." *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001); *see In re: Alibaba Group Holding Ltd. Securities Litig.,* No. 20 Civ. 9568 (GBD), 2023 WL 2601472 (S.D.N.Y. Mar. 22, 2023). Here, the SAC plausibly alleges that Defendants were aware of but failed to disclose material facts that went to the heart of Fubo's business model: (i) Fubo's constraints in providing advertisers with meaningful differentiated proprietary user data (¶¶4-5, 76); and (ii) the trivial nature of the Balto acquisition (¶¶6, 59, 61, 63-65, 80-82). Defendants' bullish pronouncements in Fubo's SEC filings, earnings calls and analyst and industry conferences (¶¶36-67), support a strong inference that management was knowledgeable about the matters on which they publicly spoke, including adverse facts contradicting their enthusiastic views. *See In re Atlas Air Worldwide, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004) ("[W]hen contradictory facts of critical importance to the company either were apparent, or should have been apparent, an inference arises that high-level officers . . . had knowledge of those facts").[16]

Moreover, CW#1 stated that Defendant Gandler regularly held and was actively involved in "hands-on" meetings, during which he gave financial and operating performance updates. ¶125.

---

[16]  *See Gauquie v. Albany Molecular Rsch., Inc.*, No. 14-cv-6637 (FB)(SMG), 2016 WL 4007591, at *2 (E.D.N.Y. July 26, 2016) ("Actively communicating with the public about this issue demonstrates defendants' sensitivity to it."); *City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012) ("*City of* Pontiac") (executives' specific statements about company's information system was "strong circumstantial evidence that [they] were receiving some form of specific information").

21

CW#1 confirmed that some meetings were devoted to discussing content procurement, including meetings during which Defendant Gandler himself negotiated deals with content providers, such as HBO and Starz. *Id.* Placing Gandler at meetings prior to the Class Period where the problems at issue were discussed necessarily shows his knowledge during the Class Period. *See Freudenberg*, 712 F. Supp. 2d at 183 (CW accounts held to be reliable and sufficiently detailed where employees told confidentially in a meeting attended by Defendants that company was experiencing losses); *In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192, 219 (S.D.N.Y. 2004) (knowledge based on meetings where advertising revenue and fraudulent deals were discussed.). Thus, Gandler's involvement in negotiating those deals raises a strong inference that he knew facts that contradicted his public statements and omissions.

*Second*, where the alleged false or misleading statements implicate the core operations of a company – such as matters critical to its viability or are a significant source of revenues – an inference arises that the defendant knew or should have known the statements were false when made. *City of Pontiac*, 875 F. Supp. 2d at 371 (Second Circuit has "endorsed the idea behind the core operations doctrine as . . . supporting, an inference of scienter") (citing *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 14 & n.3 (2d Cir. 2011) ("allegations of a company's core operations . . . can provide supplemental support for . . . scienter"). Here, Fubo touted two of the three operating "megatrends" that would supposedly be driving the Company's growth. *See* ¶52 *(*"**wagering** will lead to more viewing and this increased engagement will lead to **more ad monetarization**, better subscriber retention and a reduction in subscriber acquisition costs."). The misstatements implicate Fubo's core operations thus supporting an inference of knowledge.

*Third*, the temporal proximity between the misleading statements and the corrective disclosures bolsters the allegations that Defendants Gandler and Bronfman were aware of the

22

undisclosed facts when they touted Fubo's growth strategy. *See In re Pareteum Sec. Litig.*, No. 19 Civ. 9767 (AKH), 2021 WL 3540779, at *16 (S.D.N.Y. Aug. 11, 2021) (temporal proximity supports an inference of scienter). Here, only a few weeks elapsed from Defendants' bullish pronouncement that the Balto acquisition was "instrumental" in Fubo's entry into the online sports betting and the revelations the Balto deal was insignificant hype. Only six weeks elapsed between the misstatements about leveraging user data to ramp up ad revenue and the Kerrisdale Report. The timing thus supports an inference that Defendants knew the adverse facts but withheld them.

### G.     Plaintiffs Have Sufficiently Pled Loss Causation

Loss causation "is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003). This requirement is not meant to impose a great burden on plaintiffs. *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005). One way to plead loss causation is to allege that a corrective disclosure revealed prior misstatements and resulted in a price drop. *See Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232–33 (2d Cir. 2014) (*citing In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511, 513 (2d Cir. 2010)).

A corrective disclosure may emanate from any source, *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 297 (S.D.N.Y. 2006) ("Dura imposed no requirement that corrective disclosures emanate from the company itself, so long as the truth is disclosed in some fashion."); *In re Winstar Commc'ns*, No. 01-cv-11522, 2006 WL 473885, at *14-15 (S.D.N.Y. Feb. 27, 2006) ("*Winstar*") ("The Supreme Court [merely] spoke in terms of . . . 'truth' making its way into the market place . . . [but] did not address the means by which the information is imparted to the public"). Nor is there any requirement that a corrective disclosure "be a 'mirror image' tantamount to a confession of fraud," *Freudenberg*, 712 F. Supp. 2d at 202; *In re Vale S.A. Sec. Litig.*, No. 1:15-cv-9539 (GHW), 2017 WL 1102666, at *29 (S.D.N.Y. Mar. 23, 2017), or take the form of a "flashing neon

light" with the message that it is intended to cure a prior misstatement. *Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 477 (S.D.N.Y. 2013). Rather, the truth may be revealed gradually "by partial disclosures during the class period which causes the price of shares to decline." *In re Gen. Elec. Sec. Litig.*, No. 09 Civ. 1951 (DC), 2009 WL 2259502, at *4 (S.D.N.Y. July 29, 2009).

Contrary to Defendants' contention (Def. Br. at 22-23) numerous cases have ruled that reports by analysts and short sellers that provide investors with new information can constitute corrective disclosures. *See, e.g., Lea v. TAL Educ. Grp.*, 837 F. App'x 20, 28 (2d Cir. 2020) (loss causation pled where analyst revealed fraudulent transactions based upon interviews with former employees and less accessible filings from China). As reiterated in *Behrendsen v. Yangtze River Port & Logistics Ltd.*, No. 19-cv-00024 (DLI)(LB), 2021 WL 2646353, at *15 (E.D.N.Y. June 28, 2021), "a short seller's report can constitute a corrective disclosure, if the report reveals accurate information about a company that exposes actual misstatements by the company." *Id.* at *15 (citing *Winstar*, 2006 WL 473885, at *14–15) (short seller report revealed company's poor cash flow); *In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, No. 17 Civ. 01580 (LGS), 2019 WL 5287980, at *31 (S.D.N.Y. Oct. 18, 2019), *report and recommendation adopted in part*, 2020 WL 1329354 (S.D.N.Y. Mar. 23, 2020) (accepting short seller report as corrective). Here, Plaintiff has adequately pled loss causation by alleging that Kerrisdale revealed new, material information from its own investigation,[17] rather than negatively characterizing public information. Kerrisdale alerted investors (i) of difficulties in segregating user data for advertisers, which called into question Defendants' statements about "allow[ing] advertisers to access our audience by leveraging our technology, data, and measurability," (ii) that the Balto acquisition was inconsequential, not an

---

[17] Kerrisdale's due diligence was substantial, including (1) interviews with former senior marketing executive at Sling TV, Fox Sports, Hulu Live (other streaming apps); (2) interviews with range of market participants and boutique media firms; and (3) reliance on a third-party data analytics provider. *See* ECF Nos. 53-7 at 3, 6, 7, 15-16, 19.

24

"instrumental" "first step" into the $155 billion sports wagering business. *See*, *e.g.*, ¶¶7, 32, 35, 46, 63, 74-75, 80.[18]

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss should be denied in its entirety.[19]

Dated: September 14, 2023

**LOWEY DANNENBERG, P.C.**

*/s/David Harrison*
David C. Harrison
Andrea Farah
Scott V. Papp
Radhika Gupta
44 South Broadway, Suite 1100
White Plains, New York 10601
Telephone: (914) 997-0500
dharrison@lowey.com
afarah@lowey.com
spapp@lowey.com
rgupta@lowey.com

Anthony M. Christina (*pro hac vice*)
One Tower Bridge
100 Front Street, Suite 520
West Conshohocken, PA 19428
Telephone: (215) 399-4770
Email: achristina@lowey.com

*Counsel for Lead Plaintiff Nordine Aamchoune and the Lead Counsel for the Proposed Class*

---

[18] Defendants' authorities are inapposite because the analyst reports were neither new nor corrective. *See*, *e.g.*, *Omnicom*, 597 F.3d at 512 (accounting professors' commentary in news article raising suspicions did not disclose any new information); *Meyer v. Greene*, 710 F.3d 1189, 1201 (11th Cir. 2013) (short seller's asset impairment valuation was derived from the company's financial statements and did not involve revelations about the company's prior disclosures.); *Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*, 543 F. App'x 72, 75 (2d Cir. 2013) (information already public); *In re Arcimoto Inc., Sec. Litig.*, No. 21-cv-2143 (PKC), 2022 WL 17851834, at *6 (E.D.N.Y. Dec. 22, 2022) (information was already publicly "existing"); *In re EHang Holdings Ltd. Sec. Litig.*, No. 21 Civ. 1392 (GBD), 2022 WL 17718546, at *12 (S.D.N.Y. Dec. 15, 2022) (information previously disclosed).

[19] The SAC adequately alleges that Defendants Gandler, Bronfman and Nardi are controlling persons under Section 20(a). ¶¶138-146.  For the reasons explained above, Plaintiffs have properly pled a primary violation of Section 10(b) against Fubo. Defendants argue that Plaintiffs have failed to allege culpable participation.  Def. Br. at 25. To the contrary, the Complaint alleges that Gandler, Bronfman and Nardi made the false statements at issue and also exercised significant control over Fubo as senior executives at Fubo. ¶¶18-20, 36-37, 40, 44, 57-62, 96, 125, 129, 140.  *See In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*, 529 F. Supp. 3d 111, 150 (S.D.N.Y. 2021).

**THE SCHALL LAW FIRM**
Brian Schall
2049 Century Park East, Suite 2460
Los Angeles, California 90067
Telephone: (424) 303-1964
Email: brian@schallfirm.com

*Additional Counsel for Lead Plaintiff*

26